E-FILED
Thursday, 16 March, 2023  12:41:40 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION - Rock Island**

| | |
|---|---|
| **CHRISTOPHER CESCA, an Individual with Disabilities,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) **Case No.** |
| | ) |
| **WESTERN ILLINOIS UNIVERSITY BOARD** | ) |
| **OF TRUSTEES, & PRES. GUIYOU HUANG,** | ) |
| **each in both their Individual & Official Capacities,** | ) **Magistrate Judge** |
| | ) |
| **Defendants.** | ) **Jury Demand** |

## <u>COMPLAINT</u>

1

# TABLE OF CONTENTS

1.  EXECUTIVE SUMMARY                                                                      5

2.  JURISDICTION & VENUE                                                                   14

3.  PARTIES                                                                                15

4.  FACTS                                                                                  21

5.  Executive Functioning Deficits & Challenges Getting to Class                          22

6.  Complex Needs Require Complex Reasonable Accommodations                               26

7.  Requests for Verbal Notice of Electronic "Faculty Notifications" Denied               28

8.  WIU Assistive Technology Ineffective for Vision-based Communication & Text-to-Speech  30

9.  Pandemic Period: Unprecedented Circumstances Require Unprecedented Innovations        32

10. Low Income Plaintiff Financially Penalized for Vision-based Communication Deficits    33

11. Extracurricular Threat, Exclusion, & Retaliation by WEMS                              37

12. Food Pantry Revoked Plaintiff's Exec. Bd. Position Due to His WIFI Access Advocacy    41

13. Plaintiff's Exclusion from Extracurricular Activity                                   44

14. Another Extracurricular Retaliation by Exclusion                                      46

15. Extracurricular Faculty Advisors Approved Exclusion by Law Enforcement Fraternity (LAE)  47

16. Discriminatory Admin. Methods: No Complete Interactive Process                        51

17. Discriminatory Admin. Methods: No Routine Enforcement of Beneficial Policies          52

18. Plaintiff Assaulted for Support of Enforcement of Beneficial Policy                   53

19. Aggravated Assault Incident Report was Falsified & Delayed                            54

20. Discriminatory Admin. Methods: Stigmatization of Disability Advocacy Itself           56

21. Plaintiff's Academic Progress at WIU Tracks the RA's Provided to Him                  57

22. Discriminatory Admin. Methods: Unexplained Denials & Futile Appeals Offered           58

23. Academic Status & WIU Obstructions to Plaintiff's Degree Completion          59

24. Discriminatory Admin. Methods: Ineffective "Misuse of Electronic Devices" Policy          60

25. Discriminatory Admin. Methods: Speculative Excuses Trumped Beneficial Policy in LEJA          61

26. Discriminatory Admin. Methods: "Other Rules" Crowded Out Beneficial Policy          .62

27. Discriminatory Admin. Methods: No ADA Training Led to Exclusion of Plaintiff & Ned          .64

28. Discriminatory Admin. Methods: Pres. Failed to Stop Continuing Unlawful Conduct          .70

29. Discriminatory Criteria & Admin. Methods: Professors Independently Determine RA's          71

30. Discriminatory Admin. Methods: Gen. Counsel Duvall Delayed Evidence for 800 Days          72

31. Discriminatory Admin. Methods: Gen. Counsel Duvall Failed to Preserve Video Evidence          73

32. Discriminatory Criteria: Attendance & Course Criteria Inconsistent          75

33. Direct Public Expressions of Hostility to Plaintiff by WIU Professors          78

34. Interference, Threats, Intimidation, Coercion, & Retaliation in Response to Advocacy          80

35. Discriminatory Admin. Methods: No RA's Matched On-Line Learning          81

36. Plaintiff's Grades without RA's Measured Cognitive Deficits, Not Learning          82

37. Discriminatory Admin. Methods: LEJA Approach to Incomplete Courses Dysfunctional          83

38. Multiple WIU Promises & Tuition Payments Created Implied Contract          84

39. Due to WIU Recalcitrance, Court Action Is Plaintiff's Only Recourse Now          85

40. CONCLUSION          87

41. COUNT I - FAILURE TO PROVIDE INTERACTIVE PROCESS          88

42. COUNT II - DISCRIMINATORY CRITERIA & METHODS OF ADMINISTRATION          92

43. COUNT III - MAINTAINING A HOSTILE EDUCATIONAL ENVIRONMENT          96

44. COUNT IV - INTERFERENCE, THREATS, COERCION, INTIMIDATION, RETALIATION 98

45. COUNT V - DEPRIVATION OF RIGHTS UNDER 14th AMENDMENT (§1983)          99

46. PRAYER FOR RELIEF, Findings          105

47. Injunctive Relief - Appointment of Special Master & Purposes in Assisting Court     107

48. Injunctive Relief - Academic Adjustments for Plaintiff     112

49. Injunctive Relief - Financial Aid Adjustments for Plaintiff     114

50. Injunctive Relief - Changes in Procedures at Western Illinois University     115

51. Other Monetary Relief     116

52. COMPLAINT EXHIBIT LIST     118

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION - Rock Island

| | | |
|---|---|---|
| **CHRISTOPHER CESCA, an Individual with Disabilities,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **WESTERN ILLINOIS UNIVERSITY BOARD** | ) | |
| **OF TRUSTEES, & PRES. GUIYOU HUANG,** | ) | |
| **each in both their Individual & Official Capacities,** | ) | **Magistrate Judge** |
| | ) | |
| **Defendants.** | ) | **Jury Demand** |

## COMPLAINT

Plaintiff Christopher Cesca ("Plaintiff" or "Chris"),[1] is a low income, otherwise qualified student with disabilities, and a civil and disability rights advocate for fellow students with disabilities at Western Illinois University at all times pertinent, and Chris alleges as follows:

### 1. EXECUTIVE SUMMARY

*1*        Chris brings this action to redress violations of Section 504 of the Rehabilitation Act of 1973, as amended ("504"), 29 U.S.C. 71, 34 C.F.R; Part 104 of Title II of the Americans with Disabilities Act, as amended ("Title II" and "ADA"), 42 U.S.C. §§ 12131-12134, 28 C.F.R Part 35; and the Fourteenth Amendment of Constitution of the United States through 42 U.S.C. § 1983 ("§ 1983"). Chris demands declaratory relief, injunctive relief, and damages against the Defendants Western Illinois University ("WIU") Board of Trustees and the WIU President, Dr. Guiyou Huang, each in both their individual & official capacities, to enforce the civil and disability rights of students with

---

[1] The last name of Plaintiff Chris Cesca is pronounced "Ches'-ka."

disabilities,[2] including himself, and as a determined public advocate for such students. Chris demands a jury trial.

*2*      Defendants have a legal duty to provide access to equal educational opportunities for Chris's academic and career advancement as an eligible degree candidate under state and federal disability rights laws, including those supporting the rights of federal financial aid recipients, and to provide due process under the Fourteenth Amendment to the U.S. Constitution as enforced thru § 1983.

*3*      Chris has complex ADHD, executive function & learning disability deficits, and has been a WIU bachelors degree candidate for several years.

*4*      Chris has earned high grades in courses when WIU has implemented workable and appropriate reasonable accommodations and auxiliary services, but has done poorly or failed completely when they are not provided[3] or when Chris is otherwise discriminated against, and these have had a cumulative, compounding effect to limit his learning & graduation progress.

*5*      504 and Title II require that State instrumentalities which receive federal financial assistance and are providing programs, services and activities to the public, respectively, give people with disabilities meaningful access equal to that allowed others, and they are required to provide aids, auxiliary services, and modifications, a.k.a., reasonable accommodations ("RA's"), such as service animal access, academic and extracurricular adjustments, and policy & program modifications to accomplish this, in recognition that the failure to provide these things will often have the same practical effect as outright exclusion.

---

[2] On information and belief, a full 11% of the WIU student body have disabilities, have registered as such with WIU, and are primarily those with cognitive disabilities, like Chris.

[3] While the Plaintiff has attempted to use the WIU's disability office to obtain needed assistance, that office has proven to be unable to make many of the needed reasonable accommodations and aids, auxiliary services, & changes for the Plaintiff in the policies, programs, services & activities of WIU due to its limited resources, staffing, and authority. Relief below addresses reforms needed.

*6*      In the education context, the timely provision of RA's will allow and encourage academic success & improved career opportunities for otherwise qualified students with disabilities, such as Chris, as recognized by numerous academics in recent national surveys:

> Postsecondary faculty hold the academic fate of students in their hands—they create course content, decide how it will be presented, and design the methods to assess whether learning goals have been accomplished (Murray et al., 2008). Faculty are also responsible for accommodating students with learning disabilities (SWLD). Since learning disabilities (LDs) are hidden, faculty may question the need for accommodations, and question whether accommodations provide an unfair advantage or compromise course integrity. They may resent intrusions on their time, teaching style, and academic freedom. Yet accommodating SWLD is important to academic success and persistence and is required by law.

McCarron, E. C. (2020). Postsecondary Faculty and Willingness to Provide Academic Accommodations for Students with Learning Disabilities. *Journal of Postsecondary Education and Disability*, *33*(4), 339-352 at 339. https://files.eric.ed.gov/fulltext/EJ1293013.pdf

*7*      Instead of providing a complete interactive process to allow the cooperative design of necessary accommodations for Chris so that Chris could successfully complete all of his coursework and fully participate in student life, WIU has blatantly discriminated against the Plaintiff by, *inter alia*, refusing or ignoring most of his requested RA's, and by refusing to implement already granted RA's such as by excluding Chris and his WIU registered service animal from the library.

*8*      Chris's grades have suffered, and Chris is far behind in degree requirements, not because of any deficiency in his own capabilities, desire to learn, or work habits, but because WIU has failed to implement RA's to provide an equitable educational environment as federal & state law require.

*9*      WIU is legally required by 504 and the ADA to conduct a complete & user-friendly interactive process to gather sufficient information from disabled students and their qualified experts upon any request made explicitly or impliedly by a student with disabilities to determine what accommodations are necessary and to arrange RA's that are workable and successful.

*10*     WIU is a major local institution in the small town of Macomb, Ill; and Chris is aware that this Court may be asked to defer to the institutional administrators in these complex administrative

matters and may be tempted to assume any deficiencies are anomalous occurrences best corrected by professional, self-guided administrators in the usual course of business.

*11* To assist the Court, this Complaint takes pains to show that the opportunities for self correction have been thoroughly rejected by pertinent decision-makers all the way up to Presidents of WIU.

*12* Further, this Complaint explains in detail how WIU's discriminatory actions, omissions, criteria, and methods of administration have frequently and repeatedly blocked the provision of requested RA's, and denied any explanation of its refusals & implementation failures.

*13* This Complaint demonstrates how WIU has deliberately intimidated and retaliated against Chris at times, and as a whole how WIU has created & maintained a hostile educational environment through a continuing violation of law as to its grossly deficient interactive process that blatantly denies needed RA's to Chris.

*14* Indeed, the attached exhibits document how this has resulted in wholesale, discriminatory interference with, and denial of, Chris' meaningful access to WIU programs, services, and activites, up to and including constructive exclusion.

*15* Chris attaches these exhibits to assure the Court that Chris is not asking it to engage merely in some type of second-guessing of the professional judgment of the University faculty on narrow academic matters, but that Chris has substantial corroborative evidence for his allegations.

*16* Thus, the Court will have what it requires to enable it and any special master the Court may appoint to assist it, along with other pleadings, to form an initial understanding of the complexities of the dispute and see at least a glimmer of the opportunities for engineering a workable & successful outcome for the parties.

*17* To wit, WIU under the supervision of the Defendants has discriminated when it has:

a.) repeatedly failed to provide an interactive process for Chris' RA requests and has summarily denied them; denied him use of RA's already granted; refused to replicate its previously provided RA's that have proven to be workable for WIU & successful for Chris; and failed to provide consistent, verbal notifications that Chris requires for his vision-based communication deficits regarding key information & deadlines after repeated requests for such RA's;

b.) used discriminatory criteria & methods of administration that variously allow or promote malicious animus, deliberate indifference, thoughtlessness, apathy, and/or benign neglect of students' disability rights, including Chris' rights, among pertinent WIU decision-makers;

c.) created & maintained a hostile educational environment for Chris since he began attendance at WIU in the fall of 2018;

d.) interfered with, threatened, coerced, intimidated, and/or retaliated against Chris for his advocacy for the rights of students with disabilities and himself; and

e.) denied Chris due process as to his constitutionally protected rights arising both from his property rights in the implied contract created between Chris & WIU and from his liberty interest in accessing education at this state university.

*18*      WIU's discriminatory criteria[4] & methods of administration routinely mismanage Chris's education, such as by forcing Chris into a seemingly endless loop of inequitable & discriminatory bureaucratic requirements to retake failed coursework provided without proper RA's, or requiring repetitive, time-consuming appeals that are known to be futile[5] for a student with disabilities for each

---

[4] Denials of requests for RA's have included express ignorance of legal requirements in statements such as, "if we do it for you, we have to do it for everybody."

[5] "The Council on Admissions, Graduation and Academic Standard ("CAGAS") is a Faculty Senate Council that considers undergraduate student appeals concerning various academic matters, including admission, readmission, New Start, semester hour overload, late registration, late withdrawal, class/section switches, and graduation substitution/waivers. CAGAS also serves as the University level committee for undergraduate Grade Appeals and Academic Integrity Appeals." It is acknowledged to have no authority over RA's, making appeals of matters requiring RA's for their full resolution quite

failed course because these appeals are without hope of an effective remedy for underlying

discriminatory treatment that continues in violation of law, even when appeal is otherwise successful.

*19*    Further, in reckless interference with the rights of, and/or in deliberate retaliation

against, Chris, the Defendants have used denial of his requested RA's to isolate Chris from nondisabled

students by excluding Chris formally from various student activities, and by isolating, and segregating

Chris from the student body, most recently and most ironically perpetrated by WIU's authorized

Lambda Alpha Epsilon ("LAE") law enforcement fraternity, rather than "administer [its] services,

programs, and activities in the most integrated setting appropriate to the needs of qualified individuals

with disabilities" according to law.[6]

*20*    This continual act of unlawful discrimination has been a pattern and practice by the

Defendants and their authorized agents since Chris initially came to WIU in late summer of 2018, and

it has physically, psychologically, & financially exhausted Chris.

*21*    This continual act also requires Chris to work especially hard in several ways as a self-

advocating student with a disability: first, Chris must work hard to navigate this bureaucratic gauntlet

while struggling to find the resources for the fees required.

*22*    Chris must work hard to take & retake courses required for his initial major of Law

Enforcement & Justice Administration ("LEJA") and for his double major that adds Economics.

*23*    Second, Chris must attempt to arrange RA's where Chris anticipates that his disabilities

will limit his educational opportunities in a scheduled course, which is most of the time.

---

futile there. See http://www.wiu.edu/registrar/cagas/appeal_instr.php (last visited 1/12/22).

[6] 28 C.F.R. § 35.130(d) (the "integration mandate;" the preamble discussion for this regulation explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ." 28 C.F.R. Pt. 35, App. A (2010) (addressing § 35.130). See *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) (enforcing the integration mandate regarding publicly assisted housing for persons with disabilities) and its progeny. There the Supreme Court held that "unjustified institutional isolation of persons with disabilities is a form of discrimination." *Id.* at 600.

*24*      Third, Chris must then work harder still in class to study complex course material that Chris must struggle to absorb without workable & successful RA's in and out of class

*25*      Fourth, Chris must advocate for beneficial implementation of existing WIU rules & policies that when mismanaged have added obstacles, but if administered properly, would benefit Chris, as explained below.

*26*      Sometimes this discrimination means Chris is unable to retake courses in time to recall and benefit from foundational material from his lower level courses or from the same course, when responses to requested RA's are ignored or willfully delayed.

*27*      Sometimes this discrimination means Chris is disadvantaged in scheduling required courses since Chris must identify & sign-up for infrequently repeated courses, or compete with fellow students for a seat in such courses with limited enrollment capacities before they are filled, and this has been made even more difficult with the greater logistical limitations during the long COVID-19 pandemic ("pandemic").

*28*      Moreover, by its often predatory methods of administration, WIU inequitably demands payment for one or more re-takings of a course even though the original course was provided without the RA's Chris required and had requested.

*29*      By this at times facially neutral skulduggery, WIU unfairly benefits from its own acts of disability discrimination and further impoverishes the low income Plaintiff by assessing a variety of excess fees, fines, and charges against Chris, although WIU administrators have reason to know that it will reduce the amounts that may remain available to Chris in his financial aid package with which to supplement his reported living expenses.

*30*      On information and belief, *all* charges to Chris' federal financial aid funds for courses from which Chris does not benefit, as apparent by his low grades resulting from the denial of RA's,

constitute an illegal, fraudulent practice since WIU and the Defendants here have reason to know that Chris is not benefiting and *could not benefit* from that coursework when it charges him for it.

*31*    WIU accomplishes this by compelling Chris under great financial duress to agree to multiple, related deductions from his financial aid package in order to continue his academic degree program with his remaining allotment, in full knowledge that this has the effect of reducing the remaining funds available for his needed living expenses, but also knowing it is an offer the low income Plaintiff cannot refuse since the strong do what they can and the weak suffer what they must.

*32*    These charges have repeatedly and unjustly enriched WIU as it uses Chris' federal financial aid allotment to pay again for the same course every time Chris is forced to retake it, and it levies course charges even though the payment for re-taking is without commitment for, or provision of, the RA's needed to allow Chris to understand or be successful in retaking the coursework, often from the same instructor who independently refused the requested RA's for the originally taken course.

*33*    While select WIU instructors have worked with Chris one-on-one during office hours for students, and by appointment, resulting in empirical success, including excellent grades and spontaneous praise from them, other WIU instructors, staff, and authorized agents have expressed or demonstrated recklessness, callous disregard and/or malicious animus towards Chris for his frequently identical RA requests of them.

*34*    The reality of this malice is not pretty: the WIU staff and its authorized agents have demonstrated this animus to Chris in writing; humiliated, coerced, and intimidated Chris verbally in public in the presence of fellow students; interfered with his participation in WIU programs; and retaliated against Chris for his disability and for his legitimate advocacy for students with disabilities, including for his own self-advocacy.

35      WIU, and quite a few of its instructors, staff, and authorized agents who have been gratuitously allowed final control of RA's,[7] create such burdens deliberately in order to exhaust Chris' as a student with disabilities, to thwart his self-advocacy, to discourage his requests for RA's, and to set him up when he persists toward degree completion by denying him RA's, to fail his courses, or to provoke him to quit the university altogether, all in defiance of the "integration mandate" at 28 C.F.R. § 35.130(d).

36      These discriminatory acts, omissions, and constructive exclusions result from deliberate indifference to the rights of Chris as an otherwise qualified student with disabilities, or from actual malice that at times has been documented by Chris.

37      Thereby, WIU has increased and continues to lengthen Chris' academic servitude; to increase his personal financial liability, including current living expenses & debt; to isolate and alienate Chris from academic pursuits; to isolate Chris socially & segregate him from fellow students; to delay his productive professional career; to "tone police," "gaslight," & ridicule Chris; to limit his occupational prospects, and to exacerbate his preexisting severe depression and anxiety, and cause him post traumatic syndrome disorder.

38      While under the care of a medical professional who is ready & willing to testify, Chris has had to undergo more extensive counseling, and has had to take anti-depressant prescription medication to defend his well-being because of this interminable mistreatment by the Defendants' continuing violation of law over several years.

39      Much of this is also in violation of the terms of the implied contract formed, *inter alia*, by the promises made to Chris that he has relied upon in attending WIU while paying tuition, and they have been broken repeatedly.

---

[7] WIU President Dr. Guiyou Huang, admitted to the Plaintiff during a video recorded personal meeting with the Plaintiff that instructors have the authority to determine RA's on their own for students with disabilities in courses they teach.

*40*      WIU breaches the terms of this implied contract which are property rights, and WIU also violates his liberty interests in accessing education at this state university, both of which are protected by the Fourteenth Amendment, but WIU denies due process of law regarding both.

*41*      As a low income student, Chris is currently is unable to pay for yet another duplicative and duplicitously required retaking of courses; WIU must commit to providing RA's during any retakings required in order for Chris to graduate and promptly begin a career in law enforcement.

*42*      Chris seeks certain declarations that the actions of the Defendants have been and continue to be discriminatory in its criteria and methods of administration, especially its alternately detrimental lax, and then rigid, enforcement of pertinent rules, including its written policies, published rules, regulations, codes, and/or practices, such as its Misuse of Electronic Devices Policy[8] and its Recruitment & Retention Policy[9] that WIU uses to his detriment.

*43*      WIU has harmed and is harming Chris emotionally, academically and financially by these actions and omissions that form a convincing mosaic of discrimination here, and for this harm, in addition to declaratory relief, Chris seeks injunctive relief and compensatory & punitive damages, to the extent allowed by law, along with the costs of this action, including reasonable attorney fees, through a trial by a jury of his peers to the extent allowed by law.

## 2. JURISDICTION & VENUE

*44*      This Court has the authority to grant the relief sought under 42 U.S.C. § 12133, and 28 U.S.C. §§ 2201 and 2202, and 28 U.S.C. §§ 1343 and 1344, and this case is filed under federal question

---

[8][Misuse of Electronic Devices (See Section D.24.) - Cellular phones, pagers, and other electronic devices may not be used in a manner that causes disruption in the classroom, library, or within college-owned or operated facilities.], students having overt conversations in class [D. Regulations for Student Conduct - 7. Disrupting or obstructing teaching, research, administration, other University activities, including its public service functions on or off-campus, or of other authorized non-University activities when the conduct occurs on University premises.] WIU Code of Student Conduct, Policy Statement I, Misuse of Electronic Devices. https://www.wiu.edu/student_success/srrri/codeofconduct.php

[9] This WIU policy is apparently implemented by its Office of Retention and by WIU Department heads.

jurisdiction under 28 U.S.C. § 1331; the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. ("504") and 34 C.F.R. Part 104; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA" or "Title II"); and § 1983.

45      Venue is proper here as the pertinent actions have occurred and the parties reside or conduct business within this District in Macomb, Illinois.

## 3. PARTIES

**Plaintiff Chris Cesca**

46      Plaintiff Chris Cesca is a 36[10] year old male student who has been enrolled since late summer of 2018 at WIU's Macomb Campus and has lived with his service animal, a dog named Ned, in Macomb, Illinois, where Chris still resides.

47      Chris is an individual with multiple, profound disabilities that, while often dismissed to his detriment as not serious because they are not obvious to the casual observer, are acutely and functionally debilitating in educational and other environments.

48      Chris' disabilities substantially limit one or more of the major life activities, including reading & learning; Chris has a record of such impairments; and Chris is regarded as having such impairments, consistent with 34 C.F.R. 104.3(j)(2)(i) and the ADA. Exhibit 1, Lt from Larry S. Wexler, PhD to WIU Pres. Huang dated 2/22/21. Exhibit 7, DRC Accommodation Request Form for C. Cesca dated 7/17/18 (plus subsequent documentation of disabilities).

49      Chris is further regarded as having such disabilities due to being subjected to actions prohibited under 504 and the ADA by WIU staff because of a perceived impairment of, whether or not

---

[10] Federal law enforcement positions have a maximum starting age of 37 years old at hiring; Chris intends to apply for a job with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("AFT").

the impairment limits or is perceived to limit, at least one of his major life activities. *Id.* Exhibit 24, Emails C. Cesca and Professors Engaged in Disparaging Remarks about Chris, dated 8-23-21.

*50*    Due to his disabilities at all times pertinent, Chris has been substantially limited in several major life activities, including, but not limited to, concentrating, thinking, communicating, comprehending & retaining, reading, and learning, consistent with 34 C.F.R. 104.3(j)(2)(ii). Exhibit 1, Lt from Larry S. Wexler, PhD to WIU Pres. Huang dated 2/22/21; Exhibit 7, DRC Accommodation Request Form for C. Cesca dated 7/17/18.

*51*    At all times pertinent, Chris has been an outspoken and assertive advocate for the rights of students with disabilities, including himself, and when provided with appropriate resources, has met and continues to meet the academic and technical standards requisite for admission and participation in WIU's educational program, services and activities. Exhibit 9, Official Western Illinois University Transcript for Chris Cesca dated 1-21-22.

*52*    Due to the repeated discrimination by WIU, Chris was not enrolled for the Fall 2022 semester, and Chris is not enrolled for the current semester, Spring 2023, because of his constructive exclusion and the compounded failures of WIU in this regard.

*53*    Yet Chris also has been billed for immediate payment on part of his debt to WIU, court action is threatened by WIU, and Chris will not be allowed to register for classes until it is fully paid or payment arrangements are made.

*54*    Chris has a long and complex history of deficits in learning that clearly emerged first when Chris was in 4th Grade at 9 years of age.

*55*    At 28 years old and after much earlier academic and personal achievement well below his potential at Holy Cross College and U. of Missouri, among others, Chris was first diagnosed with

the impairments of severe attention deficit/hyperactivity disorder[11] ("ADHD"); learning disability ("LD") that manifests as a severe reading comprehension deficit; severe depression & anxiety; and executive functioning disorder. *Id.*

56      Executive functioning is a multidimensional concept referring to higher-order brain functions necessary for individuals to *execute*, or perform, tasks, and examples of these brain-based functions include the ability to effectively manage one's time, plan ahead & organize, and carry out activities with multiple steps.[12] Exhibit 1, Lt from Larry S. Wexler, PhD to WIU Pres. Huang dated 2/22/21.

57      Under circumstances of tremendous pressure, Chris can briefly force himself to write and speak clearly and effectively; but it is with disproportionally greater effort, and then only for a brief period of severely taxing work, making his disabilities seem to disappear to the casual observer, but greatly increasing his anxiety. *Id.*

---

[11] Here, it is relevant to the Plaintiff that executive functioning problems are seen in various diagnoses, such as Attention-Deficit/Hyperactivity Disorder (ADHD), Depressive Disorders, Learning Disabilities, and Anxiety Disorders, yielding cumulative adverse effects.

[12] Executive functioning is multidimensional; scholars list eight different domains of executive functioning (e.g., Gioia, Isquith, Guy, & Kenworthy, 2000). Behavioral descriptions of these eight domains are:

**Inhibit:** difficulty controlling impulses, appropriately stopping one's own behavior at the proper time;

**Shifting:** moving freely from one situation or activity to another, solving problems flexibly;

**Emotional Control:** appropriately modulating emotional responses;

**Initiate:** beginning a task or activity and independently generating ideas;

**Working Memory:** holding information in mind for the purposes of completing a task;

**Planning and Organization:** anticipating future events, setting goals, and developing appropriate steps ahead of time to carry out a plan;

**Organization of Materials:** keeping work space, recreational & work areas, & materials orderly; and

**Monitoring:** checking work for errors and tracking how one's own behavior impacts others.

58     Medical professionals have confirmed that Chris' condition amounts to a vision-based communication and behavioral disorder that intermittently and adversely affects his ability to understand or use language and speech to communicate with others; it is not a mental illness but a cognitive disability.  Exhibit 7, DRC Accommodation Request Form for C. Cesca dated 7/17/18.

59     Chris' multiple deficits make it difficult to learn and effectively utilize interpersonal and social interactions & relationships, and common social cues, and his medical professional has stated Chris has autism spectrum disorder. *Id.*

60     As a lifelong condition, these deficits create several academic difficulties for Chris, such as being unable to sustain attention due to his extreme distractibility, then having difficulty re-attending to the task from which he was distracted, and this distractibility has been regularly triggered by classroom settings hampered by student chatter, buzzing and flashing devices, including cell phones, laptops and smart watches. *Id.*

61     Chris also has sleep apnea which makes alertness a frequent challenge, and it makes appointments and class schedules, especially those early in the day challenging; Chris has been seeing a somnologist & otolaryngologist, Clare Kenneally, M.D., for treatment for around 10 years, yet, Chris has an exemplary attendance record when allowed to attend classes. *Id.*

62      At all times pertinent, as a low income person Chris must participate in federal financial aid, grant & related programs to attend WIU and supplement his living expenses. Exhibit 9, Official Western Illinois University Transcript for Chris Cesca dated 1-21-22.

63     In the Summer of 2021, WIU provided no offering of in-person classes, at least none that applied to Chris' degree program; only online classes were offered; and because low income student grants help with his living expenses, Chris was without critically needed supplementary living funds.

64    Tragically, there was no WIU emergency financial plan for this eventuality during that summer, despite the fact that funds were previously, if sporadically, made available through stimulus money, that had provided Chris with $2,200 & $1,000, now leaving Chris in the lurch financially.

65    Chris last enrolled for the Spring 2022 Semester, but received an incomplete grade in most of his courses due to the inability to perform in the face of the pattern of discrimination by the WIU and many of its instructor's refusals to provide RA's. *Id.*

66    Therefore, as of the spring of 2023, Chris was at an impasse; WIU had not initiated contact with Chris since prior to the Summer semester of 2022 or during it; no classes were conducted in person during the Summer; and no classes needed for degree completion were offered in person.

67    Enrolling then or for Spring 2023 without resolution of these problems would have been counterproductive, practically out-of-reach, and prohibitively futile, and WIU has barred Chris from registering for courses until Chris resolves a debt, including a debt for not completing two courses during the pandemic which Chris could not complete for the reasons stated herein.

68    The resulting harms that are occurring to Chris are many; psychologically, Chris is exhausted and at his wits end, as anyone would expect Chris to be after dozens of to go through the "proper channels" to obtain reasonable and appropriate responses from WIU.

69    Financially, Chris is beleaguered by obligations resulting from the unnecessary and avoidable delays during his time spent at WIU.

70    Academically, Chris is being artificially held back from completing his degree by WIU's failure to reasonably, consistently and reliably provide the RA's Chris needs; WIU knows Chris would use them effectively to achieve superlative grades as Chris overwhelmingly did up to the pandemic starting in the Spring Semester of 2020. *Id.*

71    Occupationally, Chris accepted a formal invitation to pursue a double major in Economics due to his superior academic achievement, and Chris expects a dual degree in LEJA and

19

Economics, but Chris knows that the graduation delays have and are diminishing his opportunities; some of the federal law enforcement opportunities Chris desires and for which Chris would be well qualified Chris may miss through no fault of his own, have an age ceiling of 37 that Chris will exceed in winter of 2024.

*72*     Chris has not requested any accommodations that would result in a fundamental alteration of a program, service, or activity, or one that WIU has not already provided as an established precedent.

*73*     Chris has not attempted to impose an undue burden on WIU, nor has WIU shown, especially in writing, that an undue burden has been requested or created; and all such requests have comported with the nondiscriminatory WIU policies as found on the WIU website under WIU Home policies to the extent they are consistent with existing law.

**Defendant WIU Board of Trustees**

*74*     Defendant WIU Board of Trustees is a body politic and corporate that has the legal authority and responsibility to operate, manage, control, and maintain WIU as an instrumentality of the State of Illinois per 110 ILCS 690/35-1 *et seq*.

*75*     WIU is a public entity that is covered by 42 U.S.C. § 12131(1)(B) and 28 C.F.R. § 35.104, as it receives & manages federal funds.

*76*     WIU also operates various health, welfare, and/or other social service programs or activities for those students at its main campus and principal place of business located in the City of Macomb in McDonough County, Illinois.

*77*     WIU has a substantial endowment; it allocates and distributes federal financial aid program funds to students, including to Chris at times.

*78*     WIU is required to provide students with appropriate academic adjustments and auxiliary aids & services that are necessary to afford an individual with a disability an equal

opportunity to participate in the school's program; and WIU must assure its compliance with law as a condition of its participation in federal financial aid programs.[13]

79    WIU holds itself out to the public as a university whose major academic emphasis is its LEJA program which promised "an internationally known, top criminal justice/public safety program," on which Chris has relied since he applied for admission to WIU to take coursework toward, *inter alia*, a major in LEJA since 2018. Exhibit 3, WIU Website Screenshot, LEJA Promotion (last visited 1/12/22 at http://www.wiu.edu/coehs/leja/).

**Defendant President Guiyou Huang, PhD.**

80    Dr. Guiyou Huang is President of WIU and functions as its chief executive officer; he is responsible for the administration of WIU, and he reports to, and is accountable to, the Defendant WIU Board of Trustees; he is the third President in over three years;[14] and his immediate predecessor was Interim President Martin Abraham.

81    At no time to date has Dr. Huang as President of WIU, nor has any of his designees, demonstrated that any of the Plaintiff's requested reasonable accommodations would result in a fundamental alteration in the nature of any service, program, or activity or in undue financial and administrative burden for WIU, nor have any of them provided evidence of such to Chris.

## 4. FACTS

82    Chris has requested explicit or implicit requests for RA's, whether made verbally, by nonverbal communication, or in writing; this is true whether Chris or the pertinent university employee

---

[13] 34 C.F.R. § 104.5 Assurances required. (a) Assurances. An applicant for Federal financial assistance to which this part applies shall submit an assurance, on a form specified by the Assistant Secretary, that the program or activity will be operated in compliance with this part.

[14] It is difficult to track who is responsible for organizational functions & methods of administration at times because top WIU Administrators change roles and titles so frequently.

or agent knew it or not at the time each communication was made, regardless of the formally established system for requesting RA's at WIU.

83      Due to Chris' deficit in executive functioning, Chris cannot effectively manage the logistics of coordinating the public bus schedule and the walk of two blocks from his house to the public bus stop to use the free, public Go West bus service, since the more travel stages that are required, the harder it is for Chris to complete the journey and get to class on time; moreover, the service was characteristically unreliable. Exhibit 1, Lt from Larry S. Wexler, PhD to WIU Pres. Huang dated 2/22/21.

84      Chris has a record of not effectively managing such logistics in personal travels, but Chris also has a record of being academically penalized for being late when it was beyond his control since grade school. *Id.*

5. <u>Executive Functioning Deficits & Challenges Getting to Class On Time</u>

85      When Chris began at WIU in the fall of 2018, Chris lived two miles from WIU's Stipes Hall where Chris took classes, and Chris could not predictably plan his 20 minute walk to be at the classroom at the start of class;[15] the only other way to get to campus is for Chris to use his truck and drive to the campus parking lot.

86      Typically, Chris drove with his service animal and parked at the nearest lot across the street, west of Stipes Hall where Chris has usually attended classes, but WIU Office of Public Safety ("OPS") Parking Enforcement has required Chris to pay to park there.

87      However, Dr. Wexler has provided a professional recommendation that Chris be allowed to park anywhere on campus without penalty due to his disabilities which preclude his capacity to adhere to typical parking protocols. *Id.*

---

[15] Chris has had this problem since childhood when he tried to use public transportation, and he would be regularly late for classes when he used it.

**Chris Fined for Disabilities Preventing Chris from Selecting a Proper Parking Space.**

*88*    Parking presents major challenges for Chris due to his reading comprehension deficit that greatly reduces his understanding of the intent of the WIU parking signage, as well as due to his executive function deficit that makes multiple, sequential directions hard to follow. *Id.*

*89*    Just prior to the fall 2018 semester, Chris received his first parking ticket after parking in one of the Macomb Campus Parking Lots across the street from Malpass Public Library; the ticket was for a $50.00 fine; and on this first occasion, Chris was simply unable to understand where to park due to his reading comprehension deficit that make the parking signs visually inscrutable to Chris. *Id.*

*90*    Chris appealed the ticket; Chris explained his mistakes were due to his deficits; subsequently, Chris requested parking accommodations, even though Chris did not realize its legal import at the time; but his requests for RA's were ignored, then denied summarily without explanation.

*91*    By this notification of his disabilities and request for accommodation, the neurotypical WIU staff ignored their responsibilities to engage in a continuing interactive process by not working to find mutually agreeable RA's; effectively terminated the interactive process without proper explanation; and by the obstruction and failure to respond, WIU showed its staff was not acting in good faith toward Chris as a student with cognitive disabilities.

*92*    Instead, WIU coerced Chris into accepting a reduction to a $10.00 fine if Chris bought a $70.00 "hang tag" which is a tag hung from a rear view mirror for parking by those in the general student body.

*93*    Chris paid the fine and the fee for the hang tag under duress and under protest because Chris had no reasonable alternative transportation due to his disabilities. Exhibit 4, Western Illinois University History Snapshot Transaction Detail for C. Cesca dated 11/9/21.

94      These WIU denials of requests for RA's violated Chris' rights as a person with

disabilities & has severely interfered with his participation in programs, services, & activities of WIU.[16]

**Repeated Denials of Parking RA's & Failures of an Interactive Process to Determine RA's.**

95       The Macomb Campus parking lots have over 11,000 parking spaces for the approximate

maximum of 6,000 vehicles of students and staff attending the WIU Macomb Campus, but those lots

are underutilized during the summer semester and semester breaks, and the parking lots are never

completely full.

96      Upon discovering his vehicle was missing, in lieu of attending classes, Chris called OPS

Parking Enforcement which informed Chris it was towed.

97      Since the vehicle was impounded, Chris met with V.P. John Smith, who took Chris and

Ned, his service animal, to the towing facility, had the vehicle released to Chris, and in this instance,

Chris was not required to pay for the tow; most RA disputes have not ended as inexpensively for Chris.

**Towing Increased Parking Fears for Chris**

98      Before the pandemic pervasively spread in early 2020, Chris attempted to go through

Bill Polley, the then-V.P. of Admin. Services at WIU, to request an RA for his disabilities in the form of

parking without penalty or undue cost in any open parking space that was not legally required to be

allocated to other parties or for special purposes.

99      On November 14, 2019 after a three hour meeting, V.P. Polley told Chris that as to his

request for RA's, Polley would "work on it," but unfortunately Polley left his position as V.P. before the

parking accommodation was resolved, and thereafter he has only functioned as a Professor in the

Economics Dept, including serving as Chris' Economics Professor.

---

[16] 34 CFR 104.4(a) "General. No qualified handicapped person shall, on the basis of handicap, be
excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination
under any program or activity which receives Federal financial assistance." See also 28 CFR 35.130(a).

*100*    On January 21, 2020, V.P. John Smith, offered to meet with Chris regarding parking issues; and on January 24, 2020, Chris responded and asked that Angie LaFrance, Coord. of WIU's Disability Resource Center ("DRC"), now called the Student Development and Success Center ("SDSC")("DRC/SDSC" collectively), attend the meeting. Exhibit 6, Email Chain from V.P. Smith to C. Cesca re Offer of A.M. Mtg w Counter of Later Mtg.

*101*    On January 29, 2020, Chris & V.P. Polley exchanged emails in which Polley bowed out of administrative matters. *Id.*

*102*    On January 30, 2020, the parking issue resurfaced when Chris used his friend's car which was towed from the Macomb Campus parking lot by the OPS Parking Enforcement.

*103*    Chris then met with WIU Provost Mark Mossman about parking accommodations, who discounted Chris' needs and refused his parking accommodation.

**Discriminatory Penalties for Parking Errors**

*104*    When the pandemic gained force after March of 2020, WIU switched entirely to an online class format, but currently the parking accommodations are still unresolved for Chris, and WIU's parking services continue to be inaccessible as a whole or in their entirety, which constructively excludes Chris from full WIU program access when Chris needs to go to the WIU campus.

*105*    As of March of 2022, Chris had been assessed about a half-dozen additional parking tickets from the Spring 2022 Semester.

*106*    Chris' vehicle was once towed when Chris mistakenly parked in the wrong space due to his disabilities; as a result, Chris retains a constant sense of anxiety that his vehicle will be towed and defaced with stickers again when Chris tries to use any campus parking facility to attend class or transact business with WIU so he has restricted his use of campus facilities where possible.

**Multiple Undue Charges Required to Be Paid to Continue Enrollment**

*107*     Parking fines are substantial; when added to charges during the time Chris has attended WIU, Chris has been unfairly assessed about $2,500, including parking fines, other penalties, undue fees, unneeded health insurance, and things called "finance charges," which are actually late fees.

*108*     Chris still paid substantial charges to attend Spring 2022 classes; WIU demands payment before Chris is allowed to enroll for the next semester; and when enrolled, WIU usually deducts monies from his financial aid package, consisting entirely of subsidized loans, MAP Grants & Pell Grants. Exhibit 5, Student Advisor M. Eskridge Summary of WIU Requirements for C. Cesca for Spring 2022 Attendance.

**6. Chris' Complex Needs Require Complex Reasonable Accommodations**

*109*     During Chris' first semester at WIU in the fall of 2018, Chris did not understand the WIU responsibilities about RA's or its interactive process duties, but Chris registered with the Disability Resource Center ("DRC"), now the Student Development and Success Center ("SDSC") (collectively "DRC/SDSC"), anyway because Chris knew he needed accommodations to be successful. Exhibit 7, DRC Accommodation Request Form for C. Cesca dated 7/17/18.

*110*     Unfortunately, DRC/SDSC's promoted role[17] of handling accommodation requests of disabled students broadly exceeds its actual function: it only issues minimal directives for RA's based on what its staff's subjective notions of acceptability are, regardless of the applicable law or what the

---

[17] "The role of Disability Resources in the SDSC is to facilitate equal access to University classes, programs, and activities for students with disabilities. Because access is a shared University responsibility, the SDSC serves as a resource for faculty, staff and administrators on creating accessible and inclusive environments. While WIU is committed to access and inclusion, it is not possible to anticipate all barriers that might exist for individuals with disabilities. Therefore, *the SDSC is the campus department designated by the University to work with students through an interactive process to determine disability and hear requests for reasonable accommodations.*" https://www.wiu.edu/student_success/disability_resources/ (last visited on 2/24/22).

student's actual, documented educational needs may be, and it has not provided proper interactive process because it too does not state clear reasons for denying or reducing RA requests.

*111*     Moreover, WIU President Huang has personally admitted to Chris that instructors can issue *their own RA's independently*, resulting in no true, central authority for making final RA determinations at WIU, and DRC/SDSC does not apparently monitor responses to RA requests by others.

*112*     This means Chris has had to continually request RA's from each course instructor or program official each time Chris takes or retakes a WIU course or begins a program, not knowing when he will be able to obtain what he needs to complete the course or program successfully.

*113*     This unsupervised decision-making is so decentralized it also results in a wide variance in the criteria used to determine RA's by the instructor or program official, causing frequently arbitrary and capricious decisions, allowing for effectively discriminatory criteria and methods of administration being applied to Chris' RA requests without institutional controls.

*114*     This includes such wildly illegal and nonsensical responses to Chris' requested RA's as "if we give it to you [Chris], we would have to give it to everybody else," even though his disabilities and his resulting educational needs are unique to Chris as an individual with disabilities, not common characteristics of students generally.

*115*     Further, Professors frequently diminish, dismiss, or demand gratuitous evidence of Chris' needs, characterizing those needs as frivolous by repeating hearsay that blames Chris, such as "from what I heard, you just didn't do the work you were supposed to do" or that questions his disabling characteristics "there doesn't seem to be anything wrong with you," despite WIU's formal authentication of his disability when he registered with DRC/SDSC.

*116*     By default, the final determination of RA's beyond the boilerplate offerings has been yielded to each individual instructor, teaching assistant, program staff person, and program authority

within WIU without the Defendant WIU President or the WIU Board of Trustees providing effective oversight of these decisions, even when expressly requested by Chris; but Chris' requests of these Defendants mean these Defendants have reason to know of WIU's treatment of Chris.

117    This decentralized decision-making is a discriminatory process since an identical RA request can be approved by one instructor and denied by another, even after that RA has already proven to be workable and effective, as has already occurred to Chris several times.

118    Such arbitrary and capricious conduct cannot be justified under the guise of academic freedom or otherwise as it effectively, decisively, and constructively excludes Chris from participation in the programs, services, and activities of WIU.

119    The Defendant WIU President has even failed to act to prevent discrimination against Chris as an otherwise qualified student with disabilities when requested in person.

120    This includes the President's refusal to grant proper RA requests when refused by underlings in WIU, even though Chris personally apprised the Defendant President of the details and the serious harm to Chris that the refusals caused.

**7. Requests for Verbal Notice of Electronic "Faculty Notifications" Denied**

121    It is the practice of the DRC/SDSC to email "faculty notifications" of RA's to the pertinent faculty after the intake of students with disabilities who decide to participate & request accommodations, like Chris did.[18]

122    Since the DRC/SDSC is intended to function as an anonymizing intermediary between the professors and all other pertinent parties, its "faculty notification" mechanism is meant to apprise

---

[18] Alternatively, on information and belief, OPS could use its automated emergency alert system that regularly sends texts to students, and thereby send notifications to only those students with vision-based communication deficits, like Chris.

such parties of, and document for the student making the request, any initial RA's granted, and this is regularly done by email only.

*123* However, the RA's issued by the DRC/SDSC are characteristically a few boilerplate items, like use of a laptop for note taking or extended test taking time, that are widely applied but that fail to reflect the complexities of the educational needs of students due to their disabilities, and they are typically unresponsive to all of the documented needs of Chris.

*124* As Chris continued to learn how to ask for help at WIU and the limitations of DRC/SDSC assistance, Chris began to pursue requests with individual professors.

*125* Of course, the RA's needed for Chris's multiple disabilities have varied by the type, difficulty, and content of his classes, and Chris later used a variety of formal and informal ways of requesting the different RA's Chris needed, both explicitly and implicitly.

*126* Though Chris has tried to approach this in a systematic way, Chris has predominantly requested RA's verbally by asking Professors and teaching assistants ("TA's") for what he believed were the strategic methods for his success in each class at virtually every chance.

*127* Then, Chris would verbally appeal to Dept. Chairs, Administrators and the Presidents of WIU as Chris has frequently been forced to go up the chain of command to appeal denials of RA's.

*128* Chris pursued these appeals until the administration simply acquiesced to the relevant custom, policy or practice as they were followed or not followed by their underlings to deny the RA request, or until the continued appeal became clearly futile in the then-current situation.

*129* Chris has specifically and repeatedly requested verbal notice to Chris of the faculty notifications of RA's, with emailed copies of the notifications provided, but only used as backup documentation; verbal communication is habitually resisted and systematically avoided by WIU employees and authorized agents involved in RA decision-making.

**8. <u>WIU Assistive Technology Ineffective for Vision-based Communication & Text-to-Speech.</u>**

*130*     Ironically and in spite of repeated attempts to use WIU electronic technologies, Chris has found that those technologies are inaccessible to qualified individuals with vision-based communication deficits, like Chris, and WIU has not ensured that such parties can reasonably access WIU's curricular and co-curricular materials that are equivalent to access provided to non-disabled students. *Id.*

*131*     Persistently, without apparent consideration of alternatives in such cases, the Defendants require the use of assistive technology ("AT"), especially in the form of aids and services,[19] that is ineffective, such as inaccessible speech-to-text software on its website, and WIU requires regular email or written notice on those website screens that further confuses Chris visually.

*132*     The Defendants failed to deploy the accessible course management, assignment, & website software that students with vision-based communication disabilities, including Chris, need to be able to use their own text-to-speech software on their own laptops to access courses courses are online, especially when only online courses are given.

*133*     Although Chris has requested aids and services or AT services to use with the WIU website, such requests and attempts have also proven futile and no written statement of the reasons for refusal were provided. *Id.*

---

[19] "'The ADA uses the term "auxiliary aids and services" ("aids and services") to refer to the ways to communicate with people who have communication disabilities."' U.S. Dept. of Justice, Civil Rights Div.  https://www.ada.gov/resources/effective-communication/

134     In fact, Chris tried to use Speechify, a text-to-speech software application program, and told uTech[20], the WIU technical service for students, that Chris couldn't use it effectively, and requested RA's. *Id.*

135     However, the Utech refused and indicated RA's were not something it provided, and it refused to provide any usable text-to-speech software to Chris that would work. Exhibit 8, Email Chain uTech #7735 Refusal of RA for C. Cesca re Electronic Access, dated 9/19/21.

136     This express refusal to modify an existing program was unreasonable and discriminatory on its face since uTech is the sole technical arm of WIU able to address such requests, but also because there was no consideration given to the latest development and advances in pertinent technology that might have proven workable for WIU and successful for Chris.

137     To attempt access with WIU websites, Chris had subscribed to Speechify Premium and paid the first year promotional price of $69.50/yr, but it was ineffective in accessing WIU websites, in doing homework, in accessing course textbooks, etc; Chris requested a refund but could not get a refund. *Id.*

---

[20] "University Technology (uTech) is a division of Academic Affairs at Western Illinois University.  Its mission is to provide secure, reliable and high-speed technological infrastructure; an efficient, effective operations environment; integrated information management solutions, and other high-quality, timely services and support to the Western Illinois University community to advance the University's goals and objectives while reflecting its core values: Academic Excellence, Educational Opportunity, Personal Growth and Social Responsibility.

The Center for the Application of Information Technologies (CAIT), which is part of University Technology, was chartered by the Illinois Board of Higher Education in 1996. CAIT's mission (as described in the 2013 IBHE Program Review) is to develop, deploy, and support online learning systems and applications for educational entities, businesses, public agencies, and not-for-profit organizations. It is 100% self-funded through the grants/contracts for services it provides both to the University and to outside clients." http://www.wiu.edu/university_technology/about/ (last visited 2-24-23).

31

*138*     No WIU website allows verbal communications via use of AT software that might be

readily available to Chris, even though WIU intends that much learning is done via access to its

websites, and that denies Chris electronic access to coursework and the WIU community. *Id.*

*139*     In addition to this RA violation of Title II and 504, it also appears that no web access at

WIU complies[21] with the current version of the Web Content Accessibility Guidelines (WCAG),[22] the

current standard for website accessibility, therefore additional aids, auxiliary services, & RA's are

required to achieve accessibility of the communications between WIU and individuals with vision-

based communication disabilities, like Chris.[23]

*140*     Ironically, this inaccessibility also extends to electronic "faculty notifications," which

other than notify faculty of DRC/SDSC-granted RA's, are intended to relay confirmation to the student

with a disability that his faculty member has been notified of the student's RA's as determined by the

DRC/SDSC, even when they currently only consist of inadequate boilerplate checked on the form.

**9. Pandemic Period: Unprecedented Circumstances Require Unprecedented Innovations**

*141*     As a result, academic circumstances for Chris changed substantially when the pandemic

began and WIU abruptly implemented all courses to an online-only format, causing Chris to be denied

---

[21] "The Department of Justice does not have a regulation setting out detailed standards, but the Department's longstanding interpretation of the general nondiscrimination and effective communication provisions applies to web accessibility. FN1 *See* 42 U.S.C. §§ 12132, 12182(a); 28 C.F.R. §§ 35.130, 35.160(a), 36.201, 36.303(c)." https://www.ada.gov/resources/web-guidance/

[22] WCAG is a set of requirements that is the international system of coding standards. WCAG compliance ensures that a website is accessible by everyone, irrespective of disabilities and age.

[23] See also DOJ Guidance on the ADA as applied to the Web sites of public entities in its 2003 publication entitled, Accessibility of State and Local Government Web sites to People with Disabilities, (June 2003) available at http:// See also DOJ Guidance on the ADA as applied to the Web sites of public entities in its 2003 publication entitled, Accessibility of State and Local Government Web sites to People with Disabilities, (June 2003) available at http://www.ada.gov/websites2.hhtm.www.ada.gov/websites2.htm.
See also https://www.w3.org/WAI/standards-guidelines/wcag/ (last visited 2/16/22).

understandable, but needed, verbal communication of "faculty notifications;" academic adjustments; academic & financial deadlines; and key information in an effective, reliable, and timely fashion.

   *142*    These unprecedented problems at WIU require unprecedented innovations for students with disabilities, especially those with vision-based communication deficits, like Chris.

   *143*    Chris has explained in writing to WIU agents that harm to his rights is substantially likely unless his requests for RA's are approved, but even where not refused outright, WIU has not even consistently responded to his requests to replicate those workable and successful RA's that some professors had already used with Chris as precedent.[24]

**10. <u>Low Income Plaintiff Financially Penalized for Vision-based Communication Deficits</u>**

   *144*    OPS Parking Services provides email notices to students, but like WIU website inaccessibility generally, Chris' vision-based communication deficits, ADHD, and reading comprehension deficits prevent Chris from making effective use of those standard student communications, as Chris has informed the school in writing and in person on many occasions.

   *145*    Chris has requested verbal communication regarding any situation where his funds are at risk or there is a potential to apply for, save, or be awarded funds, including student emergency

---

[24] "When choosing an aid or service, title II entities are required to give *primary consideration to the choice of aid or service requested by the person who has a communication disability*. The state or local government must honor the person's choice, unless it can demonstrate that another equally effective means of communication is available, or that the use of the means chosen would result in a fundamental alteration or in an undue burden (see limitations below). If the choice expressed by the person with a disability would result in an undue burden or a fundamental alteration, the public entity still has an obligation to provide an alternative aid or service that provides effective communication if one is available....The decision that a particular aid or service would result in an undue burden must be made by a high level official, no lower than a Department head, and *must include a written statement of the reasons* for reaching that conclusion. " U.S. Dept. of Justice, Civil Rights Div. (emphases added). https://www.ada.gov/resources/effective-communication/

funding, and, where these RA requests have been ignored or denied, such situations have already

amounted to large dollar amount losses & liabilities for Chris.[25]

146    In response to his requests, WIU staff has ridiculed Chris for his reading comprehension

deficit and for his self-advocacy; however, this communication request was for an essential RA as a

service that Chris required to access WIU programs, services and activities.

**Denial of Verbal Communication RA's Has Cost Chris Thousands of Dollars**

147    WIU students are required to have health insurance, and at the time of Chris' initial

enrollment in 2018, unless WIU was notified of the student having such insurance or the student

waived the WIU health insurance, WIU automatically assessed the annual health insurance fee to the

student's account. Exhibit 4, History Snapshot Transaction Detail for C. Cesca dated 11/9/21.

148    In the fall of 2018, Chris was not exempt from responsibility for paying for WIU

provided health insurance plan because Chris did not complete the required waiver.

149    Of course, Chris was not aware that he had the option to decline WIU provided health

insurance by filing a waiver because the standard student notice of how to opt out was ineffective for

Chris; WIU failed to provide verbal notice to Chris, and he was automatically but unfairly charged

$842 for mandatory WIU health insurance. *Id.*

150    Chris has also been penalized with numerous finance charges, a.k.a, late fees, for late

tuition payments because Chris was not appropriately notified of the deadlines. *Id.*

151    Chris has repeatedly and emphatically requested, verbally and in writing, that WIU

provide verbal notice of important deadlines and obligations such as these, and that this verbal notice

---

[25] Chris has actually struggled to secure some student emergency funding, but only because he
inadvertently discovered its availability verbally by random chance from other students. Chris
speculates that such funds lost to him are unknown and large, and in conjunction with unfair WIU
charges constitutes substantial monies of which he has been unfairly deprived.

be *followed* by written documentation in the form of an email, but WIU has routinely ignored these pleas and absolutely continues to ignore them.

152    Chris has suffered substantial financial and emotional harm from this WIU mismanagement of notifications, other communications, and RA requests. *Id.* Exhibit 1, Lt from Larry S. Wexler, PhD to WIU Pres. Huang dated 2/22/21.

**Denial of Verbal Notice Amounts to Discriminatory Criteria for Distributing Financial Aid**

153    On 12/15/21, prior to the Spring Semester of 2022, Chris contacted in person the WIU Financial Aid Dept. to determine what resources would be available after the financially catastrophic Summer Semester of 2020 when no in-person classes were offered towards his double major, so Chris was not eligible for financial assistance, and therefore he received no grants for living expenses as he had received in the past.

154    At that time Chris spoke to a woman named Heaven in the WIU Financial Aid Office, who informed Chris that $1,500 grants were being distributed for those students financially struggling, and Chris asked about applying for one.

155    Heaven said someone would contact Chris, and Chris thought that meant he would get phone notification, which Chris needed since email-only communication was ineffective.

156    However, Chris did not receive a call with a verbal notice then, or at any time.

157    Then, Chris called the Financial Aid Office repeatedly and was ultimately told to speak with a woman named McKenzie about the WIU Retention Initiative Office and its Justin Schuch about getting a grant.

158    When Chris contacted Schuch, Chris was informed that because Chris had paid off his account balance, Chris was no longer eligible for a grant to encourage the enrollment that Chris had already ensured with his full payment. Exhibit 11, Email from Schuch to C. Cesca re Confirmation of Grant Denial dated 1-18-22;

159     Because Chris was not given an advance verbal notice by phone, video chat, or in person about this grant criteria, Chris had already paid his limited funds toward his account for fear of being penalized with additional charges as he had been previously and since, and before he found out that not paying off his account would have benefited Chris by being eligible for the $1,500 grant. *Id.*

160     Since Chris had requested such verbal notifications many times before this, the denial of funds was the fault of the WIU refusal of his requested RA, and should not be born by Chris, and is an example of effectively discriminatory criteria & methods of administration that WIU uses against students with vision-based communication deficits like Chris. *Id.*

161     By refusing this requested communications RA, Chris has and continues to be denied key notifications; is being treated differently from other students in WIU financial aid decisions based on his disability; is being offered financial aid of less benefit than than provided others, and Chris is being constructively excluded from access to monies Chris would otherwise be provided. *Id.*

**Plaintiff Given Disciplinary Reprimand, but Ineffective Notice Prevented COVID Cooperation**

162     Chris actively supports vaccination efforts of all public institutions, including WIU; Chris currently is fully vaccinated and boosted with a vaccine for COVID-19; and at all times pertinent Chris had always worn a face mask in compliance with the routinely & ironically unenforced WIU policy requiring all students and staff to wear them.

163     Nevertheless, on 1/27/22, Chris was notified by email of a Disciplinary Reprimand, a written warning citing behavior being unacceptable, by the WIU Office of Student Rights & Responsibilities ("SRR") for failure to complete the mandated weekly gateway testing requirement for COVID-19 for the previous week. Exhibit 25, Email Chain SRR and C. Cesca re Notification of Failure to Complete Mandated Weekly Gateway Testing for COVID-19, dated 1/27/22.

164     Chris saw this notification by chance, but Chris was not in a position to reasonably discover autonomously the said email in the visually confusing ocean of emails from WIU on his

personal device, as Chris had previously explained *ad nauseum* to every WIU Administrator who would listen.

165     Of course, during the previous Fall 2021 Semester, Chris had notified WIU through the WIU online vaccination portal by which Chris sent a copy of his official vaccination card to the WIU Office of Risk Management, after his Economics Prof. Kevin Bacon first verbally, then by followup email, informed Chris of the WIU vaccination notice requirement, since WIU had failed to provide verbal notice of the requirement to report his vaccination.

166     Consequently, the WIU Office of Risk Management had failed to provide yet another verbal notice to Chris of mandated weekly gateway testing requirements, just as WIU had previously failed to provide many other critical verbal notices.

167     Thus, SRR had blindly & brazenly threatened Chris with discipline after refusal to provide Chris with effective prior verbal notification as a student with a vision-based communication deficit.

168     Tragically, even though Chris is vaccinated and boosted, Chris is still vulnerable to the worst effects of COVID-19 because Chris has never been informed of the current availability of testing which could allow for early treatment if Chris were to contract the disease. *Id.*

## 11. Extracurricular Threat, Exclusion, & Retaliation by WEMS.

169     The continuing violation of law and its harm to Chris extends to activities in extracurricular organizations, much of whose leadership and membership is in the LEJA program.

170     In the fall of 2018 when Chris enrolled in WIU for his first semester, Chris decided to engage in extracurricular activities in order to gain and enhance some basic occupational skills since WIU offers these opportunities to LEJA majors like Chris.

*171*     For instance, Chris had prior experience[26] as an Emergency Medical Technician, and

when Chris began at WIU, he applied for a position, participated in a formal interview process, and was

invited to join, the Western Emergency Medical Service ("WEMS"), a WIU authorized student

organization.

*172*     At all times pertinent, Chris was forthcoming about his status and association with the

DRC/SDSC to all appropriate parties.

*173*     Chris participated as a member of WEMS that purports to provide basic life support

service (first aid) for minor emergencies on campus; and participation in WEMS is promoted by the

LEJA Dept. to allow Students to cultivate interest in an EMS career.

*174*     WEMS calls it a "job" but this is not accurate; much WEMS activity is not compensated

at all and not part of any job description.

*175*     However, Chris did not know at the time he joined that WEMS works collectively as a

tight clique of friends against any perceived opponents. Exhibit 26, Email Sent to WEMS Members

1/19/18.

*176*     WEMS gave Chris the option, separate from the notion of a work schedule for a "job,"

to attend a WEMS class that was an introduction to WEMS and would provide Chris needed continuing

education credit.[27]

---

[26] 29 U.S.C. § 794. The application of Section 504 is not limited by the purpose of the federal funds the
college or university receives. *Id.* ("For the purposes of this section, the term 'program or activity'
means all of the operations of . . . a college, university, or other post-secondary institution, or a public
system of higher education[,] . . . any part of which is extended Federal financial assistance.") This
includes both operating funds and equipment.

[27] Chris was already a nationally certified EMT before attending WIU, but to keep the certification, he
needed "Con Ed," and he relied upon this WIU class to provide the continuing education credit hours
needed before his certification lapsed.

**WEMS Interfered with Chris' Use of RA Authorized for Non-Work, Optional Classes**

*177*     During the class, Chris routinely and conspicuously used communication AT in the form of audio recording the class since Chris had been formally granted that RA by the DRC/SDSC.

*178*     During one class, Michael Doran, a member of the Executive Board of WEMS, approached Chris and told Chris that some classmates were "uncomfortable" with Chris recording the class and asked Chris to stop recording.

*179*      Of course, Chris needed the recording to review the material later due to his disability, so Chris politely declined to stop audio recording; for this, Chris regularly used his iPad Air with attached, visible microphone with a large wind screen.

*180*     Then Michael Doran directly threatened Chris by stating that he could not make him stop recording, but that he could bar him from the class if he did not stop, and that "we <u>do</u> get to control how Con Ed hours are distributed," which others overheard.

*181*     Chris felt intimidated by this direct threat of being penalized by denial of continuing education hours by a WEMS Officer, but Chris resisted the obvious interference with his RA, and continued to record the audio in the class, and no one mentioned it again.

*182*     However, soon thereafter and during a WEMS shift where Chris was volunteering, he was approached by the WEMS Exec. Bd. head Nicholle Welch and her then-boyfriend & fellow WEMS Exec. Bd. Member, Michael Doran; she gave Chris a formal disciplinary letter for wearing a "non WEMS" bandana as a violation of the dress code.

*183*     Of course, no one at WEMS had been willing or apparently able to explain exactly what the dress code was to Chris, since there were at least two competing examples of what the dress code was; Chris had requested that it be verbally explained and clarified to Chris on numerous occasions; and in fact, little was explained to Chris when Chris requested clarification of various WEMS procedures.

**WEMS Retaliated Against Chris for Advocacy of His Use of RA During Non-Work Classes**

*184*    Importantly, this began an individual targeting of Chris for discriminatory treatment by WEMS and its WIU Faculty Advisors, as Chris had worn a plain bandana only to keep his hair out of his face as he worked, and this was a minor infraction at worst.

*185*    The dress code was being selectively enforced as Exec. Bd. Members, including WEMS Pres. Nicholle Welch, would regularly and obviously violate the dress code by wearing non-WEMS apparel and regularly failed to enforce the dress code against other WEMS employees & participants.

*186*    From then on, WEMS Officers and their friends in their tight social clique, engaged in a campaign to discriminate against Chris by using disciplinary perogatives, without any due process, to issue unilateral disciplinary "write ups" for Chris' performance during WEMS work shifts (four write ups during one shift) and activities regarding trivial matters, e.g., for unintentional "misuse" of radio; for swapping shift schedules without authorization even though no harm resulted; for unfounded allegations of vaguely worded "unprofessional" conduct, etc.

*187*    Not long after several of these write ups were given to Chris, Nicholle Welch issued a letter informing Chris of his dismissal from WEMS by the Exec. Bd. by email in which she alleged that Chris had failed to timely communicate with the Exec. Bd. regarding resolution of on-going concerns about his write ups and complaints to the WEMS Exec. Bd.[28]

*188*    However, because of the closeness in time to the disciplinary write ups to the dismissal, and the unsubstantiated and trivial nature of the complaints, Chris realized that the actual reason for his exclusion from participation and membership in WEMS was retaliation against him for his self-advocacy for his own RA's during the non-work, optional, continuing education class.

---

[28] Although this is not an employment action, discrimination in extracurricular activities is relevant to the pervasive nature of the harassment Chris had to endure since he was unfairly excluded from WEMS activities because his vision-based communication disabilities required an RA for audio recording of what WEMS referred to as an optional "class." WIU is apparently violating its financial aid obligations under 34 C.F.R. § 104.46 (b).

*189*     After Chris the meeting arranged with WIU Office of Equal Opportunity & Access to discuss his discriminatory termination, WEMS fabricated additional write-ups for poor attendance.

*190*     Chris was the only WEMS member to receive this volume of disciplinary write-ups, disciplinary letters and exclusionary punishment within such a short period.

*191*     Chris left WEMS, but this exclusion caused Chris educational harm: WEMS Officials knew because Chris told them that he was depending on using his extracurricular class by WEMS to obtain continuing education credits that Chris needed in time to maintain his then-existing certification with the National Registry of Emergency Medical Technicians ("NREMT") before it lapsed.

*192*     Although Chris had worked as a EMT prior to attending WIU, as a result of this exclusion, Chris lost a timely opportunity to earn continuing education credits and thereby lost his NREMT certification in March of 2021 as a result, limiting his occupational opportunities in the U.S.

*193*     Chris raised the employment aspects of this WEMS situation with WIU's Equal Opportunity & Access office ("EOA"),[29] but it failed to investigate all the facts of discrimination and discounted the violations of law, and Chris began to view EOA as merely an human relations bureaucracy by which the university simply defended its actions; EOA apparently did not even consider the lack of an interactive process then by WEMS.

**12. Food Pantry Revoked Chris' Exec. Bd. Position Due to His WIFI Access Advocacy**

*194*     Chris had volunteered for a period of time at the WIU Food Pantry where Chris had been a consumer and had been recruited as a new member of its Exec. Bd.

---

[29] "The Equal Opportunity & Access office ensures that University policies and programs are in compliance with federal and state regulatory agencies, including Illinois Department of Human Rights (IDHR), Equal Employment Opportunity Commission (EEOC), and the Office of Civil Rights (OCR). The University's Anti-Harassment Policy is administered by the Office. The director of Equal Opportunity & Access is also the Campus Compliance Coordinator for the Americans with Disabilities Act and the Title IX Coordinator for the university. This includes monitoring and assisting academic and professional areas with personnel recruitment, hiring and other employment practices." https://www.wiu.edu/equal_opportunity_and_access/

*195*     On April 22, 2019, Chris was elected Operations Mgr. of the Food Pantry.

*196*     The Food Pantry gets funding from WIU, and WIU advertises it on its website.

*197*     The WIU website held out its WIFI as top quality & available "throughout" the campus, but the available WIFI had a dead signal at the Food Pantry, then located next to the WIU football field.

*198*     Chris joined the Exec. Bd. because Chris was familiar with the wide variety of disadvantaged persons who use the Food Pantry.

*199*     Chris wanted proper WIU services for its volunteers and its customers, especially for those disabled like Chris, because he knew it was important to have WIFI access, esp. for the low income customers who, like Chris, depend on WIFI when they cannot afford expensive data packages from their cell service provider.

*200*     Chris made a simple call to advocate about the dead zone at the Food Pantry and for better WIFI coverage with the campus technical service, uTech, which was responsible for maintaining WIFI service on campus.

*201*     A few days after Chris was voted into the Exec. Bd. position, Chris was dismissed from his Exec. Bd. position, but not told about it directly for well over a month.

*202*     When Chris inquired with two other Exec. Bd. members to discuss upcoming plans for the Food Pantry, they failed to respond; so Chris then inquired with the Food Pantry Faculty advisor, Emily Schupe, who told Chris that Chris had been dismissed.

*203*     Without asking Chris about the phone call, Emily Schupe accepted an interpretation by another volunteer, Erin Lee, who was present, of an assertive & specific phone call Chris had made at the Food Pantry to uTech as demanding & rude, and lead the effort to dismiss Chris from the Exec. Bd.

*204*     Ms. Schupe told Chris that he had made the Food Pantry look bad when Chris requested better WIFI service in the geographic area of the Food Pantry from uTech, the WIU electronic technical service, and an another person present for the call complained to Ms. Schupe that

Chris was too demanding and that the tone in his phone complaint was disrespectful regarding the absent WIFI service around the Food Pantry, part of the WIU campus.

205     However, Chris, as a student with disabilities, had merely called in a complaint to the uTech service to notify them that there was a WIFI dead zone[30] at the Food Pantry, that Chris wanted the WIFI improved there, and added for emphasis that Chris requested a prorated refund on his tuition payment for the inadequate WIFI.

206     Importantly, Chris did not represent himself as Exec. Bd. member, but called in the complaint as a student of the university.

207     This WIU Faculty Advisor's criticism was what Chris has come to learn is the routine "tone policing" by WIU staff persons who do not want to be held accountable for poor work and commitments made to students, but rather divert attention to subjective perceptions of the person making the complaint and away from its content about real problems that need to be addressed; here, the tone policing and the dismissal were acts of retaliation for Chris' disability rights advocacy.

208     After his dismissal, Chris continued as an active Food Pantry member because Chris as a disability rights advocate refused to acquiesce to what he believed was discriminatory responses to disability rights advocacy.

209     Anyone who visits the Food Pantry now will see widespread use of WIFI connected computer tablets by both the volunteers and the customers, at least in part because Chris raised the issue so effectively with uTech by his advocacy.

210     Although Chris arranged verbal communication by phone with the then-President of the Food Pantry to set up *ad hoc* appointments for Chris to get food, later it discontinued this service.

---

[30] Although Chris was unaware of the specific violation of law at the time, Chris as an advocate correctly objected to uTech affording worse WIFI service than on the rest of the campus to him and the disproportionate number of fellow students with disabilities who have to use the Food Pantry due to their low income status. "Affording an opportunity to receive benefits or services that are not equal to or as effective as the benefits or services provided to others," is an express violation of 504. See 34 C.F.R. § 104.4(b)(2)&(3), § 104.52(a)(2).

211    After missing the limited Food Pantry access times largely due to his executive functioning deficits, Chris approached the new President, Brittany Van Tyne, and requested an access RA to make his appointments by phone to set a time for his use of the Food Pantry.

212    Despite her assurance this request would be addressed, she never approved his RA even though he was not regularly able to attend its limited business hours of 7 hours over 2 days per week.

213    As recently as December 2022, Chris additionally self-advocated by asking Executive Board member Jordan Rouse for an update on his request, but he responded with empty assurances from which nothing came.

## 13. Plaintiff's Exclusion from Extracurricular Activity.

214    Chris applied to and was hired[31] by WIU's Concert Safety Corps. ("CSC"), a WIU authorized agent, to provide unarmed, noncontact, minimal security service around campus, esp. at football games, concerts & other campus events, and this included the authorized use of what CSC pretentiously called "verbal judo" as a way of controlling disorderly attendees.

215    The faculty advisor to CSC was a former Prof. Glenn Daugherty who was aware that Chris was a student with a disability because he had received Faculty Notifications from the DRC for each of the three classes Chris took from him and "aced."

216    During that period, Chris sought advice from Prof. Daugherty after the incident in which he was escorted out of Malpass Public Library under protest and under duress by armed OPS officers, and Chris hoped to consult with the Professor about how to alleviate the overwhelming trauma caused by the incident.

217    Prof. Daugherty, a former OPS Officer himself, had recruited Chris for CSC membership and participation, but defended the two OPS Officers that had been involved.

---

[31] Again, this Complaint does not assert any employment claim, rather these facts show the pervasiveness of the resistance to engaging in the interactive process and the common disdain for RA's requested for non-obvious, but severe, disabilities by WIU and its authorized agents & employees.

218     Prof. Daugherty chided Chris as to the presentation of his disability by stating "there doesn't seem to be anything wrong with you," as if the extensive RA's were not necessary for the A grades Chris got in his three courses.

219     Chris is intelligent and adept at verbal communication, so he worked many over 12 hour shifts, but he was never paid, supposedly because he never filled out the right forms.

220     At the beginning of every course, while the bulk of the written syllabus is casually discussed, there is always a thorough & detailed verbal review of the written ADA/Students with Disabilities and Title IX rights statement that is recited at the beginning of the first class in each course.

221     However, this deliberate review is completely lacking in WIU extracurricular programs.

222     This explains why the process to complete the forms had never been explained to Chris by CSC; CSC failed to provide, and apparently all other WIU extracurricular programs fail to provide, the opening statement and information of disability rights during their onboarding process for students.

223     The pertinent violations for all these instances echo the line in the film Cool Hand Luke before the prisoner, Luke, was allowed to die for lack of medical attention: "what we have here is a failure to communicate." CSC never initially provided the information about the interactive process to student participants or their own staff; CSC never recognized Chris' requests for RA's as the beginning of the interactive process; CSC never provided an effective communication about the required process to complete needed forms; CSC never provided Chris with a way to understand and navigate that process, its forms or its dress code; and WIU never provided any understandable and reasonable notice that he needed forms in order to participate, including to be paid.

224     Had CSC provided such, consistent with his established pattern, Chris would have requested an RA to navigate the process, and he would not have been so easily and systematically excluded from participation in the programs, services, and activities of CSC.

**14. <u>Another Retaliation by Extracurricular Exclusion</u>**

*225*     Chris volunteered to provide security on board the public bus system, called Go West.

*226*     Go West Security is WIU's authorized organization which coordinates a WIU extracurricular program that also provides security as a presence (like bouncers) for Go West that services WIU and Macomb, Illinois.

*227*     Chris applied as a fully qualified candidate to Go West Security but was not accepted which seemed strange because he had so much more security experience than most of the other, younger students.[32]

*228*     Go West Security claimed Chris failed a test because he did not meeting a passing score; upon Chris requesting a review of his test, he was refused, then upon his insistence, Chris was only told his score of 19.5 out of 40 points; however, he was refused any more information about his testing.

*229*     Since the test was purportedly about common sense judgments about security situations on buses, Chris had a big advantage due to his decade long and much greater security experience over the other predominantly younger test takers; therefore, the claim that Chris scored less than 50% is incredulous, and to date has been not substantiated, in spite of Chris' attempts to verify the validity of the purported score.

*230*     As products of a small town institution, the personnel of WIU organizations are closely intertwined, and their overlapping leaders and members have extensive interrelationships, some by marriage and offspring, and several of the individuals involved in Go West Security are related to, or are close friends with, other staff at WIU who had previously denied Chris' rights as a student with disabilities.

---

[32] Chris offers this additional evidence of discrimination as a nonemployment complaint under the ADA & 504 since the discrimination was at the hands of an extracurricular organization with an educational purpose to provide an educational experience and authorized by WIU for extracurricular programming.

231    It turns out that the Go West Security Exec. Bd. Member, Kyle Sandhaas, is a close friend of Michael Doran who previously discriminated against Chris in WEMS as described above.

232    There was ample opportunity for collusion between them to further discriminate against Chris by falsifying the test score and preventing its third-party review.

233    Further on information and belief, the test was a largely subjective assessment by unqualified fellow students who were not experts and have about a decade less security experience than Chris who has worked extensively in bar and venue security, as an EMT with combative psychiatric patients, and in many other client-facing paid positions.

234    The test was scored unfairly and was a pretext for retaliation for Chris' previous disability rights advocacy at WIU.

235    As a result, Go West Security further harmed Chris in his efforts to augment his occupational skills in security services through this extracurricular activity; this denial added to Chris' severe depression and anxiety, and resulted in Chris' loss of another WIU benefit that he had hoped would improve his occupational prospects in law enforcement.

## 15. <u>Extracurricular Faculty Advisors Allowed Exclusion by Law Enforcement Fraternity</u>

236    During the week before Spring Break of 2022, Lambda Alpha Epsilon ("LAE"), a WIU & LEJA authorized, professional fraternity devoted to fostering understanding of law enforcement, had denied a request for verbal notifications, and had used Chris' inability to understand email notifications to delay an interview for membership until Fall of 2022, without any correction by its two WIU faculty advisors or LEJA Chairperson Jill Myers.

237    On or about February 21, 2022, Chris was recruited by email to join LAE by Emily Akers, a classmate in LEJA 306.

238    On March 9, 2022, Chris sent Esmeralda Almanza-Velazquez, the LAE recruitment officer, an email requesting a video chat regarding admission to LAE.

47

*239*　　Later that day, she responded by email that she had emailed Chris but had not received a response; that she was finished with all interviews for the semester;

*240*　　Chris responded by email that he reminded her of his then-stated requirement for a verbal notification for deadlines (he never received any email notification either); and that he wanted a video chat to discuss his admission for the Spring 2022 Semester.

*241*　　On March 10, 2022, Esmeralda sent an email acknowledging her previous understanding that Chris needed different accommodations in which Chris needed "verbal communication to effectively meet deadlines in academic or other environments," and that she completely understood that.

*242*　　In that email she noted a personal meeting with Chris where she initially explained the need for an interview, and she claimed that was the verbal communication required by his RA.

*243*　　Later that day, Chris emailed a response that objected to Esmeralda's excuses and explained he would appeal to the two faculty advisors, and requested a detailed summary of the previous LAE meetings' materials since he had been excluded from its programs, services, and activities already.

*244*　　Then also later that day, Esmeralda responded with more excuses for not providing verbal notifications.

*245*　　On March 11, 2022, Chris replied to Esmeralda, and copied LAE Advisors Frank Schweitzer and Thomas Maloney, and the LAE Pres. Blake Weisenberger, restating his request for RA's to allow Chris to participate in LAE and denying Esmeralda's dismissals of Chris' attempts to participate.

*246*　　There was no response from Esmeralda.

*247* On March 25, 2022, Chris emailed the two advisors and copied Sarah Mahoney, who advocated for Chris in LAE, V.P. Braverman, and other LAE persons, and he detailed instances of LAE denials of his requested RA's, LAE promises to provide them, and subsequent denials.

*248* Further, Chris detailed Esmeralda's justification for denials of RA's as an ironic misunderstanding of the undue hardship provision of ADA that "if we do it for him, we have to do it for everyone;" the prior discriminatory attempts to exclude him from LAE activities; and singling out Chris in an LAE meeting for threat, coercion, intimidation and retaliation by its members by the statement that "we are talking about one person in particular" while LAE officers were glaring at Chris in front of 40 to 60 LAE participants.

*249* Further, Chris explained the blaming of him publicly for the canceling of an LAE meeting by the statement to the LAE audience that they were welcome to "thank Chris" for the canceling.

*250* Moreover, Chris explained in this email that in the hallway outside the meeting room subsequent to this cancellation, LAE officers attempted to summon Ms. Mahoney back into the room and when she did not come, they told her in front of other LAE members, including Chris, that they were "no longer interested in having [Ms. Mahoney] as a new member."

*251* Thereafter, LAE limited Chris' participation with the excuse that he had not passed an interview for admission to the fraternity, even though Chris had attempted to get interviewed, and accelerated this limitation on his participation while LAE officers claimed that the disputed was "being sorted out."

*252* This included seruptitiously changing the venue of an LAE meeting to prevent Chris from attending, which was made through a group chat, GroupMe, *outside* WIU data servers.

253    On or about March 31, Chris began his formal administrative objections by email for the improper interference with his participation to the top administrators relevant at WIU, LAE, and others, and for the harm to Chris from this personal animus, intimidation and retaliation.

254    On April 5, 2022, Chris met twice with David Braverman, V.P. for Student Success, and some of his staff to discuss the LAE denial of his rights; Chris brought an advocate, CallaBria Putrino.

255    Chris conspicuously attempted to video record the first meeting since he already had an RA to record video and audio of classes from the DRC/SDSC, and his disabilities also required this RA in this similar setting.

256    However, V.P. Braverman refused to allow Chris to video record the first meeting, only allowed audio recording of the second meeting, and required Chris to sign a paper listing the DRC/SDSC purporting to restrict his use of the audio recording.

257    Although Chris requested a verbal explanation of the paper due to his reading comprehension deficit, Braverman glossed over the content with vague wording, and Chris signed the paper but noted that it was signed "under protest and under duress."

258    No changes to LAE's limitiations on Chris' participation were made during those meetings, and on April 6, 2022, Chris emailed a professor regarding the film class he missed when V.P. Braverman rescheduled the meeting from the morning before to later that day because of his refusal for Chris to video record.

259    Later that day, Chris received an email from a functionary of V.P. Braverman which purported to restrict his participation in LAE.

260    On May 11, 2022, Braverman refused to change the LAE determination that Chris must reapply for the following semester; upheld the discriminatory positions of LAE against Chris; and then doubled down on LAE's position by stating that Chris was permanently excluded from LAE.

## 16. Discriminatory Admin. Methods: No Complete Interactive Process.

*261*     Although WIU organizational personnel are closely intertwined, WIU Administration allows extracurricular program supervisors to work in independent isolation to determine RA's, just like faculty members, instructors & TA's are allowed to do.

*262*     Typically, when Chris requests an RA, WIU staff refuse to engage in an interactive process entirely; they don't provide a written statement of the reasons for refusing an RA request; they do not complete the process to arrive at a mutually agreeable RA for Chris's needs; and/or they frequently show their ignorance of how to adopt a workable RA for Chris on their own, even where previous RA's are requested and have been shown to be *workable* for WIU and *successful* for Chris.

*263*     An especially troubling denial of Chris' requests for RA's is frequent WIU instructors' failure to enforce standing policies or rules that are of particular benefit to Chris due to his disabilities.

*264*     When Chris requests enforcement of those WIU policies, WIU instructors and department chairpersons typically refuse with hostility, but without explanation, or say they will take action, but fail to do so.

*265*     For instance, WIU has a policy barring students from creating disturbances in class by the student use of cell phones and electronic devices, ("Misuse of Electronic Devices Policy")[33] because in a quiet class, even minimal cell phone use by multiple students can disturb the instructor's ability to direct class and provide lectures that can be clearly understood by all students.[34]

_____

[33] "Policy Statement I, Misuse of Electronic Devices. Found on the WIU website under the Student Rights & Responsibilities section. See http://www.wiu.edu/student_success/srrri/codeofconduct.php

[34] D. Regulations for Student Conduct....4. Engaging in harmful or potentially harmful behaviors, including, but not limited to, the following: a. committing acts of physical abuse, verbal abuse, or violence. This includes, but is not limited to, fighting, battery, use of a weapon, restraining or transporting someone against their will, or any action that threatens or endangers the physical health of safety of any person or causes reasonable apprehension of such harm. b. committing actions which cause physical, mental, or emotional harm; bully; intimidate: harass: threaten: coerce; or otherwise endanger the health or safety of oneself or others.

266     WIU also has a related, explicit policy barring disruption by students, such as disruptive talking between students during class or packing up personal effects before a class has ended.[35]

267     A small exception to the Misuse of Electronic Devices Policy applies for those few who go through the required process to register with the DRC/SDSC and have been formally granted the use of an RA, such as DRC/SDSC granting Chris an RA to use his laptop and other devices in class to take notes and to take audio & photographic recordings of classes.

## 17. Discriminatory Admin. Methods: No Routine Enforcement of Beneficial Policies

268     The willful refusal and failure to enforce this important rule encourages students to ignore the rule and disrupt the class, making it as if the rule does not exist and making the classroom instruction inaccessible to Chris.

269     It also results in Chris being saddled with two problems: a.) initially having to solve the lack of enforcement by appealing to the instructor, and if that fails to obtain enforcement, b.) having to address offending students directly, resulting in his unneeded social alienation from classmates just so he can participate in class and learn.

270     Since his disability is in part a vision-based communication disorder, inappropriate device usage inherently involves bright screen image movement & flashing, the various noises from devices, and the classmate voices on cell phones, as well as the inevitable interpersonal conversations of students during class, all of which cause the instructor's lecture to be unintelligible to Chris.

271     This diminished input makes studying homework much more laborious because Chris does not have foundational learning required from lectures to understand the reading as well.

272     This combined sensory assault on Chris has regularly resulted in gross exacerbation of already great difficulty in understanding instruction and concentrating on it during class for Chris and

---

[35] Found at http://www.wiu.edu/student_success/srrri/codeofconduct.php

as yet unidentified students with vision-based communication disorders like Chris who may be his classmates.[36]

273     Due to this, as a disability rights advocate, Chris has made a habit of requesting enforcement of this Misuse of Electronic Devices Policy at every opportunity since the instructors have the authority to dismiss students from class or otherwise take decisive action if they do not comply with the instructor's direction to put away their cell phones and stop disturbing the class.

274     Most of the time, WIU Instructors refuse to enforce the Misuse of Electronic Devices Policy during class when requested, causing Chris to miss large portions of the oral lectures during class and this results in lower grades for Chris.

275     Such lower grades can cause a secondary result in Chris failing the course and being retroactively losing his financial aid support for course tuition and require Chris to repay the cost.

## 18. Plaintiff Assaulted for Support of Enforcement of Beneficial WIU Policy

276     On 8/27/19, Chris attended his enrolled course ECON 231 with about 40 other students in the amphitheater-styled classroom where Chris sat in the 2nd row to get a clear view of the board/projection screen. (In traditionally arranged classrooms, Chris sits in the front row.).

277     That day, a number of students in the classroom were violating the Misuse of Electronic Devices Policy by using their visibly flashing and audibly ringing/chirping cellphones and other devices during class, and Chris was unable to maintain his concentration on the instructor's directions and lecture clearly, so he felt saddled with the burden of mitigating the classroom disruptions.

278     Chris again requested the instructor to enforce the policy as he had numerous times previously requested such RA's.

---

[36] Importantly, the Supreme Court has similarly held that classroom experiences that were "in no way meaningful" and "incomprehensible" made "a mockery of public education" and were therefore in violation of Title VI's prohibition of discrimination in federally funded programs. *Lau v. Nichols*, 414 U.S. 563, 566 (1974).

*279* In an unexpected, but initially positive response to this request for an RA, the instructor informed an offending student to put away her cell phone, but the student kept using her cell phone and delayed her compliance with the instructor's directive; it took three instructions from the instructor, then the offending student aggressively shouted at the instructor.

*280* As a result, class halted and Chris vocalized support for the instructor, for himself, and his fellow students.

*281* The offending student then physically threatened Chris loudly in front of the entire class by saying she would "slap the shit of you" and "fuck you up," which intimidated Chris since he was in immediate apprehension of receiving a battery through a physical attack from that student.[37]

*282* Chris waited till the class was over, and that day he went to Tara Feld for advice who instructed Chris to file a report with OPS; he then went to Mowbry Hall and requested OPS to get a security officer to come to the classroom on the next class day to interview witnesses and complete a Police Report on the incident threatening violence[38] against Chris as it is also against WIU policy for a student to make threats of violence against fellow students.[39]

**19. Aggravated Assault Incident Report was Falsified & Delayed**

*283* However, the resulting Incident Report filed by OPS was not accurate.

---

[37] 720 ILCS § 12-1. "Assault. (a) A person commits an assault when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery."

[38] 720 ILCS § 12-2. Aggravated assault. 720 ILCS (a) "Offense based on location of conduct. A person commits aggravated assault when he or she commits an assault against an individual who is on or about a public way, *public property, a public place of accommodation* or amusement, or a sports venue." (emphasis added).

[39]"Interference of an institution of higher education is committed by one who, without authority of the institution, through force or violence, actual or threatened, willfully acts as prohibited by 720 ILCS 5/21.2-2. In appropriate circumstances, court action of the injunctive or criminal nature should be sought." WIU Code of Student Conduct Section D, No. 7 & Policy Statement A thru I, approved 9-23-19. (https://www.wiu.edu/student_success/srrri/codeofconduct.php, last visited 1/17/22).

284     That OPS Report seemed as if the offending student had been coached in making excuses and vilifying Chris.

285     That OPS Report falsely equated what Chris said to the offending student with the threat of physical violence she made against Chris for supporting enforcement of the Misuse of Electronic Devices Policy. Exhibit 12, FOIA Redacted OPS Cell Phone Incident Report dated 8-30-19 w/o cited Email or Written Statement Being Attached.

286     Importantly, that Incident Report contained the offending student's statements showing bias against Chris as a person with complex ADHD and executive function deficits by calling Chris a "strange dude," and otherwise mischaracterized Chris and his conduct to portray Chris as a foul-mouth, threatening, and offending student. *Id.*

287     However, that Report contained no information from the many students who observed the verbal threat & assault by the offending student on Chris Cesca.

288     Due to these deficiencies, therefore, it could not have been "fully investigated" as required by the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"),[40] to determine that it was unfounded.

289     WIU subsequently removed the offending student from that Economics Course.

290     Although Chris had requested a copy of the report from OPS, he was denied a copy and his request was diverted to a very, very lengthy FOIA process. Exhibit 13, Email Chain C. Cesca and Ms. Worthington re: No Report Received on 8/27/19 Assault by Classmate, dated 9/16/19;

---

[40] 34 CFR 668.46(c)(1). This federal regulation requires a university to publish an Annual Security Report which must include aggravated assaults and hate crimes of intimidation, and "*can only "withhold a reported crime from its crime statistics in the rare situation where sworn or commissioned law enforcement personnel have fully investigated the reported crime*." 34 CFR 668.46(c)(2)(iii) (emphasis added).

291     Chris understands this Incident Report was falsely made and incorrectly indicated Chris'

complaint was unfounded in order to circumvent the law which requires public reporting of crimes on

campus; an accurate report would require public reporting of this aggravated assault and hate crime of

intimidation, but would provide negative public relations for WIU relative to current and potential

students they wish to recruit & retain.[41] *Id.*

292     WIU published its Annual Security Report on or about December 31, 2020 without

reporting the incident in which Chris was the victim.

## 20. Discriminatory Admin. Methods: Stigmatization of Disability Advocacy Itself

293     Chris has explained to the WIU Administration officials that his RA requests have been

unfairly characterized as disruptive, even though the content of his RA requests are typically to reduce

the classroom disruptions that prevent Chris and other students from understanding lectures and course

content consistent with WIU policy. Exhibit 14, Email Chain C. Cesca and M. Abraham re Viol. of

Policies and Your Potential, Our Purpose, dated 10/5/20.

---

[41] 20 U.S. Code § 1092 - Institutional and financial assistance information for students.

(1) Each eligible institution participating in any program under this subchapter, other than a foreign institution of higher education, shall on August 1, 1991, begin to collect the following information with respect to campus crime statistics and campus security policies of that institution, and beginning September 1, 1992, and each year thereafter, prepare, publish, and distribute, through appropriate publications or mailings, to all current students and employees, and to any applicant for enrollment or employment upon request, an annual security report containing at least the following information with respect to the campus security policies and campus crime statistics of that institution:
....
(iii) policies which encourage accurate and prompt reporting of all crimes to the campus police and the appropriate law enforcement agencies**,** *when the victim of such crime elects* or is unable to make such a report.
(D) A description of the type and frequency of programs designed to inform students and employees about campus security procedures and practices and to encourage students and employees to be responsible for their own security and the security of others....
(F) Statistics concerning the occurrence on campus, in or on noncampus buildings or property, and on public property during the most recent calendar year, and during the 2 preceding calendar years for which data are available—(i) of the following criminal offenses reported to campus security authorities or local police agencies: (I) murder; (II) sex offenses, forcible or nonforcible; (III) robbery; (IV) *aggravated assault*;....(emphases added).

*294*    Chris believes that disability advocacy is a desirable activity for himself, others with

disabilities, and WIU, as it is supported by 504 and the ADA as a protected activity.

**Differences in WIU Academic Departments**

*295*    Before taking Economic Game Theory, ECON 445G, with Prof. J. Jobu Babin, Chris

was solely an LEJA major.

*296*    Upon achieving an A grade in this 400 Level class, Chris was formally invited by Prof.

Babin to add Economics for a double major.

*297*    In recognition of his high level of performance when provided the needed RA's as

a.) student group learning and collaborative learning was encouraged, and b.) the Misuse of Electronic

Devices Policy was strictly enforced by Prof. Babin.

*298*    Chris has requested replication of these workable and successful RA's in other courses.

**21 <u>Plaintiff's Academic Progress at WIU Tracks the RA's Provided to Him</u>**

*299*    Indeed, there is a clear, documented, and empirically direct correlation between

academic performance and adequate RA's for Chris who has consistently achieved exemplary grades at

WIU when he has been provided with RA's that are adequate, and that contain adequate auxiliary aids

and services for his disabling conditions by his professors, as shown by both his transcript and by

glowing email feedback from pertinent teachers. Exhibit 9, Official WIU Transcript for Chris Cesca

dated 1-21-22.

*300*    In fact, before the 2020 Summer Semester, Chris got straight A's except for only 2

classes in which he was not provided with equitable treatment or RA's. *Id.*

*301*    In his first semester, Chris enrolled in an elective Anatomy & Physiology course to

obtain credit for advance licensure in Emergency Medical Services ("EMS"), but was not granted RA's

and he obtained only a "D+" because a major assignment was never graded despite several recorded

promises by the Dept. Chairperson and WIU Administrators, even though it was appropriately submitted. *Id.*

*302* In Math 123, he received only a "B-" since the professor refused Chris's *weekly* request to enforce the University Policy against use of noisy, flashing cell phones and talking that was disrupting each entire class. *Id.*

*303* From the beginning of his WIU career, Chris has expressly requested RA's from WIU staff for his courses & extracurricular activities by following WIU procedures where they actually exist, to the extent they are understandable.

## 22. Discriminatory Admin. Methods: Unexplained Denials & Futile Appeals Offered

*304* However, WIU staff have typically responded inconsistently, inadequately, or incompletely to his requests, providing Chris with no clear idea what to appeal other than vague denials.

*305* Chris' very lengthy appeals to the institutional chain of command shows it is futile to appeal since his appeals have proven the process is arbitrary & capricious, so the harm to Chris has continued. Exhibit 15, Email Chain C. Cesca and Interim Pres. M. Abraham re Malpass Lib. Incident, dated 9/30/19;

*306* Before the pandemic occurred, Chris was taking LEJA 357 and getting some RA's sent out thru electronic faculty notification.

*307* Faculty notifications were of RA's that consisted of Time Accommodations including "reasonably" (time & a half) extended time for quizzes, exams & assignments; no objections to presence of Chris' service animal, Ned, in class; room accommodation of a semi-private exam room (Chris went to the DRC/SDSC, in Memorial Hall to have a test proctor administer an exam in a small office with a closed door with video/audio monitoring without any personal items or cellphones).

*308* It is important to note that Chris is a good test taker, but a bad test preparer.

309    Chris' advisor, Monica Eskridge, has informed Chris that if he had completed all of his previously taken courses, he would have graduated with a double major in LEJA & Economics for a Bachelors degree by the end of the Fall of the 2021 Semester. Exhibit 5, Student Advisor M. Eskridge Summary of WIU Req. for C. Cesca for Spring 2022 Attendance;

310    In addition, there are other reasons for Chris' delay in graduation.

311    First, WIU began shifting to all online courses without notice or consultation; Chris and others with disabilities were egregiously abandoned to an inaccessible teaching format; and Chris could not understand & participate in the coursework without WIU providing appropriate & correlated RA's.

312    Second, in March of 2020, WIU began spring break for one week, then expanded spring break for a second week and announced all courses would be online. *Id.*

## 23. <u>Academic Status & WIU Obstructions to Plaintiff's Degree Completion</u>

313    However, WIU never communicated the procedure by which students with disabilities, including Chris, were to obtain correlated RA's; and the all online instruction was unprecedented, and the correlated RA's Chris required were largely new ones.

314    Moreover, even the WIU staff that was fully aware of Chris' disabilities preventing his use of online learning and his previous success when provided adequate RA's, for the most part refused or resisted engaging with Chris to determine them.

315    Chris then attempted through email, phone (when WIU allowed phone numbers to be shared), & through the WIU DRC/SDSC to engage the pertinent WIU staff in a meeting in person, as the best way for Chris to communicate, or secondarily by video chat, but most of them flatly refused.

316    However, one instructor, Phil Entzminger, eventually agreed to limited communication through video chat, even though the LEJA Chairperson Jill Myers systematically discouraged video chats, and in a few weeks they worked out an RA, and Chris earned an "A" in that class due to his

exemplary efforts in LEJA 357, by going around Jill Myers obstructions. Exhibit 9, Official Transcript for Chris Cesca dated 1/21/22.

317    Outside of RA's, Prof. Entzminger even decided that because Chris' coursework was so exemplary in the first part of the course *before* the pandemic and *before* WIU moved to all online learning, he was not required to take the final exam. Exhibit 16, Email Chain C. Cesca and Prof. Entzminger re No Phone Calls but Zoom okay for LEJA 357, dated 3/30/20;

318    Since Chris' attempts at online learning failed and he got an Incomplete or "I."

319    Part of the successful RA was that on March 30, 2020 Prof Entzminger reopened the required online portal for Chris to gain access to the quizzes he missed, and provided an extended deadline to take the quiz for the first time, showing Chris is not a "bad test taker," but that he has tremendous difficulty preparing for a test due to his reading comprehension deficit. *Id.*

## 24. Discriminatory Admin. Methods: Unenforced "Misuse of Electronic Devices" Policy

320    During fall 2019 semester, Chris took Math 123 from Instructor Aouoina.

321    Chris noticed students there were talking on their cellphones, using buzzing & flashing cell phones, and making lots of noise during class, so neither Chris nor other interested students he noticed could hear the instructor clearly enough to focus and concentrate.

322    Chris requested Instructor Aouoina to enforce the Misuse of Electronic Devices Policy, but Instructor Aouoina declined Chris' request.

323    Due to Chris' difficulty hearing, focusing & learning during class lectures, he only obtained a course grade of "B-" in Math 123, further reducing his GPA after inadequate RA's were provided. Exhibit 9, Official WIU Transcript for Chris Cesca dated 1-21-22.

324    After the beginning pandemic semester, about March of 2020 when the pandemic skyrocketed and unbeknownst to Chris at the time, the LEJA Dept. Chairperson, Jill Myers, issued a

directive to Department instructors not to communicate with students by phone. Exhibit 16, Email Chain C. Cesca and Prof. Entzminger re No Phone Calls but Zoom okay for LEJA 357 dated 3/30/20.

325     This directive from Jill Myers explains the difficulty Chris had in engaging LEJA staff in RA discussions because he could not discuss his RA requests with LEJA staff verbally: "We have been sent emails regarding phone calls," wrote Prof. Entzminger. *Id.*

326     In the fall of 2020, Chris attempted to retake LEJA 312 without penalty during the delay in bureaucratic decision-making on the administrative details of retaking classes; he did this in order not to miss critical class instruction early in the semester that served as the foundation for the course.

327     However, when he submitted a homework assignment to create a practice Police Report, he was excluded and formally prohibited from retaking the course by Provost Mark Mossman via Jill Myers who taught the class.

**Bureaucratic Delay Prevented Retaking of Class**

328     Chris was denied a complete & user-friendly interactive process to gather sufficient information and qualified experts as needed to determine what accommodations were necessary and to arrange mutually agreeable substitute RA's for retaking the course. Exhibit 17, Email Chain C. Cesca, J. Myers and Provost Mossman Confirming Exclusion from Retaking Certain Courses, dated 8/27/20;

**25. <u>Discriminatory Admin. Methods: Speculative Excuses Trumped Beneficial Policy in LEJA</u>**

329     When Chris appealed to get enforcement of the Misuse of Electronic Devices Policy, the Chairperson of the LEJA program department, Jill Myers, who also teaches LEJA 312, contrived numerous speculative reasons why students would need to use electronics in class, contrary to WIU Policy.

330     In a 10/5/20 email, Chris quoted school policy on misuse of electronic devices, and recounted the irony of Jill Myers as head of the WIU LEJA Department cherry picking what policies she would enforce based on speculative excuses for students.

*331*    In that email, Chris recounted how Jill Myers told professors not to give out their cell phone numbers, even though she was aware he was requesting RA's for verbal communication (though he never requested phone numbers). Exhibit 14, Email Chain C. Cesca and M. Abraham re Viol. or Policies and Your Potential, Our Purpose.

*332*    Jill Myers had reason to know that this was a beneficial policy for students with communication deficits, like Chris, and that he would suffer from continuing denial of RA's, including those he could not obtain as a result of her directive denying cell phone use by LEJA instructors.

## 26. <u>Discriminatory Admin. Policies: "Other Rules" Crowded Out Policy of Benefit</u>

*333*    Around 2020, WIU marketed an initiative referred to as "Recruitment and Retention," in the midst of falling enrollment.

*334*    This initiative was ultimately disparately detrimental to students with learning disabilities, including Chris, in that it encouraged professors to relax enforcement of school policies, such as those pertaining to electronic device use in class and attendance.

*335*    However, many students enjoyed lax enforcement of the rules, as it afforded them unfettered use of cell phones in class, even as it disrupted the classes for which they were paying.

*336*    Chris and many students sharing the same learning struggles were harmed by this lax approach which was aimed at placating current students and enticing potiential WIU applicants, in response to sagging enrollment.

*337*    Coinciding with this, Dept. Chair Jill Myers encouraged the lax enforcement of rules whose proper enforcement would be beneficial to students, including students with disabilities, such as Chris.

*338*    Although class room distractions need to be minimized, the cell phone, smart watch, and other device uses are very popular with younger students who habitually use such devices during class without instructor comment or restraint.

*339*    Ms. Myers had reason to know that enforcement of the Misuse of Electronics policy in class would trigger student disapproval.

**Plaintiff Constructively Denied Access to Courses**

*340*    When the pandemic skyrocketed in March 2020, WIU instructors forced Chris mid-semester to use solely the electronic web screen information for course material, but WIU provided no RA's in response to his requests to understand the web screens.

*341*    The format of class as advertised in the course catalogue and syllabus when Chris signed up no longer applied, so these denials meant Chris was educationally marooned in an unworkable situation.

*342*    As a result, he ultimately received "Incompletes" instead of "F"s in 3 courses, but these were converted to 3 "F"s when Chris could not complete them without the RA's that had been refused.

*343*    As a result of the mismanaged provision of RA's for those courses he failed, Chris currently will only be able to graduate by late 2023 or 2024, at least two or three years later than expected for non-disabled students, depending on his academic workload. Exhibit 5, Student Adv. M. Eskridge Summary of WIU Requirement for C. Cesca for Spring 2022 Attendance.

*344*    A prime example of WIU's repeated denial of RA's was its continuing pattern & practice of blatant violation of law throughout the 9/28/19 library incident. Exhibit 18, OPS Malpass Public Library Incident Report on Malpass Library Service Animal Exclusion with Master, created on 9-28-19 and approved on 9-29-19.

## 27. <u>Discriminatory Admin. Methods: No Proper Training Led to Exclusion for Using Ned</u>

On the Thursday, 9/26/19, Chris entered the Malpass Public Library[42] with Ned, his service animal, to run a study group session for a class he was taking.[43]

345    Having used a basement library room many times before for individual study & for study groups, Chris went straight there where Corey, the student worker at the Library, opened the door for Chris; Corey had no issue with Ned nor did Corey call anyone to check about Ned.

346    After the end of the study group, Chris used the restroom and took Ned, after he locked the study room with his personal effects in it.

347    Chris returned to the locked study room, and since Corey had left, Chris asked the library staffer present to unlock the door.

348    It was Doug Endres who unlocked the door for Chris, but instead of unlocking the door, Enders grilled Chris at the Library Desk with about 10 inappropriate questions about Ned's status as a service dog; he did not seem to accept Chris' answers, but kept grilling Chris.

349    Chris felt extremely anxious and nervous under interrogation as Endres, a neurotypical person, attempted to characterize Ned merely as an emotional support animal or pet, rather than a valid service animal despite repeated confirmation by Chris that Ned was a Service Animal and was registered with DRC/SDSC as such.

350    The inappropriate questions included: "Why do you have the dog today?" and "Why have I never seen you with a service animal before?"

[42] WIU's Malpass Library doubles as a *public* library for Macomb, Illinios, as stated on the official website for the town.

[43] "Policy on Animals in Buildings - Western Illinois University is committed to providing a safe and healthy working, studying and living environment for students, staff and faculty. Pursuant to this commitment, animals will not be permitted in university building *unless required for visual assistance or educational requirements*." (italics added). File code: PRES.ANIMBLDG.POL, Approval Date: 07/29/98, Approved By: President. (http://wiu.edu/policies/animbldg.php, last visited 1/17/22) (emphasis added).

351     Of course, Ned's function as a service animal was to alert Chris to mitigate distractions, redirect Chris' focus, and prompt Chris to re-attend to the task at hand.

352     After Enders finally let Chris into the room, he left the building with the clear impression that Endres wanted to exclude Ned from Malpass, in retaliation for Chris' attempt to use Ned as a service animal.

353     At all times pertinent, Chris functioned with Ned as a unified team, and since Chris was functioning with Ned during this time, Chris took the verbal interrogation by Endres personally.

354     Chris had regularly used the library with Ned, and when he returned to use the library next on the following Saturday, he feared more inappropriate behavior and retaliation by Endres.

**Repeated Denial of Service Animal Access Indicated Lack of Proper ADA Training of WIU Staff**

355     On Saturday, 9/28/19 around 1 pm, Chris entered Malpass Public Library, with Ned, his service animal, to study, as allowed by the WIU Policy on Animals, state law, the DOJ regulation on service animals,[44] and the ADA regulations. *Id.*[45]

356     At all times pertinent, Ned has worn a service dog[46] vest labeled "SERVICE DOG" on both sides in approximately 150 pt. auto luminescent, sans serif hi-viz, white-on-black font, even though this is not required by law or WIU policy, in order to avoid disruptive incidents.

---

[44] 28 C.F.R. § 35.136.

[45] 28 C.F.R. § 36.136(g) "Access to areas of a public entity. Individuals with disabilities shall be permitted to be *accompanied by their service animals in all areas of a public entity's facilities* where members of the public, participants in services, programs or activities, or invitees, as relevant, are allowed to go." (emphasis added).

[46] (105 ILCS 5/14-6.02) (from Ch. 122, par. 14-6.02) Sec. 14-6.02. Service animals. Service animals such as guide dogs, signal dogs or any other animal individually trained to perform tasks for the benefit of a student with a disability shall be permitted to accompany that student at all school functions, whether in or outside the classroom. For the purposes of this Section, "service animal" has the same meaning as in Section 48-8 of the Criminal Code of 2012. (Source: P.A. 97-956, eff. 8-14-12; 97-1150, eff. 1-25-13.)

357     However, since Library personnel are not trained to proficience in disability rights, they challenged Chris' use of Ned anyway.

358     The Malpass Public Library has no outward facing door signage to welcome service animals, although the local Walmart does.

359     Upon entering Malpass Public Library, Chris approached the reference desk, and he asked Douglas Enders, the WIU chief of the Library that day, to unlock a private study room so he could study in it.

360     Doug Enders then told Chris, immediately, dismissively, and in no uncertain terms, that his dog was *not* permitted in the building.

361     Chris was outraged at this gross violation of his well-settled legal right as a student with disabilities, but respectfully protested the order, and then requested that Mr. Enders call a higher up administrator.

362     At all times pertinent, Chris maintained his composure through his habit of restraint and because he wished to avoid another instance of WIU mischaracterizing his conduct as threatening or combative, but he repeatedly requested to be allowed to study in the library.

363     Then Chris asked Endres to call OPS, as Chris wished to document this violation of law.

364     Enders antagonistically agreed to do so. *Id.*

365     In a few minutes, OPS Officers Slater and Seaver arrived and approached Chris, and asked Chris for "paperwork" on the "service animal."

366     Chris noted the words on Ned's vest and explained this was not required of Chris, but told them nonetheless that he had previously registered Ned with the DRC/SDSC.

**OPS Officers Required to Know Law on Service Animals, But Do Not**

367     The OPS Officers did not know the law regarding additional documentation of a service dog.

66

*368*    The master who is a person with a disability is not required by law or WIU rules to produce such documentation, and that demanding such documentation, esp. in a very public place, like the Macomb's Malpass Public Library, also frequented by non-disabled students, is expressly contrary to U.S. DOJ Guidance interpreting the ADA.[47]

*369*    Since there were student workers and library patrons actually present near the reference desk, this most public part of the library where Chris had inquired about a study room, Chris felt publicly humiliated by this inappropriate questioning by the OPS officers.

*370*    Chris was frightened to reveal his weaknesses and vulnerabilities in front of peers and colleagues more than almost anything, but the OPS officers required him to reveal his disabilities and his need for Ned in that public setting.

*371*    Then Enders instructed Chris to remove his service animal from the building, and told Chris that he would not be permitted to stay if he had the dog with him.

*372*    Ironically, the OPS officers on scene together with Enders interrogated Chris longer & more intensively about the service dog RA than any other WIU staff had engaged Chris previously regarding any RA he had requested or obtained.

*373*    The clarity of the facts here makes this incident a prime example of the continuing denial of RA's as a pattern & practice of WIU discrimination by a state university that promotes itself

---

[47] "Under the ADA, State and local governments, businesses, and nonprofit organizations that serve the public generally must allow service animals to accompany people with disabilities in all areas of the facility where the public is allowed to go....When it is not obvious what service an animal provides, only limited inquiries are allowed. Staff may ask two questions: (1) is the dog a service animal required because of a disability, and (2) what work or task has the dog been trained to perform. *Staff cannot* ask about the person's disability, require medical documentation, *require a special identification card or training documentation for the dog*, or ask that the dog demonstrate its ability to perform the work or task." (italics added) U.S. Department of Justice, Civil Rights Division, Disability Rights Section, ADA Requirements, Service Animals. Originally issued: July 12, 2011, Last updated: February 24, 2020. (https://www.ada.gov/service_animals_2010.htm, last visited 1/17/22).

as "internationally recognized" for its law enforcement & justice administration program. Exhibit 3, WIU Website Screenshot - LEJA Promotion.

374     The OPS armed officers then deferred to Douglas Enders, Library Chief, for a resolution of the conflict.

375     Enders made a phone call, presumably to the higher up WIU Administration, to confirm his decision on the service animal, and Enders directed the OPS armed officers to force Chris to leave the library.

**Chris Complied with Order to Leave Library under Duress**

376     When OPS Officers ordered tChris to leave with his dog, Chris complied under protest because he is required by law to follow the order of law enforcement officers and because leaving was more likely to avoid further harm to himself and Ned, who appeared as anxious as Chris was.

377     By that point, Chris had already had discriminatory actions taken against him by OPS, so he also complied for fear of legal and/or academic penalty.

378     This fear included the potential for Chris to be arrested, hand cuffed, searched in his personal effects, physically harmed, fined, expelled, and/or charged with a crime, which would have serious consequences on his potential candidacy for a law enforcement job. Exhibit 18, OPS Incident Report on Malpass Library Service Animal Exclusion, dated 9/28/19 and approved on 9/29/19.

379     This incident caused post traumatic stress disorder, nightmares, and greatly exacerbated Chris' anxiety, and these conditions require regular, intensive rehabilitative therapy at substantial cost in time and money to address this trauma. Exhibit 1, Lt from Larry S. Wexler, PhD to WIU Pres. Huang dated 2-22-21.

380     Before exiting the public library, Chris verbally requested a copy of any police report or documentation of the library incident when it were to become available, but instead of providing that information, he was told to file a request with Sara Worthington of the WIU administration.

381    At 9/28/2019 6:30 pm, Chris sent an email expressing, *inter alia*, his deep concern about the incident as "being subjected to this extraordinary malfeasance and misconduct, it should be realized that my civil rights, as well as any and all such related rights protected by federal law, have been grossly, brazenly violated."

382    In that email, he requested again, this time in writing, to Sarah Worthington as instructed by OPS Officer Slater, a FOIA Request for a copy of any police report or documentation of the library incident. Exhibit 20, 1st FOIA Req. dated 9-28-19 and Gen. Counsel Email Mischaracterizing Date of FOIA Request.

383    A simultaneous copy of that email was sent to the WIU General Counsel, Elizabeth "Liz" Duvall as a "cc." *Id.*

384    By this notice on 9-28-19, Gen. Counsel Duvall was alerted to the anticipation of litigation regarding the denial of Chris' access to the Library with his service animal.

385    WIU admitted in a subsequent email that Chris and his service animal had been excluded from the library, but it contained an otherwise factually inaccurate apology with lukewarm assurance that he would be welcomed back with his service animal. Exhibit 21, Email Chain Dean of Lib. M. Lorenzen and C. Cesca re: Apology for Malpass Lib. Incident, dated 10-10-19.

386    The Malpass Incident interrupted Chris' pattern of successfully using frequent study groups at Malpass for three, going on four, semesters, and now had to find other locations and when they were available.

387    Chris' medical professionals have diagnosed Chris with Post Traumatic Stress Disorder as a result of the Library Incident, and the trauma still causes Chris not to return to the Malpass Public Library since being ejected and to avoid formation of a study group to meet there again as he had

frequently done because it contained one of the few such study rooms available on campus. Exhibit 1, Lt from Larry S. Wexler, PhD.

## 28. <u>Discriminatory Admin. Methods: Pres. Failed to Stop Continuing Unlawful Conduct</u>

*388*     Thereafter, Chris arranged by email to meet with Interim President Martin Abraham about the incident on 9/28/19 and other dire concerns. Exhibit 2, Opening Statement of C. Cesca in Mtg with M. Abraham on 11/15/19.

*389*     Although Chris was expected to come alone, he arrived at the meeting bringing his adoptive parents, Chris' friend, and Ned, his service animal as witnesses, but not an attorney as Pres. Abraham gave no indication one would be present representing WIU. *Id.*

*390*     However, Pres. Abraham brought his attorney, WIU Gen. Counsel Elizabeth L. Duvall, without providing Chris advance notice, in what Chris believes was an attempt by WIU to gain an unfair advantage over a student with a disability, rather than to settle the matter amicably. *Id.*

*391*     Chris again requested assistance from Interim President Martin Abraham regarding RA's for students with disabilities, including for Chris, but to no avail. *Id.*

*392*     There was no resolution at the meeting, but Chris clearly indicated to Pres Abraham and Gen. Counsel Duvall that "I would like to get resolution here. If I am not to get that resolution, I will seek resolution from other sources." *Id.*

**Abraham Promised Reimbursement But Broke That Promise**

*393*     During that meeting, Pres. Abraham admitted that reimbursement of the improper $842 health insurance charge "could be done" before Spring 2020 Semester, but to date this has not been addressed. *Id.*

*394*     At a later date, Chris met with V.P. Mark Mossman and complained, but Mossman called instructor's decisions allowable as "academic freedom."

*395*     Chris then met with and video recorded the then-new WIU President Huang, and fully apprised him of the pattern of discrimination, and requested remedies.

*396*     Chris gave Huang the available official documentation of this and other RA denials.

## 29. Discriminatory Criteria & Admin. Methods: Each WIU Prof. Independently Determines RA's

*397*     During that personal meeting, President Huang finally admitted to Chris after being pressed for a response, that each WIU instructor has the independent discretion to determine what RA's are adequate upon a student's request to that instructor for RA's.[48, 49]

*398*     This administrative delegation of the interactive process to each course instructor makes their new training in 504/ADA duties and procedures crucial for WIU students with disabilities, like Chris, even if WIU portrays such delegation as allowed under the guise of "academic freedom."

*399*     However, the pattern & practice of frequent, repeated failure of the WIU Instructors and responsible WIU Staff and authorized agents to acknowledge when a request for an RA is being made; failure to conduct adequate & complete the interactive process to determine the appropriate RA's and their accessibility; and failure to provide timely, accessible, & adequate RA's when Chris has requested them, even previously successful RA's, are a continuing violation of 504/ADA regulations by WIU as a public entity receiving federal monies.[50]

*400*     Said continuing violation demonstrates the Defendants WIU Board of Trustees & current WIU President Huang have failed to properly train WIU staff in their 504/ADA duties.

---

[48] This is at variance from the national practice according to academic surveys. "Faculty do not determine accommodations but are responsible for providing them." McCarron, E. C. (2020). Postsecondary Faculty and Willingness to Provide Academic Accommodations for Students with Learning Disabilities. *Journal of Postsecondary Education and Disability*, *33*(4), 339-352 at 339. https://files.eric.ed.gov/fulltext/EJ1293013.pdf

[49] This authority is also freely exercised by other WIU authorized agents and extracurricular officials.

[50] Sadly, this reflects the widespread practice among university instructors of resisting adequate RA's for students with LD in the U.S. See generally, McCarron, E. C. (2020).

*401*     Said continuing violation also demonstrates that the Defendants regularly use discriminatory criteria & methods of administration and cannot ensure the WIU programs, services & activities are nondiscriminatory in nature as required by law.

*402*     As a result, workable & successful RA's are still not dependably available to Chris.

**30. <u>Discriminatory Admin. Methods: Gen. Counsel Duvall Delayed Evidence for 800 Days</u>**

*403*     Pres. Abraham also claimed that WIU had responded to Chris' FOIA requests in a timely fashion, but the FOIA Response due from Gen. Counsel Duvall that she promised for 1/18/22 was still not received until *800 days after* the emailed written request on the day of the Library Incident, or until Monday, December 6, 2021.

*404*     No response had been received from that email addressee, Sarah Worthington, with any instructions or requirements in order to get a copy until 800 days later.

*405*     Another request was required to actually get a copy of the Incident Report, but even then, that incident report was only partially true and accurate, and appears to have been altered after initial completion by the OPS Officer on scene.

*406*     Chris requested a second mtg, Pres. Abraham agreed, but it never happened.

*407*     Three days after their meeting, in an 11/18/19 Email, Pres. Abraham told Chris that he would try to reverse the health ins. charge, and Chris would get his $842, plus 4 late tuition payment fees, back, but Chris has never received any word on them, even when Abraham transferred to the lower position of Provost.

**Notice of Alleged "Malfeasance and Misconduct" Sufficient to Anticipate Litigation after 9-28-19**

*408*     WIU President, other top WIU Administrators, & WIU General Counsel, Elizabeth "Liz" Duvall, had been immediately informed about the Library Incident the same day it had occurred on 9/28/19 by an email from Chris also requesting a copy of the Police Report of the Malpass Library Incident.

72

*409* Said email put Atty. Duvall, as the WIU General Counsel, on immediate notice that litigation was anticipated and likely to occur; this was especially true since Chris had previously complained to the EOA about WEMS, so he had a prior litigation history with WIU, such as it was.

*410* The Defendants and Gen. Counsel Duvall each know or had reason to know and probably approved the retention policies for security video recordings on campus, including regarding the Malpass Public Library.

*411* Upon receiving such notice, each Defendant and Gen. Counsel Duvall had an obligation to preserve the video by suspending the Malpass Public Library routine document retention/ destruction policy since they had reason to know a security video of the incident existed and that this policy would lead to destruction of that video otherwise 30 days from the Library Incident unless officially stopped.

## 31. <u>Discriminatory Admin. Methods: Gen. Counsel Duvall Failed to Preserve Video Evidence</u>

*412* Chris again reminded the WIU Administration and Atty. Duvall that there was reason to anticipate litigation regarding that incident when Chris had suggested the possibility of litigation when he met with Abraham and Duvall on 11-15-19.

*413* At all times pertinent, Atty. Duvall knew that security camera's in Malpass would very likely have recorded the incident at the entrance to the Library and at the front desk.

*414* Atty. Duvall had an obligation to put a "litigation hold" on library evidence immediately after the incident to ensure the preservation of all relevant documentation in anticipation of litigation, including any video security recording of the incident.

*415* Chris never received the documents promised by the WIU Interim President Abraham until Chris filed another FOIA request by email in which he also repeated in writing his oral request for documentation of the Library Incident. *Id.* Exhibit 20, 1st FOIA Req. dated 9-28-19 and Gen. Counsel Email Mischaracterizing Date of FOIA Request.

416     In the FOIA Response, Atty. Duvall admitted in writing that the video of the library incident had been destroyed under the Library's routine through its retention/destruction policy. *Id.*

417     Crucially, Gen. Counsel Duvall did not mention the FOIA request on the day of the Library Incident that she had received a copy of that same day, 9-28-19, in time to put a litigation hold on the Library Security Video Recording of the Library Incident.

418     Instead, Duvall mischaracterized the date of the FOIA Request for the Library Incident Report, then subsequently claimed the video had already been destroyed due to the automatic destruction policy at the Library.

419     Atty. Duvall did not explain in that writing what acts she took as WIU General Counsel to preserve the evidence of the Library Incident, if any, after she received notice of anticipation litigation on 9-28-19. *Id.*

420     Atty. Duvall had the duty to preserve said video in anticipation of litigation.

421     When she received the copy of Chris' email on the day of the incident, *Atty. Duvall actually knew or had reason to know that any library security video would be destroyed if she did not act immediately to preserve it as evidence.*

422     Gen. Counsel Duvall, who is also the ethics officer for the University, took no effective action to preserve evidence of the Library Incident. *Id.*

423     Chris ultimately received a FOIA Response with the Incident Report that showed Chris was forcibly removed from the Library, but Chris did not receive it for 800 days after the Incident.

424     That Report was missing critical information that was deliberately omitted, but that the on-scene OPS Officers had reason to know and include in their report. Exhibit 18, OPS Malpass Library Incident Report on Service Animal Exclusion dated 9-28-19, approved on 9-29-19.

425     Moreover, that OPS Malpass Library Incident Report was altered by as yet unknown person or persons from its original writing by the on-scene OPS officer.

*426*     Almost two weeks later, WIU Dean of Libraries Michael Lorenzen sent an email of apology.

*427*     Said email was vague & incorrect (e.g., recording the incorrect date of the incident) and did not even recount accurately the minimal true facts that were in the Incident Report. *Id.*, Exhibit 21, Email Chain Dean of Lib., M. Lorenzen and C. Cesca re Apology for Malpass Lib. Incident, dated 10/10/19.

*428*     These failures of administrative responsibility prevented effective appeal by Chris.

*429*     The failures demonstrate that WIU criteria and methods of administration were and are discriminatory against students with disabilities, including Chris, through deliberate indifference, recklessness, and/or malicious animus.

## 32. Discriminatory Criteria: Attendance & Course Administration Criteria Inconsistent

*430*     On a very few occasions, Chris has received 1:1 instruction in coursework by WIU instructors, which has established a precedent for replicable RA's, and he has done very well in such classes and obtained an "A" grade.[51] *Id*; Exhibit 9, Official WIU Transcript for Chris Cesca dated 1-21-22.

*431*     Strangely, LEJA Dept. Chair Jill Myers ordered Prof. Ekici to stop seeing Chris during his weekly office hours as a substitute for the class period.

*432*     LEJA Dept. Chair Jill Myers required Chris to be marked absent if he did not attend Prof. Ekici's class.

*433*     This is an instance of the inconsistently applied attendance policy at WIU since Prof. Ekici had not considered this an essential academic requirement before Chairperson Myers' intervention against Chris. Exhibit 22, Email from Prof. Niyazi Ekici to C. Cesca dated 2/14/20.

---

[51] Previously granted RA's are considered presumptively the minimum required RA's for high stakes testing by the U.S. Dept. of Justice, according to the ADA National Network. See https://adata.org/factsheet/postsecondary, last visited 12/27/21.

434     Chairperson Jill Myers has routinely refused each of Chris' requests for RA's with excuses, some of which refusals are directly violative of WIU Policy.

435     Chairperson Jill Myers' intervention with Prof. Ekici demonstrated her actual malice regarding Chris as a student with disabilities. *Id.*

436     Unfortunately, many WIU staff do not recognize, and do recalcitrantly refuse to adopt, previously successful RA's as precedent and as appropriate to reuse even when requested expressly by Chris or his medical provider on Chris' behalf. Exhibit 1, Lt from Larry S. Wexler, PhD to WIU Pres. Huang dated 2/22/21.

437     On many occasions, Chris was denied any RA adequate for his individual needs, and he has done poorly in such classes, obtaining lower grades than he is capable of earning and as his earlier GPA demonstrates that he could have made.

438     This includes at least 7 "F" grades (2 remained on his record from the initial pandemic semester in Spring of 2020 for courses without RA's), thus WIU denied Chris meaningful access and equal opportunity to participate in coursework and assessed repetitive charges as a further penalty. *Id*.

439     Strangely, one of these remaining "F's" is from Prof. Ekici's LEJA 303 course, even though Chris had a grade of approximately 96% (or an "A") when WIU shifted mid-semester to all online learning in March of 2020.

440     When confronted with Prof. Ekici's documented failure to communicate with Chris regarding remaining class requirements, Pres. Huang assured Chris that at least this issue with the course completion would be resolved; however, no such resolution has occurred since then.

441     Chris has also made many requests for RA's to address his difficulty in understanding information transmitted via computer monitors/overhead projectors, and he has requested alternative methods, but his requests are typically denied, with no optional RA's offered by WIU.

442     Frequently, Chris anticipates his challenges in understanding lectures, so he requests professors endorse and incentivize the formation of group learning opportunities with fellow students outside of classes, but this has frequently been ignored by instructors.

443     Another request typically denied Chris is that the WIU instructors provide assistance in taking lecture notes.

444     Commonly, Chris requests changes in meeting times or extending assignment deadlines because of his time management and punctual arrival challenges, assistance in organizing his personal studies, and in interacting with others, all to reduce disruption of classes; but typically no such RA's are provided.

445     WIU and its staff are engaging in deliberate indifference to the legal rights of students with disabilities, like Chris, when it has both knowledge that a harm is substantially likely, and that a failure to provide RA's are likely to harm Chris.

446     Frequently, WIU staff have refused to even acknowledge the legitimacy of Chris' disabilities when presented with a requested RA; they have also refused to acknowledge that his related coursework struggles are legitimate; and they have willfully refused to recognize Chris' needs for RA's.

447     For instance, when Chris took a course from John Butts, instructor in LEJA 306, Chris was constantly distracted by noise in the class, but Butts' typical dismissive response to Chris' requests for RA's, including enforcement of Misuse of Electronic Devices Policy, was "I'll take care of it."

448     However, Prof. Butt never provided the requested RA's, and Chris got an incomplete or "I" when he struggled to understand and complete the coursework. Exhibit 23, Email from Adm. Mark Mossman on Grading Correction Arrangements dated 9/21/20.

449     The provision of RA's in some classes allowed Chris to obtain an almost straight "A" average resulting in a 3.77 GPA on a four point scale with a class load including 200, 300 & 400 level

advanced classes during his first semesters at WIU; but for the disputed 2 classes, then he would have gotten straight "A"s for a 4.0 grade point average. Exhibit 9, Official WIU Transcript for Chris Cesca;

450    Chris' GPA has plummeted ever since the initial pandemic semester in Spring of 2020 in proportion to the denials of RA requests, in spite of those requests for previously workable & successful RA's, those for access to authorized AT and communication assistance, and those for timely responses to his requests.

451    After the March 2020 shift to online-only instruction, several of Chris' professors increasingly and inexplicably resisted engaging in the interactive process, frequently claiming Chris' RA requests, if granted, would be "unfair" to others in the class or would give Chris unfair advantage.

**Chris Needs Library Study Groups as RA's, But He Avoids Them for Fear of Retaliation**

452    Chris on his own initiative from his first semester at WIU had organized several study groups when he could not get official RA's, but as a result of the Library incident, Chris has developed a fear of going to the library, preventing its use for his study groups, but it is hard to find another study room or get students to come anywhere but the library to participate.

**33. _Direct Public Expressions of Hostility to Chris by WIU Professors_**

453    Some WIU Professors have ignored Chris's requests for RA's, delayed responding, and/or simply refused to engage in any continuing interactive process to determine RA's, and have unilaterally issued boilerplate accommodations without the needed interaction with Chris, to understand his individual needs and to adjust such routine measures to be effective for Chris.

454    Unfortunately, some WIU staff have also expressed obvious hostility to requests for RA's; Chris has been subjected to barking, yelling, and loud verbal recriminations at times by University professors when has made RA requests of them.

455     He has been subjected to bullying and intimidation in front of class and fellow students, thus showing the instructors either acted with deliberate indifference, recklessness, callous disregard and/or malicious animus.

456     When Chris repeatedly attempted to request RA's politely but firmly, at times WIU staff have engaged in various levels of threats, intimidation, coercion, interference & retaliation in response, and these acts & omissions have had more adverse effects on Chris when the pandemic arose and WIU abruptly switched to an online-only instruction format.

**Chris Intimidated, Segregated, & Publicly Humiliated in Front of Class by Professor**

457     For instance, Chris met with Prof. Macherie Placide during her office hours just before their Political Science class together to implore her for RA's.

458     During this meeting, Prof. Placide addressed Chris combatively and made numerous hostile accusations, including accusing Chris of telling her how to run her class.

459     Prof. briefly left her office to ask her Dept. Chairperson to come and intervene; when the Dept. Chairperson Keith Boeckelman came, and did nothing, but when they walked back to his office, Chris heard her say, "I don't have time for this."

460     When she returned to Chris waiting in her office, she denied saying anything, but concluded the meeting by saying "I'll see you in class" three times while glaring at Chris.

461     Chris arrived in the classroom 20 min. later and found that she had re-arranged Chris' desk that he had been using to *physically segregate* Chris from the class by placing it four to five feet in front of the first row of seats of the class and in the front of the class.

462     She stated the need for the class to observe the policy, but listed numerous excuses why students could easily avoid the policy, and then started a loud tirade and ridiculed Chris verbally in front of the class, apparently to intimidate and retaliate against Chris for his self-advocacy.

463     Ironically, the staff in the LEJA Dept. have committed WIU's greatest violation of the laws protecting disability rights in education as to Chris, rather than working to comply with the law.

464     LEJA Dept. staff have responded to Chris' RA requests by insulting him, by making demeaning allusions to his disabling conditions, and by taking direct action against him, thereby threatening, coercing, intimidating, and retaliating against, Chris when he self-advocates for RA's.

## 34. <u>Interference, Threats, Intimidation, Coercion & Retaliation in Response to Advocacy</u>

465     Throughout the educational environment, some Professors, Administrators, and Extracurricular Officials have responded to RA requests by threats, intimidation, coercion, interference & retaliation with the obvious purpose of getting Chris to stop his self-advocacy.

466     Typically, this is done by insulting Chris and making demeaning allusions to his disabling conditions, or by taking direct acts of retaliation that harm Chris in some way.

467     For instance, Chris requested a refund on the $842 optional student health ins. policy payment from Adm. Digger Oster in the Adm. Services Office (which oversees OPS) since Chris had not understood an email buried in the large volume of WIU email messages, or noticed any post card that was claimed as sent by WIU; it was reported to have stated in its wall of text that he could opt-out and not pay extra for WIU health insurance.

468     Administrator Oster's reported response regarding the inquiry about Chris, who had disclosed his reading comprehension deficit to Angie LaFrance of DRC/SDSC, was an insulting "Well, does he know how to read?"

469     Of course, Chris knows how to read *per se*, but he has a severe deficit in reading comprehension, especially on a computer monitor screen, and Chris was outraged and hurt when Chris heard the report of these words because someone in authority was taking discriminatory action against Chris.

*470*    The Defendants have knowingly aided or assisted subordinate decision-makers and program staff at WIU in the operation of programs, services and activities regarding Chris that are not equal to that provided to nondisabled students, resulting in nondisabled students being treated more favorably than Chris.

*471*    Many of Chris' denied RA requests were for academic adjustments that required (a) provision of auxiliary aids and services; (b) modifications to nonessential academic requirements; and/or (c) reasonable changes in the application of WIU policies, procedures, and practices.

**35. Discriminatory Admin. Methods: No RA's to Match Shift to All Online Learning.**

*472*    When WIU began online instruction for all students in the spring 2020 semester, Chris supplied additional documentation of learning disabilities and/or other associated challenges he had in online instruction to WIU instructors.

*473*    In the pre-pandemic period prior to the 2020 Spring Semester, WIU provided students with in-class instruction, and Chris had earned grades at WIU that were all "A" except for one "B" and one "D" which resulted from unmet RA requests.

*474*    Chris's online instruction *prior* to Spring Break 2020 produced the following results.

*475*    In the LEJA 303, Chris achieved a score of 95% prior to the pandemic.

*476*    In LEJA 306, Chris achieved an approximate grade of "B" prior to the pandemic.

*477*    In LEJA 312, Chris achieved an approximate grade of "B" prior to pandemic, and it was taught by Jill Myers, LEJA Dept. Chairperson.

*478*    In LEJA 357, Chris completed most of the classwork prior to the pandemic (grade: "A").

**36. Plaintiff's Grades without RA's Measured Cognitive Deficits, Not Learning.**

*479*      However, Chris's online instruction *after* Spring Break 2020, Chris' learning

environment changed drastically, and Chris produced the following results, consistent with Exhibit 9,

Official WIU Transcript for Chris Cesca dated 1-21-22:

*480*      In ECON 381, Chris's classwork was incomplete, but the Economics Dept.

accommodated Chris's need in order for Chris to finish the class.

*481*      In STAT 171, Chris summarily failed the course after going online for instruction, but he

took the class again in the Fall Semester of 2020, and he achieved a grade of "A." Exhibit 10, Email

Eskridge to C.Cesca, Repeating Course for Grade Replacement Policy, dated 1-11-22; *Id.*

**WIU Approach to Incomplete Courses Varied by Department**

*482*      After the pandemic was well underway and in response to his requests for reasonable

accommodation, the Instructor in ECON 381, Tara Feld, encouraged Chris to restart the course with her

without any penalty, academically or financially, and complete it when possible and reasonable for

Chris. *Id.*

*483*      The *precedent* of RA's for retaken coursework at WIU was thus established with this

approach in ECON 381. *Id.*

*484*      Although a few instructors used this precedent in the same and subsequent semesters,

the LEJA Department's approach to RA's was not consistent with other academic departments, was

contrary to this WIU precedent, and was recalcitrantly rejected when requested. *Id.*

*485*      The LEJA Instructors gave incomplete grades or "I"s which were ultimately changed to

failing grades or "F"s for LEJA 303/306/312, but only after great efforts and it was only a half-measure

since he should have been allowed to restart each course without penalty but with RA's for the retaken

course. *Id.*

*486*    The LEJA Dept. Chair, Jill Myers, defeated communication/resolution regarding RA requests from Chris to the LEJA Dept, as Chris noticed when multiple emails were sent to the pertinent instructor but no response occurred.

## 37. <u>Discriminatory Admin. Methods: LEJA Approach to Incomplete Courses Dysfunctional</u>

*487*    Chris began to understand the motivations of pertinent faculty when he accidentally came within hearing distance of a disparaging private discussion among LEJA staff (including one who never had Chris as a student) and the LEJA Dept Chair. *Id;* Exhibit 24, Emails C. Cesca and Professors Engaged in Disparaging Remarks about Chris, dated 8-23-21.

*488*    Chris met with WIU President(s), including the Defendant President, regarding this matter, without any resolution of the discriminatory pattern. *Id.*

*489*    This lack of LEJA Dept. responsiveness to Chris' RA request varied greatly from the Economics Dept. which prior to the pandemic allowed Chris to restart ECON 231 (where Chris was threatened & assaulted when he originally took that course).

*490*    Before, during, and after the widespread proliferation of the pandemic, the LEJA Dept. responded in a systematically inequitable manner to almost all of Chris' RA requests.

*491*    The LEJA Dept. stood alone in its recalcitrant refusals of RA's regarding retaking of classes, indicating deliberate indifference to Chris's rights as a student with disabilities, or actual malice, through its determined enforcement of its draconian refusals to make accommodations.

*492*    By stark contrast, several other departments responded equitably and productively to Chris' requests, as shown by the examples above.

**WIU Made Many Promises to Chris**

*493*    Part of the relationship between Chris as a student with disabilities and WIU as a public university is contractual in nature in that an implied contract has existed between Chris and WIU.

494     Chris can even point to identifiable contractual promises that WIU failed to honor as part of the terms of this implied contract.

## 38. <u>Multiple WIU Promises & Tuition Payments Created Implied Contract</u>

495     First, the catalogues, bulletins, circulars, promotions, and regulations of WIU, including the syllabus[52] that creates a "class contract" for each class, that it has made available to Chris and that information he gleaned from its website & otherwise when he chose WIU as his undergraduate school and first enrolled in 2018 constitutes a promise, *inter alia*, that he could obtain a bachelors degree in professional law enforcement and justice administration if he successfully completed the required coursework and paid tuition. Exhibit 3, WIU Website Screenshot - LEJA Promotion.

496     Chris relied on these promises when he applied to WIU, began as a WIU student, and paid tuition, but WIU broke these promises by denying his re-enrollment in further courses towards his degree for the Fall 2022 Semester, discouraging his completion of LEJA courses and extracurricular activities, and thereafter, resulting in loss of federal financial aid support for his living expenses, more emotional trauma, depression and anxiety for Chris, and further delay in his graduation & the opportunity to apply for federal law enforcement jobs before he ages out of eligibility.

497     Second, the WIU promised in its published "Misuse of Electronic Devices Policy" that students, esp. those with communication deficits like Chris, will be able to listen to and concentrate on classroom lectures without distractions from other students' laptops, cell phones, smart watches, etc.

498     Chris relied on this promise of a undisturbed classroom, but WIU has frequently broken it, causing Chris' inability to participate and understand many classes he paid for, and resulting in his low grades in those courses; threat and assault by another student in another course; and in public

---

[52] During Fall 2018 Semester, Chair of the Kinesiology Dept. Prof. Renee Polubinsky actually referred to Chris' KIN 290 syllabus from Prof. Miguel Narvaez as a "class contract."

humiliation by at least one instructor in front of his classmates when he requested enforcement of that policy.

498.a   Third, on 11-15-19, Interim Pres. Martin Abraham expressly promised to Chris personally that reimbursement of the improper $842 health insurance charge "could be done" before Spring 2020 Semester, and Chris relied on this promise, but this promise was broken to the extent that the charge remains on his student account; since then, WIU has issued many fees and charges at least partially based on this charge to his account. Exhibit 2, Opening Statement of C.Cesca in Mtg. with M. Abraham 11/15/19.

499   Chris has relied and continues to rely on these and other written & oral promises, but many have been broken to Chris' detriment.

### 39. Due to WIU's Recalcitrance, Court Action Is the Plaintiff's Only Recourse Now.

500   For well over four years, Chris has diligently reported these acts of discrimination to professors, Dept. Chairpersons, up the chain of command to WIU Administrators and to two of the three presidents of WIU over that time, as the attached exhibits show.

501   However, Chris has received little help in obtaining compliance with law; instead he has received everything from a vague and factually inaccurate written apology about his exclusion of Ned and Chris from the Malpass Public Library, to unfulfilled promises of reform in person, to nothing at all, in response to his complaints and requests for action.

502    Even appealing the university related employment discrimination to the WIU Office of Equal Opportunity and Access was unavailing and discouraging since it is the only appeals process for discrimination against students with disabilities, but it was no help at all to Chris.

503   Chris' efforts to obtain adequate RA's to participate in coursework have exhausted Chris, and the repeated academic failures have resulted in secondary trauma to Chris, leaving Chris terrified to go on campus with a service animal.

504     The totality of circumstances demonstrate that the acts that collectively form the continuing violation are so severe or pervasive that they constitute a hostile educational environment for Chris at WIU. Exhibit 1, Lt from Larry S Wexler, PhD. to WIU Pres Huang dated 2/22/21.

505     Tragically, many of the responses from WIU Administrators leave Chris with inadequate accommodations, no way of succeeding in academic coursework or meaningfully participating in extracurricular activites, and diminish the hope of a successful career in law enforcement.

506     Chris is faced with continuing violation of his disability rights by WIU through negligent mismanagement, deliberate indifference, and/or actual malice, colored by academic gossip amongst the bullying professors & faculty, reinforcing disability stereotypes and reinforcing animus towards Chris and others with disabilities. Exhibit 24, Emails C. Cesca and Professors Engaged in Disparaging Remarks about Chris, dated 8-23-21.

507     Unfortunately, Chris' near straight A record prior to the pandemic has been reduced to virtually all F's in the most recent classes, and this career-destroying pattern of academic failure is one that he does not deserve, especially after and vigorously attempting to secure RA's that would have ensured his A+ excellence as the evidence shows. *Id.*

508     WIU and the Defendants acted intentionally or/and with deliberate indifference, and they knew or had reason to know of the inaccessibility of its technologies and the barriers experienced by qualified individuals with communication deficits, including through emails, complaints, and contacts with administrators, instructors, personnel, and assistants, since WIU registered such students to receive initial accommodations, including Chris, with the DRC/SDSC.

509     As a result of WIU's continual unlawful discrimination, Chris as a qualified student with disabilities has suffered damages and injuries, including emotional harm, humiliation, frustration, and distress through this convincing mosaic of discrimination. *Id.*

## 40. CONCLUSION

*510* Chris has informed whatever WIU functionary was available and responsible for RA's of the need for accommodations, and of these failures and the harm to Chris that results from these violations and what should be done to rectify the situation. *Id.*

*511* Chris is determined to obtain a double degree in LEJA and Economics and to pursue a career in Law Enforcement, if only he can get WIU, especially its LEJA Dept., to follow the letter of the law and level the playing field by providing Chris with reasonable accommodations. *Id.*

*512* In addition to his constructive exclusion from WIU courses, on 2-2-23, the WIU Gen. Counsel Duvall sent Chris a collection demand letter for for monies due, threatening to sue Chris in court if he does not arrange to start paying this premature and unfair bill within 30 days.

*513* However, the Defendants are standing by without intervening to prevent the violation of Chris' statutory and constitutional rights, even though they had reason to know of these violations and had multiple opportunities to intervene, and nevertheless allow WIU to obstruct and delay the interactive process, and fail to communicate its formal responses to Chris's RA requests.

*514* Due to the continual unlawful acts and omissions impairing his past, current, and future participation in WIU programs, services and activities as a qualified student with disabilities, Chris faces university collection action and exclusion from degree progress that is so definitive as to have resulted in a deprivation of his federal rights, and he has no recourse but to file this action in federal court.

## 41. <u>COUNT I</u>

**VIOLATION OF 504 & TITLE II OF THE ADA**
**BY DISABILITY DISCRIMINATION THROUGH FAILURE**
**TO PROVIDE INTERACTIVE PROCESS FOR REASONABLE ACCOMMODATIONS**
**(29 U.S.C. §794 & 34 C.F.R. Part 104; 42 U.S.C. §§ 12131-12134; 28 C.F.R Part 35 )**

*515*     The allegations contained in the preceding paragraphs are incorporated by reference as if set out here in full.

*516*     The Plaintiff at all times pertinent has been an otherwise qualified student with disabilities that substantially limit several of his major life activities; has a history of disabilities; and/or is considered disabled by the Defendants and WIU's authorized agents.

*517*     The Plaintiff's disabilities adversely and severely affects his participation in post secondary education.

*518*     The Plaintiff has repeatedly informed and continues to inform pertinent WIU officials, staff and program authorities of these limitations on his participation at WIU.

*519*     Since his enrollment in 2018, the Plaintiff has repeatedly requested reasonable accommodations, including appropriate academic adjustments and auxiliary aids and services that are necessary to afford the Plaintiff an equal opportunity to participate in the school's program and so he can fully participate in the educational environment at WIU.

*520*     In the case of virtually all such requests, the Plaintiff's requests have been reasonable and the Plaintiff's requests that have been tried have been shown to be reasonable by their demonstrated workability for WIU and their success in allowing the Plaintiff to learn and achieve high grades.

*521*     Also in the case of virtually all such requests, the Plaintiff has made himself available to WIU to engage in a complete & user-friendly interactive process to gather sufficient information from the Plaintiff as a disabled student and from his qualified experts as needed to determine what accommodations are necessary to arrange mutually agreeable RA's.

*522*     The Defendant Pres. Huang and the Defendant Western Illinois University Board of

Directors, with the apparent full knowledge of its Gen. Counsel, through the authorized employees and

agents they supervise, have frequently failed to provide RA's or simply denied the Plaintiff's requests

out-of-hand, and when denied, they have typically refused to provide any explanation as to the denial

of requests or to engage in or to continue the interactive process to its successful conclusion.

*523*     WIU which receives and distributes to students federal financial aid funds, due to the

disabilities of the Plaintiff as an otherwise qualified student, by denial of his access to the interactive

process has subjected the Plaintiff to discrimination in violation of 29 U.S.C. §794 and its

implementing regulations at 34 C.F.R. Part 104, and of similar ADA rights[53] by:

(a) Denying the Plaintiff as a student with disabilities, his requests for reasonable

accommodations from participation in, from enjoying the benefits of, or from otherwise avoiding costs

of, health insurance, financial aid, transportation & parking, other extracurricular or nonacademic

services, or other postsecondary education aid, benefits, or services, 34 C.F.R. § 104.43(a);

§ 104.47(2)(c)

(b) Constructively or actually excluding the Plaintiff, on the basis of his disabilities, as an

otherwise qualified student with disabilities from academic courses, courses of study, or other parts of

its education programs or activities, 34 C.F.R. § 104.43(c);

(c) Not Operating its programs or activities in the most integrated setting appropriate, 34 C.F.R. §

104.43(d);

(d) Not making such modifications to its academic requirements as are necessary to ensure

that such requirements do not discriminate or have the effect of discriminating, on the basis of

disability, against an otherwise qualified applicant or student with disabilities, 34 C.F.R. § 104.44(a);

---

[53] This includes the ADA integration mandate and its broad judicial interpretation in *Olmstead v. LC*, 527 U.S. 581, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999) and its progeny.

(e) Imposing upon the Plaintiff, an otherwise qualified student with disabilities, other rules, such as, *inter alia*, rules on the prohibition of tape recorders in classrooms & programs or of his service animal in campus buildings, both of which contravened his pre-existing and officially granted RA's by WIU, that have the effect of limiting his participation as a student with disabilities in the WIU's education programs or activities, 34 C.F.R. § 104.44(b);

(f) Not providing in the Plaintiff's course examinations or other procedures for evaluating his academic achievement, such methods for evaluating the achievement of such students who have a disability that impairs sensory skills that will best ensure that the results of the evaluation represent the student's achievement in the course, rather than reflecting the student's impaired sensory skills, 34 C.F.R. § 104.44(c);

(g) Failing to take such steps as are necessary to ensure that the Plaintiff as a student with a disability is not denied the benefits of, excluded from participation in, or otherwise subjected to discrimination because of the absence of educational auxiliary aids for students with impaired sensory skills, 34 C.F.R. § 104.44 (d)(1);

(h) Providing less financial assistance than is provided to non disabled students, limiting eligibility for assistance, or otherwise discriminating, 34 C.F.R. § 104.46 (a)(1)(i);

(i) Denying, as a qualified student with disabilities, benefits or services for health, welfare, or other social services, 34 C.F.R. § 104.52(a)(1);

(j) Affording an opportunity to receive benefits or services that are not equal to or as effective as the benefits or services provided to others, 34 C.F.R. § 104.4(b)(2)&(3), § 104.52(a)(2);

(k) Assisting any agency, organization or person in providing employment opportunities to any of its students without ensuring itself that such employment opportunities, as a whole, are made available in a manner that would not discriminate if they were provided by the university. 34 C.F.R. § 104.46 (b);

(l) Significantly assisting fraternities or similar organizations without assuring itself that the membership practices of such organizations do not permit discrimination otherwise prohibited, 34 C.F.R. § 104.46 (c);

(m) Providing benefits or services in a manner that limits or has the effect of limiting his participation, 34 C.F.R. § 104.52(a)(4);

(n) Providing different or separate benefits or services to him except where necessary to provide him with benefits and services that are as effective as those provided to others, 34 C.F.R. § 104.52(a)(5);

(o) Failing to provide  notice concerning benefits or services or written material concerning waivers of rights or consent to treatment and to take such steps as are necessary to ensure that he as a qualified student with disabilities, including impaired sensory skills, is not denied effective notice because of his disabilities, 34 C.F.R. § 104.52(b); and

(p) Failing to provide appropriate auxiliary aids to  as a student with impaired sensory skills where necessary to afford him an equal opportunity to benefit from the service in question. 34 C.F.R. § 104.52(d)(1).

*524*     accommodations are necessary to arrange mutually agreeable RA's.

*525*     All of this continual unlawful conduct has caused harm to the Plaintiff and is harming him by emotional pain and suffering, loss of reputation, segregation & social isolation from his fellow students, reduction in academic standing, increased expenses, and financial loss of grants, scholarships & income, and this conduct has restricted and impaired his educational & occupational opportunities and expected earning power.

## 42. <u>COUNT II</u>

### VIOLATION OF 504 OF REHABILITATION ACT & TITLE II OF ADA
### BY USE OF DISCRIMINATORY CRITERIA & METHODS OF ADMINISTRATION
### (29 U.S.C. 794; 34 CFR 104.43(a) & 42 U.S.C. §§ 12131-12134; 28 C.F.R Part 35[54])

*526* The allegations contained in the preceding paragraphs are incorporated by reference as if set out here in full.

*527* The Defendant Pres. Huang and the Defendant Western Illinois University Board of Directors, with the apparent full knowledge of its Gen. Counsel, through the authorized employees and agents they supervise, have also further subjected the Plaintiff Chris Cesca to discrimination in violation of 504 at 34 CFR 104.43(a) and of similar rights cited or referenced here under ADA, 42 U.S.C. §12132 and its implementing regulations, 28 C.F.R. Part 35, by directly or through contractual, agency, or other arrangements, utilizing criteria or methods of administration, including insufficient and inconsistent policies, practices, and procedures:

(a) That have the effect of subjecting the Plaintiff as an otherwise qualified individuals with disabilities to discrimination on the basis of disability, 28 C.F.R. § 35.130(b)(3)(i); or

(b) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to the Plaintiff with disabilities, 28 C.F.R. § 35.130(b)(3)(ii).

*528* These WIU discriminatory criteria and methods of administration include, but are not limited to, the following:

(a) **False Equivalence**. Discriminatory criteria that posit a false equivalence between the legal obligations to a student with disabilities who needs & requests a reasonable accommodation, such as the Plaintiff, and a nondisabled student, to negate the institutional requirements under 504 and the

---

[54]Guidance on ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Governmental Services, 28 C.F.R. pt. 35 app. B (2018).

ADA, such as the criteria expressed as "if we give it to you, we have to give it to everybody," to deny reasonable accommodations requests.

(b) **Dysfunctional Interactive Process.** Methods of administration that have failed to provide the Plaintiff as a student with communication deficits with meaningful and timely access to programs, services and activites via a complete & user-friendly interactive process by which he can obtain reasonable accommodations and effective & timely notice of the determination of them, first verbally to inform, then in writing by email to document, the extent and details of the accommodation.

(c) **Lack of Timely RA Decisions, No Explanations of Refusals, & Futility of Appeal**. Methods of administration that have frequently and repeatedly failed to provide the Plaintiff as a student with disabilities with requested reasonable accommodations in a timely fashion or explain refusals of them, and/or have provided no appeal process that can provide an effective solution to the denial of a request for a reasonable accommodation to make the Plaintiff whole for unfair decisions.

(d) **Irrational Refusals to Replicate RA Precedent Already Proven Workable & Successful**. Methods of administration that have specifically failed or refused to replicate previously provided reasonable accommodations that have proven to be precedent of workable for WIU & successful for the Plaintiff, which is contrary to the U.S. Dept. of Justice default standard for granting such past successful RA's as precedent for RA's for high stakes testing;

(e) **Failure to Communicate Effectively**. Methods of administration that have failed to notify the Plaintiff as a student with communication deficits of key academic, programmatic, and financial information in an effective & timely manner, first by verbal means, and then by written documentation, after repeated requests for such notification;

(f) **Ineffective Use of Assistive Technology**. Methods of administration that fail to use assistive technology effectively, such as failing to use effective text-to-speech software access to its

emails/website, and insisting on the use of the regular emails/website notice that is ineffective for students with vision-based communication deficits, such as the Plaintiff;

(g) **Mandating, Allowing, and/or Repeating Harmful Procedures.** Methods of administration that function to duplicate the harm to, or exacerbate the difficulties flowing from, the disabilities of students with disabilities, such as the Plaintiff, including:

(i) Requiring the retaking of failed or incomplete courses without provision of requested RA's for courses originally taken without provision of those RA's requested by the Plaintiff;

(ii) Allowing lax enforcement of the WIU Misuse of Electronic Devices Policy by not requiring instructors: A.) to remind students of the policy at the beginning of each class; B.) to direct students not to disrupt classes with cell phone use; laptop use without authorization as an RA as the Plaintiff has obtained; or disruptive conversation; and C.) to use decisive action to stop these types of class disruptions when they occur, all without singling out or socially isolating any students with vision-based communication deficits who may or may not request such policy enforcement, such as the Plaintiff, and  D.) to require extracurricular program leaders to begin each meeting with a reading of the same reminders about ADA rights that course instructors read at their initial classes;

(h) **Inadequate Supervision of Nonacademic Programs.** Methods of administration that fail to supervise and oversee authorized nonacademic programs, such as extracurricular program, fraternities, etc., including methods that fail to require verbal notice of disability rights at the initial sesson of each program during a semester, as are required for academic classes.

(i) **Inadequate Training & Monitoring.** Methods of administration that fail to include sufficient training & regular monitoring of staff, including professors, instructors, teaching assistants, agents, other program authorities & volunteers in their duties & responsibilities under the ADA, including the proper criteria, procedures, and methods to effectuate the mandate against discrimination found in the statutes themselves, such as those:

(A) For recognizing, acknowledging and assessing the consequential limitations that result from students' disabilities, such as the Plaintiff's, and for determining and providing written notice of RA's in a timely fashion after full consideration of the students' requirements for effective course scheduling, sign-up, completion and payment;

(B) For engaging in and maintaining a continuous interactive process with students with a vision-based communication deficit, such as the Plaintiff, until a workable and successful RA is determined and the student is notified of it verbally, then is provided a written follow up, or until WIU informs that student verbally, then with a written follow up, by explaining how the requested RA is a fundamental alteration of its program or places an undue burden on WIU;

(C) For reliably implementing WIU policies that benefit students with disabilities, such as the Plaintiff, and consideration of modification of those WIU policies that prevent their meaningful access to programs, services, and activities of WIU;

(D) For verbally notifying important information, such as attendance requirements, and the availability of eligibility determinations of, and arrangements for, grants & federal financial aid, to students with vision-based communication deficits, such as the low income Plaintiff, including training on basic ways to provide accessible vision-based communication, including exchanging notes, posting written announcements to go with spoken announcements, and verbally providing printed information upon request;

(E) For using financial and program criteria that prevent students with disabilities, such as the Plaintiff, from being unnecessarily disadvantaged, determined ineligible, or denied, regarding grants, scholarships, and federal financial aid, without a sufficient program reason also applicable to students without disabilities, such as being fraudulently charged for tuition for courses not comprehensible by the student because requested RA's were never provided;

(F) For preventing the inappropriate charging of fees for courses WIU has reason to know are for courses not comprehensible by the student during a retaking because needed RA's are not provided;

(G) For preventing the requirement of discriminatory course retaking by students with disabilities, such as the Plaintiff, and their artificial retention without consideration of the lengthy delay in their graduation, the attendant increases in living costs required to maintain residence and sustenance, and the loss of occupational income during that delay; and

(H) For preventing the improper accounting of federal financial aid & grants due students with vision-based communication deficits, such as the Plaintiff, by misrepresenting that the student had been provided a course, knowing that he was never provided that course in a comprehensible manner, and using that misrepresentation to charge the student's financial aid allotment for the course tuition, to the student's detriment, and doing the same for retaking of the course.

*529*      All of these continual unlawful criteria and methods of administration have caused harm and are causing harm to the Plaintiff by emotional distress, pain and suffering, embarrassment, loss of future opportunity, segregation & social isolation from his fellow students, reduction in academic standing, and increased expenses, financial loss of grants, scholarships & income, and these acts have restricted and impaired his educational & occupational opportunities and expected earning power.


### 43. COUNT III

### VIOLATION OF 504 & TITLE II OF ADA
### BY HOSTILE EDUCATIONAL ENVIRONMENT

*530*      The allegations contained in the preceding paragraphs are incorporated by reference as if set out here in full.

*531*     The Plaintiff has been and continues to be subjected to harassment from the accumulation of repeated conduct over time based on his disabilities; that harassment was and is unwelcome.

*532*     The Plaintiff's educational environment at WIU is permeated with discriminatory intimidation, ridicule, and insult that is more than merely offensive and is sufficiently severe or pervasive to alter the conditions of his learning and creates a hostile educational environment.

*533*     The Defendant Pres. Huang and the Defendant Western Illinois University Board of Directors, with the apparent full knowledge of its Gen. Counsel, through the authorized employees and agents they supervise, have a duty to administer WIU programs, services and activities for students with disabilities, such as the Plaintiff, on an equal basis as those for students without disabilities.

*534*     The Defendants have been notified, or have reason to know, of the discriminatory actions and omissions of WIU and its agents regarding the Plaintiff.

*535*     These WIU conditions are pervasive for the Plaintiff, experienced by him as severe, and they can entail and have entailed physically threatening and deliberate conduct to embarrass and humiliate him, and they unreasonably interfere with his educational performance by causing him to feel defeated, helpless, and stressed, and even more severely depressed and anxious than his pre-existing disabilities make him feel otherwise.

*536*     The Defendants through their employees and agents have engaged in actions and omissions that are clearly unreasonable in light of the known circumstances, and result from violation of the rights of the Plaintiff as a student with disabilities as shown by the convincing mosaic of discrimination comprised of ample circumstantial evidence of ambiguous statements, suspicious timing, and otherwise, recklessness, and/or from malicious animus.

*537*     Unsurprisingly, this continuing unlawful discrimination has created bad memories which he recalls vividly when he considers attending, visiting or using certain campus locales to study or

organize study groups as he has in the past, such as the library, as his licensed health care providers are willing to corroborate.

538     This continuing unlawful discrimination has caused harm and is causing harm to the Plaintiff and has resulted and is resulting in his inability to focus properly on his learning.

539     The result is harm to the Plaintiff psychologically, emotionally and physically, and to his educational and career prospects and outcomes through his emotional pain and suffering, loss of reputation, segregation & social isolation from his fellow students, reduction in academic standing, and increased expenses, financial loss of grants, scholarships & income, and has restricted and impaired his educational & occupational opportunities and expected earning power.

## 44. COUNT IV

### VIOLATION OF 504 & TITLE II OF ADA BY
### INTERFERENCE, THREATS, COERCION, INTIMIDATION, AND/OR RETALIATION
### (29 U.S.C. 794; 34 CFR 104.43(a); 42 U.S.C. §§ 12131-12134; 28 C.F.R Part 35

540     The allegations contained in the preceding paragraphs are incorporated by reference as if set out here in full.

541     The Defendants knew or had reason to know that at all times pertinent that he was an otherwise qualified student with disabilities, and that he was a public, open advocate for students with disabilities, including himself, engaging in a statutorily protected activity.

542     The Defendants or their authorized agents at times acted, or failed to act, in a materially adverse manner to coerce, intimidate, threaten, interfere with, and/or retaliate against the Plaintiff due to his disabilities and/or for his advocacy.

543     There is a causal link between the Plaintiff's protected activity and the adverse actions or omissions; sometimes this is made apparent by the closeness in time of the advocacy actions and the harmful responses by others.

544     At other times, the causal link is apparent from the expressions of malicious animus.

**Malicious Animus, Interference & Retaliation**

545     By the direct evidence of animus, it is clear that WIU and its authorized agents have acted to interfere, threaten, coerce, intimidate, and/or retaliate against the Plaintiff with a disability in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the 504 at 29 U.S.C. 794, or its regulations at 34 C.F.R. Part 104, or by similar rights under ADA, 28 C.F.R. § 35.134(b).

546     These acts and omissions are unlawful acts that constitute a widespread pattern or practice of discriminatory and retaliatory conduct that have caused and continue to cause harm to the Plaintiff by emotional distress, pain and suffering, loss of good reputation, segregation & social isolation from his fellow students, reduction in academic standing, increased expenses, and financial loss of grants, scholarships & income, and these acts have restricted and impaired his educational & future occupational opportunities and expected earning power.

## 45. <u>COUNT V</u>

### DEPRIVATION OF RIGHTS
### UNDER THE FOURTEENTH AMENDMENT
### OF THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

547     The allegations contained in the preceding paragraphs are incorporated by reference as if set out here in full.

548     The Plaintiff sues the Defendants here in their individual capacity for compensatory & punitive damages, and in their official capacity for prospective injunctive relief.

549     The Plaintiff alleges that he was deprived of rights secured by the Constitution or the

laws of the United States.

550     The Plaintiff alleges that these violations were taken by the Defendants and their employees and authorized agents by state action and under the color of law.

551     This state action has been taken by WIU employees and authorized agents acting on behalf of WIU pursuant to state authority, or through misuse or abuse of their official positions when acting inconsistently with state law and authority, to bring about the Plaintiff's constitutional deprivations.

**Plaintiff's Property Interest in Implied Contract Subject to Constitutional Protection**

552     An implied contract has existed between the Plaintiff and WIU at all times pertinent based upon the promises made by WIU to the Plaintiff who has paid tuition in reliance on those promises.

553     In spite of his reliance on the promises made by WIU, both those cited above and others, the Defendant Pres. Huang, his predecessor, then-Interim Pres. Martin Abraham, and the Defendant Western Illinois University Board of Trustees, with the full knowledge of its Gen. Counsel, through the authorized employees and agents they supervise, have breached the said implied contract, to the Plaintiff's detriment.

554      Such implied contract is a property interest subject to constitutional protection, and the Plaintiff has rights to tangible continuing benefits from this implied contract.

555     By its acts and omissions of continuing unlawful conduct that is an accumulative denial of due process of law, WIU has breached this protected property interest for which the Plaintiff seeks relief, as stated below.

**Plaintiff's Liberty Interest in Access to Education**

*556* Further, the Plaintiff also has a protected liberty interest in access to education at Western Illinois University as a state citizen and admitted student at all times pertinent and that constitutionally protected liberty interest has also been violated.

*557* In spite of his reliance on this interest to complete his degree, both as cited above and otherwise, WIU has violated that liberty interest to the Plaintiff's detriment.

*558* Such access to education is a protected liberty interest subject to constitutional protection, and the Plaintiff also has rights to tangible continuing benefits of this liberty interest for which the Plaintiff seeks relief, as stated below.

**Continuing Right to Tangible Benefits**

*559* These specific rights to tangible benefits include, *inter alia*, specific performance of the implied contract; the right to a continuing education; the right not to be suspended, refused re-enrollment for courses, unfairly denied his federal financial aid entitlement; and the right not to face cost, consequence or penalty for circumstances outside of his control, all without good cause and due process of law, until such time as the Plaintiff matriculates and obtains his desired degree, or he voluntarily leaves WIU.

**Fourteenth Amendment Right to Due Process**

*560* To enforce these interests, the Plaintiff has a constitutional right to due process of law in in recognition of this implied contract and liberty interest.

*561* Various WIU personnel, including top administrators, department, program & extracurricular officers and faculty advisors have treated the Plaintiff with acts and omissions that were unreasonable, and the Defendants knew or had reason to know of this conduct but have allowed this conduct to continue unabated.

**Defendants Personally Responsible & Caused Denials of Due Process**

*562*	The Defendants are personally responsible for said constitutional violations because the conduct causing the constitutional deprivation has occurred at their direction or with their knowledge and consent; the Defendants knew about said conduct, facilitated it, approved it, condoned it, or turned a blind eye to that conduct.

*563*	The Defendants' personal involvement in the constitutional deprivation flows from the causal connection between Defendants and the conduct alleged here.

*564*	The Defendants, and those under their control, WIU and its authorized agents, have failed to provide due process by which students with disabilities, including the Plaintiff, could fairly challenge said conduct and be made whole for the denials of these non-employment rights and constitutionally protected interests.

*565*	These constitutional violations were caused by (a) widespread policies, practices & customs that approach the force of law and/or (b) by one or more officials with final policymaking authority.

*566*	Those customs, practices and/or policies did violate the Plaintiff's interests in implied contract in property and in liberty by denying his rights to due process under the Fourteenth Amendment to the U.S. Constitution, *inter alia*, by:

 (a) failing to provide effective and timely, advance verbal notice of requirements for waiver of, or participation in, programs, services, & activities of WIU and its authorized agents;

 (b) denying pre-termination hearings before ceasing the Plaintiff's needs-based financial aid entitlement by which he supplemented a large part of his low income, which deprived him of the very means by which to live;

 (c) denying access to courses; incorrectly computing & failing to issue fair & accurate grades once earned; charging fees for classes which were provided in an incomprehensible manner for the Plaintiff

with a vision-based communication deficit; and refusing regular semester re-enrollment purportedly based on the related and consequent accumulation of amounts unfairly added to his student account, both those currently considered paid & unpaid which the Plaintiff is now unable to pay;

  (d) failing to give primary consideration to, and failing to honor, the choice of aid or service requested by the Plaintiff who has a communication disability, without  demonstrating that another equally effective means of communication is available, or that the use of the means chosen would result in a fundamental alteration or in an undue burden;

  (e) failing to provide timely knowledge of the reasons or explanations for official actions detrimental to the Plaintiff at least sufficient for him to understand and prepare a rational appeal, including, but not limited to, reasons regarding refused modifications, including accommodations, restrictions & exclusions regarding courses & extracurricular activities and related services;

  (f) denying timely, fair, & effective appeal to reverse unfair administrative, academic & financial aid decisions detrimental to him, and/or fragmenting such appeals so that the Plaintiff could not be made whole for the violation of his rights in a timely fashion upon otherwise prevailing in a timely appeal;

  (g) by demanding immediate payment or payment arrangements for educational services, programs and opportunities that the Plaintiff did not receive, could not benefit from, and/or were faulty by design, considering his disabilities, through Gen. Counsel Duvall's 2-2-23 Demand Letter and otherwise; and

  (h) by destroying evidence of the denial of the Plaintiff's property or liberty interest, or otherwise delaying or making such material evidence unavailable to the Plaintiff, thereby preventing effective due process appeal of those denials;

  (i) by segregating the Plaintiff from other students with and without disabilities, and constructively excluded him from participation in academic and student life in breach of this implied contract without good cause or due process of law; and

(j) by Library staff directing OPS to exclude Chris from the Malpass Public Library when using his trusty service animal, Ned, WIU further violated Chris' liberty interest in access to education, without good cause or due process of law.

567     By its actions and omissions of continuing unlawful conduct in an accumulative, synergistic denial of due process of law, the Defendants have also denied, altered, and constructively extinguished the ability of the low income Plaintiff to complete the WIU degree needed to proceed with his intended occupation in law enforcement.

568     The Defendants have shown deliberate indifference, recklessness and/or malicious animus in depriving the Plaintiff of his protected property and/or liberty interest such that they have violated the Constitution regardless of whether the acts or omissions were performed by supervisor or subordinate.

569     The Defendants have created and maintained customs, usage practices and/or policies and used them to cause harm to Plaintiff when it either implemented them, failed to implement them, or directly refused to implement them, all to the Plaintiff's detriment.

570     In part, this has been caused by the Defendants' failure to train and supervise its employees and authorized agents to proficiency.

571     The Defendants' continuing unlawful conduct in violating these rights has been undertaken while they actually knew or had reason to know of the continuing risk of severe harm to the Plaintiff and knowingly disregarded it nonetheless, or undertook this conduct with malicious animus.

**Violations Caused Harm to Plaintiff**

572     By this continuing violation of constitutional rights described above, the Defendants have caused extensive detriment to the Plaintiff by inflicting emotional distress; pain and suffering; damage to his occupational prospects; segregation & social isolation from his fellow students; reduction in academic standing & loss of academic reward; loss of years of time; and related increased

expenses for personal living & debt; extra, unfair charges, fees, & fines; financial loss of grants, scholarships & funds to supplement his income; and other acts & omissions, many of which are unknown to the Plaintiff, but which have impaired his situation as a low income student with disabilities.

*573*     Unfortunately, the Plaintiff is unlikely to be made whole by compensatory relief alone because:

a.) his cognitive disabilities have made it difficult at times to recognize that which others might readily understand to be compensable harms;

b.) the long length of time that the Defendants have caused the Plaintiff's injuries & losses;

c.) the Plaintiff's limited knowledge of legal standards and how to determine how to prove his entitlement to relief before representation by counsel;

d.) the difficulties in detecting the breadth of the harm done to him;

e.) the difficulties in placing a value on the types of harm done to him; and

f.) the great magnitude of offensiveness of the Defendant's actions against him.

## 46. PRAYER FOR RELIEF

**THEREFORE**, the Plaintiff, Christopher Cesca, requires injunctive relief, and both compensatory damages and punitive damages to make him whole, and to deter or punish the Defendants from committing future harm to the constitutional, civil and disability rights of the Plaintiff and other students with disabilities for whose rights he has advocated.

**WHEREFORE**, the Plaintiff prays for this Court to issue an Order to:

1.     Grant judgment in favor of Plaintiff, Christopher Cesca, a student with disabilities, and against the Defendant Western Illinois University Board of Trustees and the Defendant WIU Pres. Guiyou Huang, on all Counts; and

**Findings**

2.         Find & declare that said Plaintiff did act at all times pertinent as a public, open advocate for students with disabilities, including himself, at Western Illinois University, and it is supported by 504 and the ADA as a protected activity, but that the Plaintiff has been harmed for this advocacy by said Defendants;

3.         Find & declare that the said Defendants, Western Illinois University, and its authorized agents violated the Rehabilitation Act of 1973, as Amended, 29 U.S.C. §794, 34 C.F.R. Part 104, and Title II of the ADA, as Amended, 42 U.S.C. §§ 12131-12134, 28 C.F.R Part 35, all as to the Plaintiff;

4.         Find & declare that said Defendants, Western Illinois University, and its authorized agents, especially including but not limited to its Law Enforcement & Justice Administration Department and its related extracurricular organizations, did knowingly and willfully deny the Plaintiff both a complete interactive process for the determination of reasonable accommodations after repeated, documented requests over a period of years, and reasonable accommodations themselves;

5.          Find & declare that said Defendants, Western Illinois University, and its authorized agents discriminated against the Plaintiff in his pursuit of post-secondary education and in his need to be partially supported by federal financial aid as a low income person with disabilities;

6.         Find & declare that said Defendants, Western Illinois University, and its authorized agents used discriminatory criteria & methods of administration that were predatory and exploitative to students with disabilities, especially the Plaintiff, including denial of the opportunity to take classes and to retake classes with adequate reasonable accommodations and without penalty, whether academic, financial, or otherwise;

7.         Find & declare that said Defendants, Western Illinois University, and its authorized agents did create and maintain a hostile educational environment regarding the Plaintiff since his first semester of attendance in the Fall of 2018;

8.        Find & declare that the Defendants, Western Illinois University, and its authorized agents did interfere with, threaten, coerce, intimidate, and retaliate against, the Plaintiff in the exercise of his civil and disability rights, including by failing to enforce properly his student rights, including under the Code of Student Conduct and the Misuse of Electronic Devices Policy, and that it did so in a discriminatory fashion that prevented the Plaintiff from benefiting from those rules and participating in education in an equal fashion with his student peers;

9.        Find & declare that Defendants, Western Illinois University, and its authorized agent especially through its Law Enforcement & Justice Administration ("LEJA") Program, did act with deliberate indifference, recklessness, and/or actual malice toward the Plaintiff;

10.        Find & declare that Defendants, Western Illinois University, and its authorized agents did violate the Fourteenth Amendment rights of the Plaintiff as to due process of law since effective recourse was not provided when his property and/or liberty interests have been taken from him, when it unfairly demanded payment or payment arrangements under threat of litigation; and when it repeatedly failed to provide proper advance notice of adverse government action, especially regarding his financial aid entitlement, or to provide verbal notice that explained adequately the basis for his benefit denial, termination, suspension, and/or the imposition of sanctions, financial and otherwise, on him;

11.        Find & declare that Defendants, Western Illinois University, and its authorized agents did unjustly enrich itself and harm the Plaintiff financially by the mishandling of the Plaintiff's student account and financial aid calculations regarding that account.

## 47. Injunctive Relief - Appointment of Special Master & Initial Purposes in Assisting Court

12.        Appoint a Special Master outside current WIU employees to assist the Court in certain pre and post judgment matters for the Court in this case, and to keep the parties apprised, by performing tasks the Court may assign, including, *inter alia,* the following initial purposes:

a.) to assist in identifying & defining the facts, including facts sufficient to calculate alleged harms and damage amounts, that the parties agree upon, and those in dispute that may require court judgment, up to and including facts for use during a jury trial, as needed;

b.) to otherwise prepare the case for disposition by assisting in development of partial or full summary judgment for submission to the Court for decision, or by assisting in settlement;

c.) to recommend and assist in implementing a plan for mediation of the parties aimed at producing a settlement for ultimate adoption as a Court Order, by means that insulate the assigned judge or magistrate, responsible for otherwise deciding the case impartially, from bias for or against either mediating party;

d.) to recommend to the Court any needed changes in university management to bring it into compliance with law, and to assist the Court in implementing any such changes it may order, and

e.) to develop & recommend to the Court any needed statements of relief to ensure effectiveness and practicality of any proposed Orders of the Court, especially those aimed at enabling the Plaintiff to resume his studies toward his degree promptly, and to recommend such to the Court.

13.      To progress toward these initial purposes, assign the Special Master the following initial tasks:

a.) the identification of critical areas for civil and disability rights within WIU, and the structures pertinent in the WIU Administration, that need significant reform, using the pleadings, disclosure and discovery items as are readily available, plus conducting any added interviews needed with WIU employees, its authorized agents, students, especially students with disabilities, the parties, and any relevant governmental agencies or officials;

b.) the development of recommendations for a continuing, formative evaluation of the WIU environment and extended bureaucracy in those critical areas identified by the Special Master that are

required to bring WIU into full compliance with the law in civil rights, especially disability rights, and to assist in implementing any of those recommendations ordered by the Court;

c.) the development of a new, more interactive and personal training program in civil and disability rights for all WIU personnel and its authorized agents, especially those working in the LEJA Dept, to assist in the identification and remediation of negative attitudes & conduct regarding those in the student body within protected classes under civil and disability rights law, including effective training about the wide variety of work and tasks a service animal can perform for a person with a disability, and appropriate treatment of persons with disabilities & any service animal they might use;

d.) the formulation of specific recommendations to the Court for upgrading the WIU education & training of professionals in law enforcement to avoid both the individual problems the Plaintiff has encountered in civil and disability rights, and the problems inherent in the structural, critical areas identified by the Special Master, in order to increase legal compliance by WIU and, to the extent practicable, to avoid repetitions of these same types of problems by WIU graduates when they are hired by law enforcement agencies as professionals.

e.) promptly assisting the Plaintiff to resume his degree program immediately, and the naming and detailing of the conduct of any person or organization who may defy or violate this Court Order or prevent any Orders from being fully effective for the Plaintiff and other students with disabilities;

f.) the assisting with, and monitoring of institutional changes, including but not limited to, provision of signage, such as "Service Animals Welcome" on all public-facing doors on campus (like those at Walmart) next to where "No Gun" signs are now posted, and inclusion of service animal education & promotion in campus events, including the annual Paint the Paws event;

g.) the production of an anti-discrimination and civil and disability rights, statement (hereinafter the "Cesca Civil & Disability Rights Statement"), similar to the one read at the beginning the semester in

each academic class, required to be read aloud to participants of each WIU authorized extracurricular organization at their initial meeting or assembly each semester; and;

h.) the submission of a monthly report to the Court and the Parties by the 1st of each month to detail progress and recommendations for needed action regarding the above items and any additional items assigned from time to time.

14.      Order said Defendants and Western Illinois University to pay the appointed Special Master for her to do this work for the Court and the Parties; and order WIU to pay reasonable funds for that work, authorize such work, and otherwise cooperate with that work until the Plaintiff's graduation or he voluntarily leaves the university;

15.      Enjoin said Defendants and Western Illinois University, its officers, agents, employees, and all other persons and entities in active concert and participation with it from discriminating against or denying the Plaintiff or other individuals with disabilities the equal participation in and equal opportunity to benefit from its programs, services, and activities, or otherwise subjecting them to disability discrimination.

16.      Enjoin said Defendants, Western Illinois University, and its authorized agents from breaching, and order specific performance of, its implied contract with the Plaintiff as to all its promises, including policies and practices, however made to him, and enjoin it from denying due process of law when threatening to take from him or deny him any property or liberty interest.

17.      Enjoin said Defendants, Western Illinois University, and its authorized agents from providing any aids, benefits, or services, directly or through contractual, licensing, agency, or other arrangements, that:

(a) Deny qualified individuals with disabilities such as the Plaintiff with the opportunity to participate in or benefit from the aids, benefits, or services;

(b) Afford qualified individuals with disabilities such as the Plaintiff with opportunities to participate in or benefit from aids, benefits, or services that are not equal to that afforded others;

(c) Provide qualified individuals with disabilities such as the Plaintiff with aids, benefits, or services that are not as effective in affording equal opportunity to obtain the same results, to gain the same benefits, or to reach the same levels of achievement as those provided to others;

(d) Provide different or separate aids, benefits, or services to individuals with disabilities such as the Plaintiff than is provided to others, unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

(e) Otherwise limit qualified students with disabilities in the enjoyment of any rights, privileges, advantages, or opportunities enjoyed by others receiving the aids, benefits, or services;

18.       Order said Defendants, Western Illinois University, and its authorized agents to take effective, concrete steps to ensure that vision-based communications with students with disabilities and their advocates, such as the Plaintiff, are as effective as vision-based communication with others, esp. regarding student notifications;

19.       Order said Defendants, Western Illinois University, and its authorized agents to furnish appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities, such as the Plaintiff, with equal opportunities to participate in, and enjoy the benefits of, Western Illinois University;

20.       Order said Defendants, Western Illinois University, and its authorized agents to provide proper due process and verbal notification of how to exercise due process in advance of any proposal that might deprive the Plaintiff of his property or liberty interests.

21.       Order said Defendants, Western Illinois University, and its authorized agents to produce an anti-discrimination civil and disability rights statement (hereinafter the "Cesca Civil & Disability Rights Statement"), similar to the one read at the beginning the semester in each academic class, and to

111

require the Cesca Civil & Disability Rights Statement to be read aloud to participants of each WIU authorized extracurricular organization at each's initial meeting or assembly each semester;

22.      Order Western Illinois University to modify policies, practices, and procedures to avoid discrimination on the basis of disability where recommended by the Special Master and ordered by this Court.

23.      Order WIU staff from the Malpass Public Library, OPS, and the three WIU individuals who checked the registration at DRC/SDSC of Ned, the Plaintiff's service animal, who were involved in the exclusion of the Plaintiff & Ned from the Library, to sign a specific, detailed apology to the Plaintiff & Ned for the violations of law committed by them on 9-28-19.

24.      Order said Defendants, Western Illinois University, and its authorized agents to cut off all relations with the national LAE law enforcement fraternity, unless Western obtains three detailed, explicit letters of apology acceptable to the Special Master, and then sent to the Plaintiff, from and signed by the officers the Plaintiff emailed on 3-31-22 plus one person:

a.) the President, V.P., & Region 6 V.P. of the national LAE fraternity,

b.) the WIU officials as follows: Pres. Huang, Gen. Counsel Duvall, Dept. Faculty Advisor Jill Myers, Faculty Advisor Thomas Maloney, & Faculty Advisor Frank Schweitzer, and

c.) David Braverman, then-V.P. for Student Success at WIU, regarding LAE's violatation of the Plaintiff's civil rights, Nicholas Katz, Director of the Office of Student Engagement, and Samantha Klingler, Dir. for Student Development and Success, & Jessica Butcher.

25.      Order said Defendants and Western Illinois University to provide a printed copy of Braverman's 5-11-22 email to the Plaintiff, manually signed by Mr. Braverman, for framing by the Plaintiff.

26.      Order said Defendants and Western Illinois University to require OPS to refrain

otherwise from initiating contact with the Plaintiff, to respond only when the Plaintiff initiates contact,

and to refer any police matters to the Illinois State Police.

**48. Injunctive Relief - Academic Adjustments for the Plaintiff**

27.      Order said Defendants, Western Illinois University, and its authorized agents to take

such affirmative steps as may be necessary to restore, as nearly as practicable, the Plaintiff, as an

identifiable person aggrieved and harmed by them to his prior status when he was an "A" student

without penalties accruing to him, his record, or his accounts, by steps designed to ensure equal

opportunities for students with disabilities, and include providing auxiliary aids and services and

modifying non-essential academic requirements and policies, as follows:

(a) For the Anatomy/Physiology class, a.k.a. KIN 290, from the Fall 2018 Semester, that it be

changed to an "A"  grade, in which case it shall satisfy the "science with a lab" class requirement, or

struck from his record, in which case he will be allowed to take the Anatomy & Physiology II class,

which will then satisfy his "science with a lab" class requirement, since all of these remedies have been

claimed to be afforded by the CAGAS requirement.

(b) For the Kinesiology class, KIN 149, from the Spring 2019 Semester, that Western Illinois

University fully refund and/or reimburse the Plaintiff for tuition and related costs with interest;

(c) For POLS 122 from the Fall 2019 Semester, that Western Illinois University fully refund

and/or reimburse the Plaintiff for tuition and related Western Illinois University costs with interest;

(d) For the SOC 100 & THEA 101 classes from the Fall 2020 Semester, that Western Illinois

University fully refund and/or reimburse the Plaintiff for tuition and related costs with interest;

(e) For the LEJA 303 class from the Spring 2020 Semester, change Plaintiff's grade to an "A" as

opposed to "CAGAS" (a written appeal to committee), since Plaintiff was carrying an "A" until

required to take 2 exams and obstructed from completed the exams by the professors;

(f) For the LEJA 306 class from the Spring 2020 Semester, that Western Illinois University fully refund and/or reimburse the Plaintiff for tuition and related costs with interest;

(g) For four classes he took in the Fall 2021 Semester, ECON 331, ECON 470, LEJA 306, ECON 430, that they be struck from the Student's record as if they had never occurred, and that Western Illinois University fully refund and/or reimburse tuition and any related fees or costs, including textbooks, related to those classes;

(h) For LEJA 312, allow retaking of the course without penalty or charge, with a clean slate, and afforded a qualified tutor whose cost will be covered by Western Illinois University, given the inability to continue classwork online during the pandemic, the cumulative learning required by the nature of the class, and the extraordinary obstacles in participation endured by the Plaintiff;

(i) For all parking fines & charges, that Western Illinois University fully refund the charges paid with interest, and strike from Plaintiff's account all remaining unpaid charges as if never occurred;

(j) Require Western Illinois University to issue the Plaintiff a free parking pass in perpetuity that is readily transferable to any vehicle he or his associates may use in transporting him or his advocates to its events and activities for all of the Plaintiff's future parking at Western Illinois University;

(k) Require Western Illinois University to provide preferred parking to the Plaintiff and anyone the DRC/SDSC registers or who can otherwise document their disability with DRC/SDSC, and to accomplish this by distribution of hang tags and electronic identification of license plate numbers.

(l) Require Western Illinois University to require its Administrators, instructors, teaching assistants, staff, OPS Officers, Library staff, faculty, and extracurricular authorities whether paid or unpaid, to undergo Disability Rights & Diversity Training developed by the Special Master in a format approved by the Plaintiff and the Special Master for the protection of the students with disabilities, such as the Plaintiff, from future acts of discrimination, interference or retaliation while attending Western Illinois University;

(m) Require Western Illinois University to eliminate completely from the Plaintiff's academic record and to strike, any incomplete, non-required elective courses, including the Film course from Dr. Ness, and refund to him funds paid for such courses;

**49. Injunctive Relief - Financial Aid Adjustments for Plaintiff**

(n) Require Western Illinois University to provide a full refund for the Plaintiff's completed, but non required elective courses, but retain any earned, final grades;

(o) Require Western Illinois University to provide the Plaintiff with a credit course in Certification of Emergency Medical Technician without charge, or pay for all charges of a similar course at a college of his choosing, such as the nearby Spoon River College;

(p) Require Western Illinois University to stop any and all collection actions by it or its agents for debt collections from the Plaintiff, reverse any credit bureau notice to favor Plaintiff, and provide written certification to the Plaintiff of the absence of any balance showing a liability or debt in the Plaintiff's student account within 10 days of the effective date of this order being entered in this case;

**50. Injunctive Relief - Changes in Procedures at Western Illinois University**

(q) Require Western Illinois University to direct all teaching staff, including T.A.'s, and officers of its authorized agents and organizations to attend ADA training covering all of the topics identified by the Special Master and as approved pursuant to this Order;

(r) Require Western Illinois University to hold disabled students, including the Plaintiff, harmless academically & financially for emergency situations beyond their control that might otherwise prevent them from completing class work;

(s) Require Western Illinois University to draft a written contingency plan for students with disabilities for any future pandemic or emergency, to provide assistance to students with disabilities, esp. those with vision-based communication deficits, as approved by the Plaintiff and the Special Master;

(t) Require Western Illinois University to fully fund an independent entity in a building off campus, that is created by the Special Master and the Plaintiff, whose function it is to be a watchdog & a Rights Advocate for all students with disputes it has with WIU bureaucracy on civil rights, especially disability rights, matters; to audit WIU annually for civil rights, especially disability rights, compliance; and to recommend changes to WIU's bureaucracy to increase such compliance;

(u) Require Western Illinois University to require cooperation of its staff and assist in the orchestration of an overhaul of the DRC/SDSC to create an organization capable & willing to advocate for students with disabilities for compliance with law within the university setting.

## 51. Other Monetary Relief

28.     Order said Defendants and Western Illinois University to require OPS to provide reasonable resources for tutoring, including up to $100/hr., for the Plaintiff to hire a private tutor, for the Plaintiff's living expenses while in attendance in any university program, and pay the Plaintiff a monthly stipend of $5,000.00 per semester for assistive technology broadly construed to assist in his studies, all until he graduates anywhere with a degree;

29.     Order said Defendants and Western Illinois University to pay for cross-training of the service animals used on campus, including any service animal(s) used by the Plaintiff, in additional tasks in which they may prove useful for their master, especially for emergency services, such as search & rescue, cadaver recovery, etc.

30.     Order said Defendants and Western Illinois University to pay or arrange for payment for the Plaintiff to transfer to another state university, such as University of Illinois in Champaigne-Urbana, at no cost, including moving expenses, living costs, and all attendance costs;

31.     Order said Defendants and Western Illinois University to award a reimbursement check to the Plaintiff for the full amounts of all costs he has paid been charged by it and that the Plaintiff has expended during his time there, including the full amounts of his living expenses, including utilities,

phone, and typical lines items on his personal budget, with market rate interest, including, but not limited to, tuition, penalties, fees, fines, & charges assessed on him, as reimbursement to the Plaintiff;

32.   Order said Defendants and Western Illinois University to pay the Plaintiff for the costs of attending a Graduate Program of his choice at any public or private university, including but not limited to, moving expenses, living expenses, local travel, and attendance costs, to be paid on a schedule & in a format, such as a trust, etc., to be set forth by him after, but not before, any award of financial aid & grants issued at said university;

33.   Award compensatory damages to the Plaintiff for his economic and non-economic losses and harms, to the extent allowed by law, including, but not limited to, personal living expenses, lost wages for delayed occupational income, etc., while at Western Illinois University;

34.   Award punitive damages to the Plaintiff to deter said Defendants, Western Illinois University, and its authorized agents from engaging in same or similar egregious & pervasive discriminatory conduct in the future against him or others similarly situated, to the extent of the law;

35.   Award prejudgment and post judgment interest at the highest rate allowed by law;

36.   Award costs of this action, including reasonable attorney's fees, to the Plaintiff; and

37.   Order such other appropriate relief as the Court deems the interests of justice may require.

Dated: March 15, 2023

Respectfully submitted,

/s/Joseph Daniel Thomas

Joseph Daniel Thomas
Attorney at Law
10705 N. State Road 55
Demotte, Indiana 46310-9671
312-296-8203
Fax 800-882-3714
ARDC# 6212202

## 52. COMPLAINT EXHIBIT LIST

Exhibit 1, Lt from Larry S. Wexler, PhD to Western Illinois University Pres. Huang dated 2/22/21

Exhibit 2,  Opening Statement of C.Cesca in Mtg. with M. Abraham 11/15/19

Exhibit 3, Western Illinois University Website Screenshot - LEJA Promotion

Exhibit 4, Western Illinois University History Snapshot Transaction Detail for C. Cesca dated 11/9/21

Exhibit 5, Student Adv. M. Eskridge Summary of Western Illinois University Req. for C. Cesca

   for Spring 2022 Attendance

Exhibit 6, Email Chain from V.P. Smith to C. Cesca re Offer of AM. Mtg w Counter of Later Mtg.

Exhibit 7, DRC Accommodation Request Form for C. Cesca dated 7/17/18

Exhibit 8, Email Chain uTech #7735 Refusal of RA for C. Cesca re Electronic Access dated 9/19/21

Exhibit 9, Official Western Illinois University Transcript for Chris Cesca dated 1-21-22

Exhibit 10, Email Eskridge to C.Cesca, Repeating Course for Grade Replacement Policy, dated 1-11-22

Exhibit 11, Email from Schuch to C. Cesca re Confirmation of Grant Denial dated 1-18-22

Exhibit 12, OPS Cell Phone Incident Report dated 8-30-19 w/o Email Attachment

Exhibit 13, Email Chain C. Cesca and Worthington re No Report Received on 8/27/19 Assault by

   Classmate, dated 9/16/19

Exhibit 14, Email Chain C. Cesca and M. Abraham re Viol. of Policies and Your Potential,

   Our Purpose, dated 10/5/20.

Exhibit 15, Email Chain C. Cesca to Interim Pres. M. Abraham re Malpass Lib. Incident,

   dated 9-30-19.

Exhibit 16, Email Chain C. Cesca and Prof Entzminger re No Phone Calls but Zoom Okay for

   LEJA 357, dated 8/30/20.

Exhibit 17, Email Chain C. Cesca, J. Myers and Provost Mossman Confirming Exclusion from

Retaking Certain Courses, dated 8/27/20.

Exhibit 18, OPS Malpass Library Incident Report on Malpass Library Service Animal Exclusion,

dated 9-28-19 and approved on 9-29-19.

Exhibit 19, Email C. Cesca to M. Abraham re Seeking Help about Service Animal Exclusion,

dated 9/30/19.

Exhibit 20, 1st FOIA Req. dated 9-28-19 and Gen. Counsel Email Mischaracterizing Date of FOIA

Request.

Exhibit 21, Email Chain Dean of Lib. M. Lorenzen and C. Cesca re Apology for Malpass Lib. Incident,

dated 10/10/19

Exhibit 22, Email from Prof. Niyazi Ekici to C. Cesca dated 2/14/20.

Exhibit 23, Email from Adm. Mark Mossman on Grading Correction Arrangements dated 9/21/20.

Exhibit 24, Emails C. Cesca and Professors Engaged in Disparaging Remarks about him,

dated 8-23-21.

Exhibit 25, Email Chain SRR and C. Cesca re Notification of Failure to Complete Mandated

Weekly Gateway Testing for COVID-19, dated 1/27/22.

Exhibit 26, Email Sent to WEMS Members 1/19/18.