E-FILED
Thursday, 16 March, 2023 12:41:41 PM
Clerk, U.S. District Court, ILCD

Exhibit 12

# WESTERN IL UNIVERSITY POLICE

## Incident Report Form

**WI-19-005660**
08/30/2019

**FOLLOW-UP INVESTIGATION**

Primary Officer: **MATTHEW J HASLAM** - **MJH**

| | | | | |
|---|---|---|---|---|
| ☐ Juvenile Involved | ☐ Investigation | ☐ Video Available | ☐ Gang Related | ☐ Paperless |
| ☐ Domestic Related | ☐ Suspects | ☐ Bias Crime | ☐ Accident | ☐ Administrative |
| ☐ Alcohol Involved | ☐ Arrests Made | ☐ Drugs Involved | ☐ Ready for DA / Prosecutor | ☐ Alarm Activated |

| Log Number | Incident Number | File Number | Case Number | UCR 0000 |
|---|---|---|---|---|
| **WI-19-005660** | **19-0281** | **0** | **19-0281** | **NO UCR** |

| Incident Type FOLLOW | | Dispatcher | Source | District | Status |
|---|---|---|---|---|---|
| **FOLLOW-UP INVESTIGATION** | | **jja** | **OFFCR** | | **CLOSED** |

**Incident Date / Times** — Incident Occurred At or Between

| Date Received | Day Rec'd | Rcvd | Disp | Arrv | Clrd | Earliest Date and Time | Latest Date and Time |
|---|---|---|---|---|---|---|---|
| 08/30/2019 | Friday | 1010 | 0000 | 0000 | 1011 | | |

| Disposition CMPLT | Cleared by Exception | |
|---|---|---|
| **ASSIGNMENT/TASK COMPLETE** | | ☐ Suspended |

| UCR Clearance | UCR Occur Date | UCR Clear Date | UCR Count | UCR Human Traffic Code | UCR HT Count |
|---|---|---|---|---|---|
| | 08/30/2019 | | 1 | | 0 |

**Location** — ☐ Intersection

| 0 MOWBRAY HALL 901 W MURRAY ST MACOMB IL 61455 | Cross Street |
|---|---|
| | GPS Loc X 0 — GPS Loc Y 0 |

| Business Name | Premise Code LAW | Arson Value |
|---|---|---|
| **MOWBRAY HALL** | **LAW ENFORCEMENT BUILDING** | |

| Gang | Weather |
|---|---|
| | |

**Modus Operandi Coding**

Entry:

Exit:

Method:

Victim:

Property:

Area:

Time of Day:

- - - - - - - - - - - WEAPON USED:

| Caller / Complainant Type | Normal ☒ | Anonymous ☐ | Hangup ☐ | Refused ☐ |
|---|---|---|---|---|

## INVOLVED PERSONS

### SUBJECT                                          CODE:  SUBJEC

| Name (Last, First, Middle) - Address | Juvenile | Date of Birth | Age | Race | Sex | Ethnic | Social Security Number |
|---|---|---|---|---|---|---|---|
| ███████████ | ☐ | | | | | | |
| | | Weight | Height | Hair | Eyes | Phone Number 33 | |
| | | Driver License Number | | | State | Class | Expiration Date |
| | | ID Provided | | ID Detail | | | |

**Link Comments**
19-0281, Interview of ██████ regarding disorderly conduct during class lecture

| WI-19-005660 | 08/30/2019 | ☒ | APPROVED BY: **KALIB LEE MCGRUDER** |
|---|---|---|---|
| IRF 1.6 | | | APPROVED ON: **09/03/2019** |

# WESTERN IL UNIVERSITY POLICE

## Incident Report Form

**WI-19-005660**
08/30/2019
**FOLLOW-UP INVESTIGATION**

---

### INVOLVED PERSONS

#### SUBJECT                                                                 CODE:  SUBJEC

| Name (Last, First, Middle) - Address | Juvenile | Date of Birth | Age | Race | Sex | Ethnic | Social Security Number |
|---|---|---|---|---|---|---|---|
| **CESCA, CHRIS** | ☐ | | | | | | |

| | Weight | Height | Hair | Eyes | Phone Number |
|---|---|---|---|---|---|
| | | | | | |

| Driver License Number | | State | Class | Expiration Date |
|---|---|---|---|---|
| | | | | |

| ID Provided | ID Detail |
|---|---|
| | |

**Link Comments**
19-0281, Interview of ▮▮▮▮ regarding disorderly conduct during class lecture

#### WITNESS                                                                 CODE:  WITNES

| Name (Last, First, Middle) - Address | Juvenile | Date of Birth | Age | Race | Sex | Ethnic | Social Security Number |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**Link Comments**
19-0281, Interview of ▮▮▮▮ regarding disorderly conduct during class lecture

### INVOLVED BUSINESSES / ORGANIZATIONS

08/30/2019

| Business / Organization Name | Business Address |
|---|---|
| **MOWBRAY HALL** | **MOWBRAY HALL** |

| Phone 1 | Phone 2 | Phone 3 | **901 W MURRAY ST** |
|---|---|---|---|
| | | | **MACOMB, IL  61455** |

**Involvement Comments**

---

### RESPONDING / INVOLVED UNITS, OFFICERS, TIMES

| Division | Supervisor / ID |
|---|---|

| Unit Number | Officer / ID  (Ofcr1 / Ofcr2) | | Officer / ID (Ofcr3 / Ofcr4) |
|---|---|---|---|
| | **MATTHEW J HASLAM** | MJH | |

---

| **WI-19-005660**   08/30/2019 | ☒ | APPROVED BY: **KALIB LEE MCGRUDER** |
|---|---|---|
| IRF 1.6 | | APPROVED ON: **09/03/2019** |

# WESTERN IL UNIVERSITY POLICE

**WI-19-005660**
08/30/2019

## Incident Report Form

**FOLLOW-UP INVESTIGATION**

| COMMENTS / NARRATIVES | | | |
|---|---|---|---|
| Title **Follow up** | | | |
| Narrative Created By / Creation Date **MATTHEW J HASLAM** | 08/30/2019 | Narrative Updated By / Update On | 09/03/2019 |
| Narrative Approved By / Approved Date | | | |

On Friday 08/30/2019, at approximately 1011 hours, I, Detective HASLAM, received a call on recorded line 1949 from Professor ███████, in reference to an incident of disorderly conduct that occurred in her class on 08/27/19, WI-19-005568 refers.

███ stated she had identified the female involved as student ███████████, and gave the following account.

On 08/27/19, at approximately 1320 hours, during her ███████████████ noticed ███████ was using a cell phone. ███ asked ███████ to put the cell phone away three times, before ███ said "I hear you, give me a second." At this point, Chris CESCA intervened and told ███████ to put the cell phone away. ███ heard the pair shouting and arguing, but she does not recall any specific threats or language used. After a few moments, ███████ packed up her things and left the class. ███ agreed to provide a written account of the incident and email it to me (attached). I thanked her for her assistance and concluded the call.

Later the same day, I contacted ███████ and spoke with her on recorded line 1940. I informed her a complaint had been made about her behavior in class on 08/27/19, and that I would like to speak to her about it. ███████ was aware of the incident and agreed to come and speak with me at Mowbray Hall to give her side of events. I thanked her for her coopertaion and concluded the call.

Later in the day, I met with ███████ at Mowbray Hall and verbally confirmed her identity. I showed her to the processing room and informed her she was not under arrest and free to leave at anytime. I closed the door for privacy before opening and closing it again to demonstrate it was unlocked. I informed ███████ the processing room was subject to audio and video recording, and confirmed she was willing to speak with me.

I informed ███████ a student from her ███████ class had made a complaint in reference to an argument they'd had on 08/27/19, and asked her if she remembered the incident. ███████ gave the following account.

███ explained she had been looking at her cell phone when ███ instructed her to put it away. As ███ was gathering the phone and accessories, ███ again instructed her to put it away. In response, ███ said, "I hear you, give me a second," and placed her cell phone in her bag. At this point, CESCA turned to ███████ and said "she shouldn't have to fucking ask you to put it away, its in the syllabus!" ███████ was upset CESCA rudely called her out in front of the whole class, and started arguing with him. ███ acknowledges she and CESCA were swearing at each other as they argued, but felt very upset CESCA had taken it upon himself to openly chastise her in front of her peers, and didn't feel he had the right to do so. After a few moments, ███████ made the decision to de-escalate the situation by leaving the class. Despite being considerably smaller and lighter than CESCA, ███████ stated she did not feel intimidated, just angry, and described CESCA as a "strange dude."

███████ informed me this was not the first time CESCA has been confrontational towards her. In the previous ECON class, CESCA made a point to raise his hand and inform ███ he was unable to concentrate due to 'others' who were making noise. He then proceeded to turn and stare at ███████, even though she was not being disruptive.

Since the incident, ███████ has spoken with her advisor and has switched to a different class. She stated

| WI-19-005660 | 08/30/2019 | ☒ | APPROVED BY: **KALIB LEE MCGRUDER** |
|---|---|---|---|
| IRF 1.6 | | | APPROVED ON: **09/03/2019** |

# WESTERN IL UNIVERSITY POLICE

## Incident Report Form

**WI-19-005660**
08/30/2019
**FOLLOW-UP INVESTIGATION**

her primary reason for doing so was to avoid CESCA, and avoid further confrontation as she feels he has something against her. At the end of the interview, ████████ completed a voluntary written statement (attached). I explained to her that this report would be passed to Students Rights, Responsibilities and Retention Initiatives (SRRRI) for review, and she and CESCA would most likely be contacted by them. I acknowledged the steps she had taken to defuse further conflict, and thanked ████████ for taking the time to speak with me before showing her out of the building.

Attachments: Email account by ████ written statement by ████████.

No further action.

---

| WI-19-005660 | 08/30/2019 | ☒ | APPROVED BY: **KALIB LEE MCGRUDER** |
| --- | --- | --- | --- |
| IRF 1.6 | | | APPROVED ON: **09/03/2019** |

Exhibit 13

 Gmail

**Chris Cesca <c-cesca@wiu.edu>**

---

## 082719 INCIDENT FOLLOWUP
5 messages

---

**Cesca, Chris** <c-cesca@wiu.edu>                                          Mon, Sep 16, 2019, 08:00
To: Nathan Garlick <nk-garlick@wiu.edu>

Mr. Garlick,

It is my understanding that a formal report of the incident we previously discussed has now
been made. At your earliest convenience, I would like a copy of this report for my records.

Please let me know if I can provide any further information.

Thank you,

Chris
[Quoted text hidden]

---

**Garlick, Nathan** <nk-garlick@wiu.edu>                                    Tue, Sep 17, 2019, 07:05
To: Cesca, Chris <c-cesca@wiu.edu>

Requests for reports need to go through our records person, Sarah Worthington (se-worthington@wiu.edu). Thank
you.
[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                          Thu, Sep 19, 2019, 13:00
To: Sarah Worthington <se-worthington@wiu.edu>

Ms. Worthington,

Per Mr. Garlick's request, I am forwarding my 091619 email to you.
[Quoted text hidden]

---

**Worthington, Sarah** <se-worthington@wiu.edu>                             Fri, Sep 20, 2019, 11:09
To: Cesca, Chris <c-cesca@wiu.edu>

Chris,

I have forwarded your request to the employees who process FOIA (Freedom of Information Act) requests as OPS
does not distribute reports out.  You will receive email contact from FOIA once they have received & are processing
your request.

Thank you!  Det. Worthington
[Quoted text hidden]

**Cesca, Chris** <c-cesca@wiu.edu>                                    Fri, Sep 20, 2019, 11:45
To: Worthington, Sarah <se-worthington@wiu.edu>

Ms. Worthington,

Thank you for this information.

If you don't mind, I would appreciate some clarity here, as I'm having difficulty comprehending
this protocol/procedure.

If my understanding is correct, after being involved in an incident in which I was the victim of assault, I am being
denied direct access to the report detailing and documenting this incident, and am instead being directed to a FOIA
request process to obtain said report.

Is my understanding correct?

Please advise,

Chris
[Quoted text hidden]

Exhibit 14

 **Gmail**

**Chris Cesca <c-cesca@wiu.edu>**

---

## "Your Potential. Our Purpose"
**11 messages**

---

**Cesca, Chris** <c-cesca@wiu.edu>                                   Mon, Oct 5, 2020, 07:00
To: Martin Abraham <ma-abraham@wiu.edu>
Cc: <sj-klingler@wiu.edu>, Angela LaFrance <ad-lafrance@wiu.edu>, Christopher Bitner <ce-bitner@wiu.edu>, Glenn Daugherty <gr-daugherty@wiu.edu>, Katrina Daytner <km-daytner@wiu.edu>, Mark Mossman <ma-mossman@wiu.edu>, Monica Eskridge <mj-eskridge@wiu.edu>, Myers, Jill <jj-myers@wiu.edu>, Phillip Entzminger <pc-entzminger@wiu.edu>, Smith, John <jw-smith@wiu.edu>, <WT-Clow@wiu.edu>, <acluofillinois@aclu-il.org>
Bcc: lswexler@gmail.com <lswexler@gmail.com>, <RAYMONDCESCA@gmail.com>, <maryloucesca@gmail.com>, <vsharma1@yahoo.com>, <ajgallegos78@gmail.com>, <macombmw@gmail.com>, Cait S. <sharkc333@gmail.com>

- *Academic Excellence*: Central to our history is the <span style="color:red">commitment to teaching</span>, to the <span style="color:red">individual learner</span>, and to active involvement in the teaching-learning process. Western Illinois University's highly qualified and diverse faculty promotes critical thinking, <span style="color:red">engaged learning</span>, research, and creativity in a challenging, <span style="color:red">supportive</span> learning community. <span style="color:red">We are committed to student success in an academic environment</span> that encourages lifelong development as learners, scholars, teachers, and mentors.

Dr. Abraham,

This is an unprecedented situation, which has precipitated unprecedented marginalization of the intellectually-disabled community at Western Illinois University.

Though this situation has proliferated unprecedented circumstances, Western Illinois University has not implemented commensurately contemporary and innovative policies and procedures for the appropriate integration of due equality and equity for its learning-disabled community.

Consequently, the civil liberties of this community, and particularly those of us that are daily saddled with intellectual disabilities and their analogous challenges, have been violated, particularly as the school is contumaciously enforcing antiquated and esoteric policies in this new and yet largely uncharted era of Covid-19.

As I have in the past, I am coming to you for assistance at the end of yet another arbitrarily arduous and counterproductive process of advocating for myself in the face of an institution assiduously committed to meeting the minimum acceptable requirements, particularly for

those of us with profound learning disabilities.

As you know, last semester was unprecedented in a number of ways, especially those involving the academic process for students globally and at home. While the pandemic affected everyone negatively, it effectively incapacitated the intellectually-disabled community, of which I am a part. Consequently, my ability to succeed academically was catastrophically impacted, and, after laboriously attempting to adapt to the online learning format over the course of two to three months, I ultimately determined I would be unable, not *unwilling*, but unable, to handle the academic workload through "e-learning".

Subsequent to this realization, I began the process of requesting incomplete (I) grades in five of the six classes in which I was enrolled last semester. While some of my professors were readily amenable to accommodating this request, others were decidedly more obdurate. Ultimately, I was given four incomplete (I) grades, and one fail/withdraw (FW) grade. I am still adamantly trying to resolve the latter by asking that it be reverted to an incomplete (I) grade. I have been told this would be done, though, to the best of my knowledge, it has yet to be changed.

Throughout this process, I have been compelled by the university to tirelessly advocate for myself as a student with profound learning disabilities, often before what feels like an arbitrarily obstinate and inexorable faculty and staff, most prevalently in the LEJA department.

On numerous occasions, I have asked for the opportunity to *learn* the material laid forth in these classes, as the accessibility I had previously had, diminished though it often was, was abruptly severed at the onset of the pandemic and subsequent protocol changes. Despite the willingness of three other professors in two other departments to meet my needs pertinent to learning the incomplete material, the LEJA department has categorically denied my requests regarding effective apprehension and comprehension of the material laid forth in the three unfinished classes for which I am currently responsible.

**My request was and is as follows:**

**<u>Allow me (and any other student affected by clinically-diagnosed learning disabilities) to restart the classes in question, given that several months have transpired during which I was not privy to or effectively learning the correlative material. This would essentially negate any previous grades I had achieved, whether high-scoring or low (the majority of</u>**

**my previous assignment and quiz/exam grades in these classes were high-scoring), allowing me to start the classes *tabula rasa*, such that I could actually *learn* the material laid forth, instead of perfunctorily jumping through compulsory hoops to finish the classes.**

I am a student ravenous to learn, and, given the right services and guidance, I am able to achieve stellar grades, including six straight A's in the LEJA department. I would invite you to review my transcript and seek feedback from the professors from whom I have heretofore learned, commensurate to this statement. Additionally, I would offer the following feedback from Ms. LaFrance, who Dr. Mossman has referred to as the university in-house expert on these matters:

*"I believe if there is a way for Chris to attend last Spring's incomplete courses in a face-to-face format this semester and his professors are willing, we should provide this option to him. I do not claim to understand the mechanisms involved in making this happen, so please forgive me if I am supporting a request which is unable to occur. I feel flexibility and leniency are warranted and have been encouraged by Dr. Abraham, specifically in these unprecedented times. One aspect of postsecondary education which is at the forefront of the disability field at this time, is the need for the entire university community to do our best to accommodate students in a way which keeps them on track for their anticipated graduation date. Because of events which have been out of our control, Chris may not be able to stay on his graduation track. I believe he has come to the realization that successfully completing the courses for which he received incompletes last semester, takes priority over his graduation track. Chris has always appeared to me to be a student who truly wants to learn, not just get a degree."*

The response with which I have been most regularly met has been one of strict and counterintuitive adherence to the policies and protocols in place at WIU, despite and in lieu of what would be best for me as a student. This is extremely frustrating, especially given the extraordinary lengths to which I have gone to be successful here.

I have repeatedly and emphatically voiced my concerns, disagreement, and frustration with and to Dr. Mossman, who, despite my resounding pleas that the school-suggested routes for completing these classes are not remotely reasonable, has insisted upon their validity and efficacy. While it appears to be the unanimous opinion of those whose paychecks are signed by this illustrious institution that meeting the minimum acceptable requirements is a constructive mindset and practice, the opinion shared by the medical professionals with whom

I consult starkly contrasts.

To this end, I am now conncting with you in reluctant hopes that you will be willing to step in and assist me in reaching a productive and constructive outcome. In this case, I believe this is one in which I am able to effectively learn the material incorporated within the three remaining LEJA classes, for which no reasonable resolution has yet been established.

As an aside, I had this email largely prepared by the end of the week before last and was ready to send it, though I wanted to ruminate for some time before doing so. Incidentally, I am glad I did, given what for me was a simultaneously philosophically horrifying and morbidly elucidating experience I had last Monday evening. Some of the following quotes are representatively and reasonably paraphrased. Earlier that evening, I attended a city hall meeting in support of some of my fellow marginalized colleagues. Following the forum, a token "meet-and-mingle" gathering was held. Present at this milquetoast congregation were two faces I recognized from school. One is a professor and department chair with whom I have both previously had class, and under whose ostensible leadership I have committed to a major. The other is a professor within LEJA with whom I have had brief, though pleasant and cordial, interactions in the past. However, I have never had a class with the latter professor, nor have I operated as a student in a department under her purported leadership. Despite these realities, I engaged in a brief conversation with her in this admittedly extracurricular environment. I expressed some degree of frustration to her regarding the experiences I was having with the LEJA department, and how those experiences were particularly discernible as they contrasted with the advocacy and services provided by the Economics and Decision Sciences department, under which is my other major. What I had expected in reply was a friendly modicum of encouragement, given the demeanor I had previously observed from this professor. Instead, what transpired when I described the extraordinary difficulty I had transitioning to the online learning model, particularly within the LEJA department, were responses including, "Well, from what I heard, you just didn't finish the work you were supposed to do.", and, "I had many students who had difficulty after the switch to online learning." When I expressed utter confusion as to how a professor I have never had in class, who is, as far as I understand, not responsible for the LEJA department, would have even the slightest knowledge of my personal business as it pertains to the profound academic struggles I faced after the switch to online learning, the response I received was, "There is no condition of confidentiality when it comes to discussing students."  The behavior demonstrated by the professor in this interaction was brazenly ableist, and speaks deafeningly and voluminously to the perverse and persistent culture of ableism inculcated by Western Illinois University.

It is my desperate hope and emphatic plea that you have the intellectual and cognitive faculties to realize how utterly horrifying this possibly seemingly innocuous interaction was. During this interaction, it was also mentioned that I would likely have a class with this professor in the future. Additionally, it was suggested, for the second time (the first being during the decidedly capricious "meeting" with Dr. Myers the Friday before last), that "grades are earned", as if to imply that I, a student that has achieved six straight A's in the LEJA department alone, as the result of tireless and seemingly endless work, would not thoroughly appreciate this concept. It is nothing short of inordinately offensive for a department chair and professor, AND a professor I have never learned from before, to wax pseudointellectual about the merits and virtues of earning exemplary grades to a student that has put in the work that I have. To this end, I would again eagerly invite you to review my transcript and reach out for feedback from many of my past professors, particularly those in LEJA, who I have CC'd to this email for your convenience.

Furthermore, this interaction served to establish a number of exacerbatory realities. First, it has now become clear to me that *two* professors I will likely be required to learn from in the future have, at best, woefully uninformed, or, at worst, willingly negligent and despicably-biased sentiments toward the disabled student community-at-large, and, more pertinent to this context, me. Second, I am now ever more blindingly aware that the chair of the department to which I have committed an extraordinary amount of time, energy, and effort, not only sees me (ironically) as a lazy and unmotivated student, but as an individual that would even consider acting in a way that did not exhibit absolute integrity. This is not the first time these implications have been made, but it is one of the more excruciating such manifestations I have experienced.

It bears critical noting that disabled, neurodivergent, neuro-atypical students are absolutely mutually exclusive in our singular needs for accommodations, and, arguably more important, services. It is essential to note that while the former constitute the bare-minimum requirements as laid forth by the Americans with Disabilities Act, the latter are critical components in establishing the equity upon which we so desperately depend in order to achieve the representation and opportunity for success we are reasonably due. If anything, *yes*, grades are earned, however, for us intellectually-disabled students, grades are *hard-fought* and *battled* to achieve.

It is extremely troubling to consider that the struggles and obstacles I have faced at this university, FAR BEYOND those of a purely academic nature, are not only not kept confidential within the very circles they are discussed, but are evidently the subject of social

conversation between professors, including those I have never before had in class. This realization is yet another that absolutely decimates what little trust I may have had in this department, as well as what notions I may have had that my dignity as a disabled person within the school would be respected.

Yet *another* troubling juxtaposition that occurs to me in this context regards the seemingly perpetual response I have gotten from the LEJA department leadership pertinent to classroom distraction and detrimental disruption. My attempts to get reasonable help completing these classes have been categorically and routinely refused, often as the purported result of strict and stringent adherence to policies in place at this institution. However, in the past, when I have, in no uncertain terms, *begged* for help ameliorating brazen classroom distractions that have regularly derailed my ability to participate (i.e. students playing on their phones [**Misuse of Electronic Devices (See Section D.24.) - Cellular phones, pagers, and other electronic devices may not be used in a manner that causes disruption in the classroom, library, or within college-owned or operated facilities.**], students having overt conversations in class [**D. Regulations for Student Conduct - 7. Disrupting or obstructing teaching, research, administration, other University activities, including its public service functions on or off-campus, or of other authorized non-University activities when the conduct occurs on University premises.**]), I have been essentially dismissed by this department chair, even when the class in question was hers. Where was the draconian approach then? Where was the adamant refusal to tolerate any deviation from established rules and policies?

Again, I understand and appreciate that the pandemic has generated extraordinary circumstances. What I am asking for is the fair opportunity to learn the academic material I was not reasonably able to apprehend as a result of these new precedents. Moreover, I am asking not to be penalized as a result of conditions well out of my control.

To summarize, when I have an appropriate support system, I am able to academically thrive, and I have myriad empirical evidence confirming this. I am insisting upon the following remedies regarding the above-detailed issues and lived experiences:

1. These three classes will be essentially reset, such that I am starting them anew, and learning the material associated with them from a fresh start.

2. I will not be offered counterproductive, counterintuitive, and unreasonable remedies, such as "filing an appeal with CAGAS". I have been compelled by the school to invest far more time, energy, and effort in this process than is reasonable, and to suggest that I continue doing

so would be and is willfully dismissive, confounding, and harmful.

3. I will not experience any penalty or retaliatory action, particularly as it relates to the above detailed issues and lived experiences.

Additionally, my private, personal business will not be casually or otherwise discussed with individuals not directly related or privy to me as a student. Pertinent to this, I would also strongly advise and advocate for formal training for members of the faculty and staff at WIU, principally those in positions of superlative authority and power, who evidently hold outdated, outmoded, obtuse, and destructive mindsets pertinent to the omnipresent scourge of ableism at this institution.

It is easy and convenient to laud the efforts and achievements of students who approach this environment free from intellectual disabilities. However, just as a chain is only measured by its most limited link, the quality and strength of an academic institution or department should only be measured by the success of its most disadvantaged student.

Please advise,

Chris

[Quoted text hidden]

---

**Gallegos, Andres J.** <ajgallegos78@gmail.com>                           Mon, Oct 5, 2020, 09:31
To: Cesca, Chris <c-cesca@wiu.edu>

Chris – thank you. Keep me posted. Andrés

Sent from Mail for Windows 10

---

**From:** Cesca, Chris
**Sent:** Monday, October 5, 2020 7:01 AM
**To:** Martin Abraham
**Cc:** sj-klingler@wiu.edu; Angela LaFrance; Christopher Bitner; Glenn Daugherty; Katrina Daytner; Mark Mossman; Monica Eskridge; Myers, Jill; Phillip Entzminger; Smith, John; WT-Clow@wiu.edu; acluofillinois@aclu-il.org
**Subject:** "Your Potential. Our Purpose"

· ***Academic Excellence***: Central to our history is the commitment to teaching, to the individual learner, and to active involvement in the teaching-learning

process. Western Illinois University's highly qualified and diverse faculty promotes critical thinking, engaged learning, research, and creativity in a challenging, supportive learning community. We are committed to student success in an academic environment that encourages lifelong development as learners, scholars, teachers, and mentors.

[Quoted text hidden]

---

**Abraham, Martin** <ma-abraham@wiu.edu>                           Tue, Oct 6, 2020, 21:24
To: Cesca, Chris <c-cesca@wiu.edu>

Chris -

I received your email and acknowledge your concerns. I do not know what is normally permitted within WIU's system, what can be authorized as exceptions, or what else might be available. I have reached out for more information.

Responses to these types of questions are fairly slow at the moment, as the pandemic is having a significant toll on our staff and students. We are working on many simultaneous challenges.

Once I have a response to my inquiries, I will get back to you with more information.
[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                  Tue, Oct 6, 2020, 21:36
To: ajgallegos78@gmail.com <ajgallegos78@gmail.com>

Mr. Gallegos - see update below.
[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                  Tue, Oct 6, 2020, 22:30
To: Abraham, Martin <ma-abraham@wiu.edu>
Bcc: <RAYMONDCESCA@gmail.com>, <maryloucesca@gmail.com>, <ajgallegos78@gmail.com>

Dr. Abraham,

Thank you for this response, and thank you for your acknowledgment of my concerns.

Regarding what is "normally permitted within WIU's system", please refer to my email to you, in which I mention, "Despite the willingness of three other professors in two other departments to meet my needs pertinent to learning the incomplete material, the LEJA department has categorically denied my requests regarding effective apprehension and comprehension of the material laid forth in the three unfinished classes for which I am currently responsible." Furthermore, whatever is "normally permitted" likely does not account for the starkly unprecedented circumstances proliferated by the Covid-19 pandemic. Please consider this in your handling of this situation.

Pertinent to "what can be authorized as exceptions", please see above, and please also realize the important distinction between what *can* be authorized versus what *will* be authorized. The

choices made by the LEJA department leadership, and inexplicably supported by Dr. Mossman are deliberate, willing, and detrimental. Whereas I am a person with *disabilities*, the aforementioned parties are exercising recalcitrant *unwillingness* in this situation.

As far as "what else may be available", please see above, and know that a shining minority of elite professors at this institution (past and present), including Tara Feld, Jessica Lin, Gregg Woodruff, and Doug LaFountain, have demonstrated an ability *and* willingness to provide me with the services I need as an intellectually-disabled student, to glowing results.

I understand that the speed of resolution for issues like this is even more glacial than normal, though frankly, because of the extraordinary difficulty I have faced during this process, the resolutions upon which I am insisting would likely need to be pushed back to next semester anyway. As you may be willing to concede, it is increasingly agitating to know that, had I been provided with appropriate services from the beginning of this process, I would likely already be flourishing in the classes in question, not battling to get the education I so desperately deserve and desire.

To reiterate, what I am insisting upon is as follows:

**Allow me (and any other student affected by clinically-diagnosed learning disabilities) to restart the classes in question, given that several months have transpired during which I was not privy to or effectively learning the correlative material. This would essentially negate any previous grades I had achieved, whether high-scoring or low (the majority of my previous assignment and quiz/exam grades in these classes were high-scoring), allowing me to start the classes *tabula rasa*, such that I could actually *learn* the material laid forth, instead of perfunctorily jumping through compulsory hoops to finish the classes.**

Please consider the above, the unprecedented and unaddressed circumstances caused by the pandemic (particularly as it has affected intellectually-disabled students), and the content of my original email, when determining what action and/or intervention you will take here.

Thank you,


Chris
[Quoted text hidden]

Abraham, Martin <ma-abraham@wiu.edu>                    Mon, Oct 12, 2020, 18:08
To: Cesca, Chris <c-cesca@wiu.edu>

Chris -

I've obtained information about the situation in each of your classes, which seems to indicate that you have a plan for completing the work in all but two of them. The outstanding issues, with proposed accommodations, are as follow:

LEJA 312: Dr. Jill Myers is the instructor. Dr. Myers requires the completion of five reading assignments, a short essay, and a completion of the final. She has agreed to meet with you and work with you on the completion of each of these items. She has also agreed to use the Disability Resource Center to accommodate any needs on any of this work.

LEJA 306: Dr. Jonathon Butts is the instructor. Dr. Butts requires you to prepare for and then complete the test from April and the final exam from May, which are the final items left unfinished in the course. Dr. Butts notes that the scores from both of these exams would then be incorporated into the final grade for the course.

I know that your proposal is to begin each of these courses *tabula rasa*, but such action is not as simple for the instructors as it would seem. For example, Dr. Myers and Dr. Butts may not be the instructors for those courses next semester.

I do believe that the accommodations that have been presented are reasonable and provide you a clear path to completing the work.

[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                    Mon, Oct 12, 2020, 21:36
To: <ajgallegos78@gmail.com>

Mr. Gallegos,

This is the response I received earlier this evening.

It feels like I am talking to a collective brick wall.

Let me know what you think,

Chris

[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                    Mon, Oct 12, 2020, 21:37
To: <RAYMONDCESCA@gmail.com>, <maryloucesca@gmail.com>

See forwarded message.

[Quoted text hidden]

---

**Gallegos, Andres J.** <ajgallegos78@gmail.com>                      Tue, Oct 13, 2020, 11:05
To: Cesca, Chris <c-cesca@wiu.edu>

Chris – are the courses being offered next semester even if it is with different professors, and if so, are you able to enroll in those classes? If so, are you then looking for a waiver of tuition for those classes?

Looking at what Dr. Abraham is offering for these two courses are there any tweaks to the offer that would make the proposal is acceptable.


Are their lectures recorded to assist you in your preparation?

[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                                    Wed, Oct 14, 2020, 10:19
To: macombmw@gmail.com <macombmw@gmail.com>

See forwarded email.

[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                                    Wed, Oct 14, 2020, 13:58
To: lswexler@gmail.com <lswexler@gmail.com>

See forwarded email.

[Quoted text hidden]

Exhibit 15

 **Chris Cesca <c-cesca@wiu.edu>**

## Seeking help
3 messages

**Cesca, Chris <c-cesca@wiu.edu>**                                            Mon, Sep 30, 2019, 07:00
To: Martin Abraham <ma-abraham@wiu.edu>

Dr. Abraham,

Frankly, I am not sure how to approach this matter, but I will do my best hereafter.

In the relatively brief period of time I have attended Western Illinois University, I have been met with and faced a seeming onslaught of experiences, situations, and individuals that have presented undue challenges and hurdles to my edification and success at this institution.

When I first attempted college, I was eighteen years old, and already had a significantly checkered academic past. What followed was not a story of meteoric triumph. Rather, I continued to fail, over and over again, to the degree that I was kicked out of college twice due to my abysmal class performance.

From an economic perspective, I wish I could say that the opportunity cost of my tremendous failure was a flourishing social life, or perhaps a glowing athletic career. However, neither of these prospects were my reality.

At age 28, I was diagnosed with *severe* learning and other disabilities. As I recall my psychiatrist bluntly stating, "You've got it, and you've got it bad.", referring to the degree to which my disabilities were present and profound.

When I learned this news, I was simultaneously devastated and filled with a sense of redemption. I come from a highly academic family, so to learn that my path to scholastic success had been, and would continue to be, resoundingly and comparatively more challenging, was infuriating. However, the validating realization that my lifelong academic impediments were not the result of laziness, apathy, or a "lack of motivation", as I had so often heard previously, was redeeming.

To this end, I started the process of working toward getting back into a collegiate setting. After weighing my options, I applied to and entered WIU.

As I alluded to above, I have experienced what feels like a never-ending uphill battle here. While there have been a handful of truly phenomenal individuals who have fostered and guided me toward a path of success, their efforts seem to be regularly countered by those who appear to have little concern for my outcome at this school.

In the time I have been here, I have put in a tremendous amount of energy, effort, and sweat equity to accomplish what victories I have had. However, it saddens, frustrates, and upsets me to say, that, with the exception of individuals like Angela LaFrance, Jobu Babin, Glenn Daugherty, Stephen Gray, and Monica Eskridge, who have been instrumental in my victories, my overall success here has been *in spite* of the school's infrastructure, not because of it.

As I am reiterating, I have faced many obstacles to my success at this school, and while I would be amenable, if not eager, to share them with you one-by-one, I am writing this to elucidate the pinnacle of these obstructions, which occurred on Saturday, September 28th, 2019.

Recently, my partner and I have moved across town. As such, I do not currently have internet access at home. Wanting to be productive nonetheless, I visited the library on Saturday around 1300. I had several hours of homework to do, and, in addition to using the school's internet facilities, I find the library to be a good environment to avoid distractions. Due to my disabilities, I am very, very easily distracted.

One of the resources I use in managing my disabilities is a service dog. Pursuant to my medical professional's guidance, I have been slowly integrating my service dog into the school-facing side of my academic repertoire. While I can understand and appreciate the dubious relationship between causation and correlation, I can tell you that, in the year that I have utilized my service dog, I have taken eleven classes, and aced ten of them. Furthermore, I have made the Dean's List numerous times in the interim. Incidentally, if you'd like to know more about why I did not ace all eleven classes, feel free to ask, and I will explicate one of the earlier, yet unresolved, interferences with my success at this

school.

Regardless, on Saturday, I was forced to vacate the Malpass Library on the basis of utilizing my service dog. Notwithstanding the utterly humiliating element of this incident, it is my intention to discuss the experience with you, in detail, at an appropriate future juncture.

Shortly after arriving at the library, I approached Douglas Endres (a/the senior librarian), and asked him to open one of the study rooms in the basement. At this time, my request was ignored, and Mr. Endres proceeded to inform me that my dog was not welcome or allowed in the library. Frustrating and mortifying though this was, I explained to Mr. Endres that my dog was, in fact, a service animal, and that his (Mr. Endres) understanding was misinformed and incorrect. If my explanation was not sufficient, my service dog is also equipped with a prominent vest, on which the lettering "SERVICE DOG" is conspicuously placed on both sides. Further, I do not feel that the burden of education regarding federal law should rest on me, or any other student with disabilities, and Mr. Endres' lack of relevant understanding was deeply concerning.

Despite my explanation, Mr. Endres insisted that I would not be permitted to stay in the library with my service animal. At this point, Mr. Endres contacted OPS, to the effect of my forcible removal from the library. I went to the basement of the library to collect my things, then returned to the front desk, to wait for OPS to respond.

After Mr. Slater and Mr. Seaver arrived from OPS, I was ultimately forced to leave Malpass Library. Not wanting to cause more of a scene, fearing arrest, and realizing that my legal rights would not prevail, I vacated the building. In addition to the ironic hindering of my academic success as I was unable to use the library facilities, my civil rights were brazenly and wantonly disregarded and violated.

As I stated above, I do not know how best to proceed here. It feels as if I have to work hard just to work hard at this school, and the Sisyphean struggle that is succeeding at Western Illinois University is distinctly wearing on me. Furthermore, the prospect of trying to resolve the numerous ongoing problems I am facing here directly contravenes my objective of productivity. It is as if I have a dichotomous choice to make - seek and obtain resolution of a series of institutional wrongs to which I have been subjected, or

work toward academic success. It is not a choice any student should have to make, especially one already approaching this environment from a profound disadvantage.

I am asking for your help, and, while my past experiences with this institution diminish my faith in any kind of resolution being realized, I have a small degree of optimism that my future here might consummately contrast toward productivity and success, academic and otherwise.

Thank you for your time,

Chris

**[Quoted text hidden]**

---

**Abraham, Martin** <ma-abraham@wiu.edu>                                    Mon, Sep 30, 2019, 08:08
To: Cesca, Chris <c-cesca@wiu.edu>

Chris -

Thank you for reaching out to me. I am sorry you had this experience  over the weekend . I will investigate to learn more about what occurred and get back to you as soon as I can.
**[Quoted text hidden]**

---

**Abraham, Martin** <ma-abraham@wiu.edu>                                    Tue, Oct 1, 2019, 21:47
To: Cesca, Chris <c-cesca@wiu.edu>

Chris -

I am sorry to hear about this incident at the library. I wanted you to know that I am working to collect further information so that we can properly respond and take any indicated follow-up actions. I hope to have this work completed by the end of the week and ask for your patience as I gather the needed information.
**[Quoted text hidden]**

Exhibit 16

 Gmail

**Chris Cesca <c-cesca@wiu.edu>**

---

## LEJA 357

7 messages

---

**Cesca, Chris** <c-cesca@wiu.edu>                                    Mon, Mar 30, 2020, 16:28
To: Phillip Entzminger <pc-entzminger@wiu.edu>

Dr. Entzminger,

Although I had seen a notice on the quiz in Western Online stating that I had until the 30th at midnight to complete it, it seems to be unavailable now.

I would still very much appreciate a phone call, at minimum, to try to get a handle on the extraordinary turn of events here. I am at a loss for why I have not heard back from you, and am exceedingly unsure as to how to proceed.

Please advise,

Chris
[Quoted text hidden]

---

**Entzminger, Phillip** <pc-entzminger@wiu.edu>                        Mon, Mar 30, 2020, 16:34
To: Cesca, Chris <c-cesca@wiu.edu>

Mr. Cesca:

Thank you for your email.

Check out the announcement on the main page (you were not the only one who missed the 12:00 a.m. due date/time).  Just stick with the Schedule on the main page.

I also noticed you were not able to complete the psychiatric quiz (extended to last Thursday).  Did you need me to open that one back up again?

We have been sent emails regarding phone calls.  Would a zoom meeting be of any assistance?  Some also use google hang-outs.  Just let me know.



Assistant Professor P. Charles Entzminger, MSCJ, JD
Law Enforcement Justice Administration
Stipes Hall, Room 409

[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                    Mon, Mar 30, 2020, 16:35
To: Entzminger, Phillip <pc-entzminger@wiu.edu>

Hangouts would be great.

Ready when you are.

[Quoted text hidden]

---

**Entzminger, Phillip** <pc-entzminger@wiu.edu>                       Mon, Mar 30, 2020, 20:39
To: Cesca, Chris <c-cesca@wiu.edu>

Reminds me of the line from *Silence of the Lambs* after Hannibal Lecter disembowels that guy.

I talked with my authorities this afternoon and they have approved one-on-one zoom or Google hangouts for up to 20 minutes.

How about tomorrow at 12:00 p.m. CST or 1:00 p.m. CST?

[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                    Mon, Mar 30, 2020, 20:42
To: Entzminger, Phillip <pc-entzminger@wiu.edu>

It is unconscionable that this is being manufactured into such a process by the ostensible powers that be.

1300 tomorrow.

[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                    Tue, Mar 31, 2020, 13:00
To: Entzminger, Phillip <pc-entzminger@wiu.edu>

Ready when you are.

[Quoted text hidden]

---

**Entzminger, Phillip** <pc-entzminger@wiu.edu>                       Tue, Mar 31, 2020, 13:23
To: Cesca, Chris <c-cesca@wiu.edu>

https://www.quotes.net/mquote/86282
[Quoted text hidden]

Exhibit 17

 **Gmail**

**Chris Cesca <c-cesca@wiu.edu>**

---

## police report
13 messages

---

**Cesca, Chris** <c-cesca@wiu.edu>                                                    Thu, Aug 27, 2020, 10:58
To: Myers, Jill <jj-myers@wiu.edu>

Dr. Myers,

Please find attached the police report assignment from this previous Tuesday.

Thank you,

Chris
[Quoted text hidden]
**POLICE REPORT.pdf**

---

**Myers, Jill** <jj-myers@wiu.edu>                                                    Thu, Aug 27, 2020, 13:02
To: Cesca, Chris <c-cesca@wiu.edu>, Mossman, Mark <ma-mossman@wiu.edu>

Chris: You are not registered for the course and per Provost Mossman, you should not be attending classes that you
are not registered for. I believe you and he met and discussed your options. Please follow his advice. Jill
[Quoted text hidden]

---

**Mossman, Mark** <ma-mossman@wiu.edu>                                                Thu, Aug 27, 2020, 14:49
To: Myers, Jill <jj-myers@wiu.edu>
Cc: Cesca, Chris <c-cesca@wiu.edu>

Chris,

You should not be attending a course you have not registered for.  As noted in our recent meeting and by numerous
other individuals with whom you have spoken, you need to complete the incompletes, and you do so by working out
a schedule for completion with each individual instructor.  My understanding is that Dr. Myers has not agreed that
coming to her course is a way to complete an incomplete.  So, again, as you do not have her permission, and as
indeed she is asking you to stop coming to class, do not attempt to attend the course.

I emailed you yesterday about a follow-up meeting on Monday.  Please let me know if you have time on Monday.

Thank you,

Mark Mossman
[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                                    Thu, Aug 27, 2020, 16:01
To: Mossman, Mark <ma-mossman@wiu.edu>
Cc: Myers, Jill <jj-myers@wiu.edu>, Angela LaFrance <ad-lafrance@wiu.edu>

Dr. Mossman,

First, I have time on Monday. Please let me know when the latest available timeslot is that works for you, and I will schedule accordingly. Also, as a logistical measure, if you wouldn't mind, please CC Ms. LaFrance on future correspondence.

Next, it is my understanding that the last day to clearly register for or drop classes (without financial or other consequence) is September 4th, 2020. Would you please confirm and clarify this understanding? Additionally, based on past experience at Western, it had been my understanding that attending classes on something of a trial basis until this date was acceptable practice. Please confirm and clarify this as well.

Last, as I detailed both in our meeting and email communication, it is unreasonable to expect that I can conceivably jump back into complex material I have not seen in months, that I was critically unable to comprehend, even insofar as essentially needing to *teach myself*, subsequent to the shift to online learning. I am running out of different combinations and permutations of stating the same thing over and over again, but I am **unable** to casually dive back into this material.

I suppose I can appreciate, though not necessarily understand, the mindset that predicates strict and stringent adherence to the arcane and antiquated policies and procedures currently in place at this university, effectively over and in lieu of effort and energy being put toward what might be best for the student, but that does not diminish any frustration being felt on my end. Further, I know it is asking a lot for a presumably neurotypical professor (and department chair), ostensibly battle-hardened by years of criminal prosecution in Baltimore courtrooms, to give me a chance and perhaps demonstrate some empathy here, or even, at minimum, not repeatedly call my integrity into question, but I feel such a request is not unreasonable. For what it may be worth, and for as frustrating as some of my interactions with Dr. Myers have been, I have a great degree of respect for her and a strong desire to learn from her. Please do not misconstrue this as vapid flattery - the challenge she presents as a professor appeals to me.

As I have repeated and reiterated seemingly ad nauseum, I am here to learn. It would be nice if the only obstacles I faced here were academic challenges, and not the cavalcade of administrative obstructions I have encountered, but I guess this is what "recruitment and retention" evidently entails.

Hopefully, we can meet this coming Monday and realize a productive solution here. In the interim (as I stated during our previous meeting), it is my intention to attend classes for which I am currently on the hook, in an effort not to miss any learning opportunity or material that may be presented, while this glacially-moving process is handled. If, however, I am being

prohibited from attending these classes, I would like to know on what basis this is being done (including the specific pertinent language within the school's policies), and I would like this to be so communicated to me, via email, for my own documentation and recordkeeping.

Please advise,

Chris
[Quoted text hidden]

---

**Mossman, Mark** <ma-mossman@wiu.edu>                          Thu, Aug 27, 2020, 20:48
To: Cesca, Chris <c-cesca@wiu.edu>
Cc: Myers, Jill <jj-myers@wiu.edu>, Angela LaFrance <ad-lafrance@wiu.edu>

I would be happy to meet with you and Ms. LaFrance at 10am on Monday, Chris.
[Quoted text hidden]

---

**LaFrance, Angie** <ad-lafrance@wiu.edu>                          Fri, Aug 28, 2020, 09:13
To: Mossman, Mark <ma-mossman@wiu.edu>
Cc: Cesca, Chris <c-cesca@wiu.edu>, Myers, Jill <jj-myers@wiu.edu>

Hello,

I am not available at 10:00 am on Monday.  Please let me know if there are other times later in the week which work for you.

Thanks,

Angie
[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                          Mon, Aug 31, 2020, 07:30
To: LaFrance, Angie <ad-lafrance@wiu.edu>
Cc: Mossman, Mark <ma-mossman@wiu.edu>, Myers, Jill <jj-myers@wiu.edu>

Dr. Mossman,

In the interim between now and when this meeting (and any subsequent resolution) takes place, or this coming Tuesday at 1100 (whichever comes first), please respond to (confirm or disconfirm) some of the questions I presented in my email to you, dated Thursday, August 27th, 2020, 1601.

1. Is my understanding correct that the last day to drop a class without incurring financial expense is September 4th, 2020?

2. Am I being specifically and/or formally prohibited from attending this (LEJA 312) class at this time? If so, on what basis is this action occurring? Please direct me to the pertinent rules, policies, and/or procedures laid forth by the school that explicitly explain this action. Further,

what formal consequence am I at risk of facing in the event that I attempt to attend this class, despite your hitherto suggestion that I should refrain from doing so?

It is my hope that you can appreciate the desire I have not to miss any class session that might help me learn the material I am still responsible for comprehending. If, however, I am explicitly prohibited from attending this class (or any other), I would appreciate the aforementioned clarification.

Please advise,

Chris
**[Quoted text hidden]**

---

**Mossman, Mark** <ma-mossman@wiu.edu>                                    Mon, Aug 31, 2020, 08:38
To: Cesca, Chris <c-cesca@wiu.edu>
Cc: LaFrance, Angie <ad-lafrance@wiu.edu>, Myers, Jill <jj-myers@wiu.edu>

Chris,

Please see my responses below:

1. Your last day to drop with a 100% refund is September 4.  I have pasted in the link to the Registrar's calendar below. http://www.wiu.edu/wiucalendar/index.sphp?control=monthly&date=2020-09-01&calendars[]=56

2. Do not attend Dr. Myers class.  As I have explained, you are not allowed to attend a class for which you have not been registered.  If you and an instructor agree that such an action is a way to fulfill an Incomplete, then I think it is appropriate.  My understanding is that that is not the case here.
**[Quoted text hidden]**

---

**Cesca, Chris** <c-cesca@wiu.edu>                                    Mon, Aug 31, 2020, 08:50
To: Mossman, Mark <ma-mossman@wiu.edu>
Cc: LaFrance, Angie <ad-lafrance@wiu.edu>, Myers, Jill <jj-myers@wiu.edu>

Dr. Mossman,

At your earliest convenience, please respond to the three specific questions I posed in item number two of my 0730 email. It would help me better understand and document the circumstances surrounding this situation to have those questions explicitly answered.

Thank you,

Chris
**[Quoted text hidden]**

---

**Mossman, Mark** <ma-mossman@wiu.edu>                                    Mon, Aug 31, 2020, 09:00
To: Cesca, Chris <c-cesca@wiu.edu>
Cc: LaFrance, Angie <ad-lafrance@wiu.edu>, Myers, Jill <jj-myers@wiu.edu>

Chris,

I answered your questions in #2.  Thank you.
[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                              Mon, Aug 31, 2020, 09:14
To: Mossman, Mark <ma-mossman@wiu.edu>
Cc: LaFrance, Angie <ad-lafrance@wiu.edu>, Myers, Jill <jj-myers@wiu.edu>

Dr. Mossman,

Perhaps we are looking at different emails. Allow me to clarify:

In item number two, in the email sent this morning at 0730, I asked,

1. Am I being specifically and/or formally prohibited from attending this (LEJA 312) class at this time? (yes/no)

2. If the answer to the immediate question above is (yes), on what basis is this occurring? (i.e. university protocol/your authority, etc.) Also, please direct me to the pertinent rules, policies, and/or procedures laid forth by the school that explicitly explain this action. (Just as you included a link to the registrar's calendar, links to the additional information would be very helpful).

3. Based on the previous two concerns, what consequences would I be at risk of facing if, in an effort not to miss valuable class material, I chose to attend this class?

I feel these should be very straightforward questions to answer, and it would again help me tremendously to be able to have an explicit understanding of these issues. In the event that you are not in a position to adequately or accurately clarify these questions, I would respectfully ask that you refer me to the appropriate party or parties that might be able and willing to further assist me.

Thank you,

Chris
[Quoted text hidden]

---

**Mossman, Mark** <ma-mossman@wiu.edu>                          Mon, Aug 31, 2020, 09:28
To: Cesca, Chris <c-cesca@wiu.edu>
Cc: LaFrance, Angie <ad-lafrance@wiu.edu>, Myers, Jill <jj-myers@wiu.edu>

Chris,

Please see the following for additional clarifications.

1. Yes

2. A student is not allowed to attend a class for which she is not registered.  To do so would constitute disruptive behavior.  Please the following:  http://www.wiu.edu/policies/disrupst.php

3. If you attend the class without the instructor's permission, your behavior is by definition disruptive.  Please see the link above for consequences of this behavior.

I ask that you heed my previous counsel here: contact your instructors and agree upon a way to complete each course.

Thank you,

Mark Mossman


Thank you,

Mark Mossman
[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                                  Mon, Aug 31, 2020, 09:38
To: Mossman, Mark <ma-mossman@wiu.edu>
Cc: LaFrance, Angie <ad-lafrance@wiu.edu>, Myers, Jill <jj-myers@wiu.edu>

Dr. Mossman,

Despite the irony of the linked article mentioning "behavior...which disrupts the educational process", especially in the context of how this situation is being handled by the administration of this fine school, I appreciate your eventual clarification, such as it was.

Please advise as to when we may meet again to continue working toward resolving this issue.

Thank you,

Chris
[Quoted text hidden]

# WESTERN IL UNIVERSITY POLICE

## Incident Report Form

Exhibit 18

**WI-19-006513**
09/28/2019
**OTHER**

---

**Primary Officer: TRACY D. SLATER - TDS**

| | | | | |
|---|---|---|---|---|
| ☐ Juvenile Involved | ☐ Investigation | ☐ Video Available | ☐ Gang Related | ☐ Paperless |
| ☐ Domestic Related | ☐ Suspects | ☐ Bias Crime | ☐ Accident | ☐ Administrative |
| ☐ Alcohol Involved | ☐ Arrests Made | ☐ Drugs Involved | ☐ Ready for DA / Prosecutor | ☐ Alarm Activated |

| Log Number | Incident Number | File Number | Case Number | UCR 0000 |
|---|---|---|---|---|
| **WI-19-006513** | | **0** | | **NO UCR** |

| Incident Type | OTHER | Dispatcher | Source | District | Status |
|---|---|---|---|---|---|
| **OTHER** | | **meq** | **PHONE** | | **CLOSED** |

| Incident Date / Times | | | | | | Incident Occurred At or Between | |
|---|---|---|---|---|---|---|---|

| Date Received | Day Rec'd | Rcvd | Disp | Arrv | Clrd | Earliest Date and Time | Latest Date and Time |
|---|---|---|---|---|---|---|---|
| **09/28/2019** | **Saturday** | **1344** | **1345** | **0000** | **1403** | | |

| Disposition | CMPLT | Cleared by Exception | | ☐ Suspended |
|---|---|---|---|---|
| **ASSIGNMENT/TASK COMPLETE** | | | | |

| UCR Clearance | UCR Occur Date | UCR Clear Date | UCR Count | UCR Human Traffic Code | UCR HT Count |
|---|---|---|---|---|---|
| | **09/28/2019** | | **1** | | **0** |

| Location | ☐ Intersection |
|---|---|

| 1   MALPASS LIBRARY 801 N WESTERN AVE MACOMB  IL  61455 | Cross Street |
|---|---|
| | GPS Loc X **0** |
| | GPS Loc Y **0** |

| Business Name | Premise Code LIB | Arson Value |
|---|---|---|
| **MALPASS LIBRARY** | **LIBRARY** | |

| Gang | Weather |
|---|---|

| Modus Operandi Coding | Victim: |
|---|---|
| Entry: | Property: |
| Exit: | Area: |
| Method: | Time of Day: |

WEAPON USED:

| Caller / Complainant Type | Normal ☒ | Anonymous ☐ | Hangup ☐ | Refused ☐ |
|---|---|---|---|---|

**INVOLVED PERSONS**

**CALLER - REPORTING PERSON**  CODE:  **CALLER**

| Name (Last, First, Middle) - Address | Juvenile | Date of Birth | Age | Race | Sex | Ethnic | Social Security Number |
|---|---|---|---|---|---|---|---|
| **ENDRES, DOUGLAS G** | ☐ | | | | | | |
| | | Weight | Height | Hair | Eyes | | Phone Number |
| | | Driver License Number | | | State | Class | Expiration Date |
| | | ID Provided | | ID Detail | | | |

Link Comments
Library staff; contact with CESCA inside library with service dog

**SUBJECT**  CODE:  **SUBJEC**

| WI-19-006513 | 09/28/2019 | ☒ | APPROVED BY: **TRACY D. SLATER** |
|---|---|---|---|
| IRF 1.6 | | | APPROVED ON: **09/29/2019** |

# WESTERN IL UNIVERSITY POLICE

## Incident Report Form

**WI-19-006513**
09/28/2019
**OTHER**

---

### INVOLVED PERSONS

### SUBJECT                                                        CODE:  SUBJEC

| Name (Last, First, Middle) - Address | Juvenile | Date of Birth | Age | Race | Sex | Ethnic | Social Security Number |
|---|---|---|---|---|---|---|---|
| **CESCA, CHRIS**<br>**632 W WOODBURY ST**<br>**MACOMB IL 61455** | ☐ | 01/12/1987 | 32 | W | M | N | |

| | | | |
|---|---|---|---|
| Weight **215** | Height **600** | Hair **BRO** | Eyes **BRO** | Phone Number **(872) 256-2789** |

| Driver License Number **C20010087012** | State **IL** | Class | Expiration Date |
|---|---|---|---|

| ID Provided | ID Detail |
|---|---|

**Link Comments**
Asked to leave library by staff due to having service dog

### INVOLVED BUSINESSES / ORGANIZATIONS

**09/28/2019**

| Business / Organization Name **MALPASS LIBRARY** | Business Address |
|---|---|

| Phone 1 **(309) 298-2764** | Phone 2 **(309) 298-2759** | Phone 3 **(309) 298-2705** | **1 MALPASS LIBRARY**<br>**801 N WESTERN AVE**<br>**MACOMB, IL 61455** |
|---|---|---|---|

**Involvement Comments**

### RESPONDING / INVOLVED UNITS, OFFICERS, TIMES

Division          Supervisor / ID

| Agency Numbers | | Units & Times | | |
|---|---|---|---|---|
| **PD** | PD-19-004546 | 117 | DISP | 13:45:46 |
| | | | CLRD | 14:03:53 |
| | | 108 | DISP | 13:47:18 |
| | | | CLRD | 14:03:53 |

---

**WI-19-006513    09/28/2019**    ☒    APPROVED BY: **TRACY D. SLATER**

IRF 1.6                                APPROVED ON: **09/29/2019**

# WESTERN IL UNIVERSITY POLICE

**WI-19-006513**
09/28/2019
**OTHER**

## Incident Report Form

**COMMENTS / NARRATIVES**

Title
**Information**

| Narrative Created By / Creation Date | **09/28/2019** | Narrative Updated By / Update On | **09/30/2019** |
|---|---|---|---|
| **TRACY D. SLATER** | | | |

Narrative Approved By / Approved Date

On 9-28-2019 at approximately 1345 hrs I, Corporal SLATER and Officer SEAVER met with Douglas ENDRES and Chris CESCA at the front desk area of the Malpass Library.

ENDRES informed us that CESCA was not allowed to have his service animal in the library.  ENDRES was informed from library administration that the animal could not be in the library and the dog had to be removed before CESCA could return.  It should be noted, the dog was "marked" service animal with a vest on its back; however, CESCA had no documentation on him that the animal was indeed a service animal.  CESCA informed us he registered the dog with the Disability Resource Center.

CESCA recorded video of the incident on his cell phone.

ENDRES again informed CESCA that his dog could not stay in the library and CESCA departed the library.

CESCA advised he would like a copy of our incident report.  I told him to contact Officer WORTHINGTON on Monday morning at 0800 hrs.

No Further Action Required.

| **WI-19-006513** | **09/28/2019** | ☒ | APPROVED BY:  **TRACY D. SLATER** |
|---|---|---|---|
| IRF 1.6 | | | APPROVED ON: **09/29/2019** |

Exhibit 19

 **Gmail**

**Chris Cesca <c-cesca@wiu.edu>**

---

**Seeking help**
3 messages

---

**Cesca, Chris <c-cesca@wiu.edu>**                                                                 Mon, Sep 30, 2019, 07:00
To: Martin Abraham <ma-abraham@wiu.edu>

Dr. Abraham,

Frankly, I am not sure how to approach this matter, but I will do my best hereafter.

In the relatively brief period of time I have attended Western Illinois University, I have been met with and faced a seeming onslaught of experiences, situations, and individuals that have presented undue challenges and hurdles to my edification and success at this institution.

When I first attempted college, I was eighteen years old, and already had a significantly checkered academic past. What followed was not a story of meteoric triumph. Rather, I continued to fail, over and over again, to the degree that I was kicked out of college twice due to my abysmal class performance.

From an economic perspective, I wish I could say that the opportunity cost of my tremendous failure was a flourishing social life, or perhaps a glowing athletic career. However, neither of these prospects were my reality.

At age 28, I was diagnosed with *severe* learning and other disabilities. As I recall my psychiatrist bluntly stating, "You've got it, and you've got it bad.", referring to the degree to which my disabilities were present and profound.

When I learned this news, I was simultaneously devastated and filled with a sense of redemption. I come from a highly academic family, so to learn that my path to scholastic success had been, and would continue to be, resoundingly and comparatively more challenging, was infuriating. However, the validating realization that my lifelong academic impediments were not the result of laziness, apathy, or a "lack of motivation", as I had so often heard previously, was redeeming.

To this end, I started the process of working toward getting back into a collegiate setting. After weighing my options, I applied to and entered WIU.

As I alluded to above, I have experienced what feels like a never-ending uphill battle here. While there have been a handful of truly phenomenal individuals who have fostered and guided me toward a path of success, their efforts seem to be regularly countered by those who appear to have little concern for my outcome at this school.

In the time I have been here, I have put in a tremendous amount of energy, effort, and sweat equity to accomplish what victories I have had. However, it saddens, frustrates, and upsets me to say, that, with the exception of individuals like Angela LaFrance, Jobu Babin, Glenn Daugherty, Stephen Gray, and Monica Eskridge, who have been instrumental in my victories, my overall success here has been *in spite* of the school's infrastructure, not because of it.

As I am reiterating, I have faced many obstacles to my success at this school, and while I would be amenable, if not eager, to share them with you one-by-one, I am writing this to elucidate the pinnacle of these obstructions, which occurred on Saturday, September 28th, 2019.

Recently, my partner and I have moved across town. As such, I do not currently have internet access at home. Wanting to be productive nonetheless, I visited the library on Saturday around 1300. I had several hours of homework to do, and, in addition to using the school's internet facilities, I find the library to be a good environment to avoid distractions. Due to my disabilities, I am very, very easily distracted.

One of the resources I use in managing my disabilities is a service dog. Pursuant to my medical professional's guidance, I have been slowly integrating my service dog into the school-facing side of my academic repertoire. While I can understand and appreciate the dubious relationship between causation and correlation, I can tell you that, in the year that I have utilized my service dog, I have taken eleven classes, and aced ten of them. Furthermore, I have made the Dean's List numerous times in the interim. Incidentally, if you'd like to know more about why I did not ace all eleven classes, feel free to ask, and I will explicate one of the earlier, yet unresolved, interferences with my success at this

school.

Regardless, on Saturday, I was forced to vacate the Malpass Library on the basis of utilizing my service dog. Notwithstanding the utterly humiliating element of this incident, it is my intention to discuss the experience with you, in detail, at an appropriate future juncture.

Shortly after arriving at the library, I approached Douglas Endres (a/the senior librarian), and asked him to open one of the study rooms in the basement. At this time, my request was ignored, and Mr. Endres proceeded to inform me that my dog was not welcome or allowed in the library. Frustrating and mortifying though this was, I explained to Mr. Endres that my dog was, in fact, a service animal, and that his (Mr. Endres) understanding was misinformed and incorrect. If my explanation was not sufficient, my service dog is also equipped with a prominent vest, on which the lettering "SERVICE DOG" is conspicuously placed on both sides. Further, I do not feel that the burden of education regarding federal law should rest on me, or any other student with disabilities, and Mr. Endres' lack of relevant understanding was deeply concerning.

Despite my explanation, Mr. Endres insisted that I would not be permitted to stay in the library with my service animal. At this point, Mr. Endres contacted OPS, to the effect of my forcible removal from the library. I went to the basement of the library to collect my things, then returned to the front desk, to wait for OPS to respond.

After Mr. Slater and Mr. Seaver arrived from OPS, I was ultimately forced to leave Malpass Library. Not wanting to cause more of a scene, fearing arrest, and realizing that my legal rights would not prevail, I vacated the building. In addition to the ironic hindering of my academic success as I was unable to use the library facilities, my civil rights were brazenly and wantonly disregarded and violated.

As I stated above, I do not know how best to proceed here. It feels as if I have to work hard just to work hard at this school, and the Sisyphean struggle that is succeeding at Western Illinois University is distinctly wearing on me. Furthermore, the prospect of trying to resolve the numerous ongoing problems I am facing here directly contravenes my objective of productivity. It is as if I have a dichotomous choice to make - seek and obtain resolution of a series of institutional wrongs to which I have been subjected, or

work toward academic success. It is not a choice any student should have to make, especially one already approaching this environment from a profound disadvantage.

I am asking for your help, and, while my past experiences with this institution diminish my faith in any kind of resolution being realized, I have a small degree of optimism that my future here might consummately contrast toward productivity and success, academic and otherwise.

Thank you for your time,


Chris

**[Quoted text hidden]**

---

**Abraham, Martin** <ma-abraham@wiu.edu>                                        Mon, Sep 30, 2019, 08:08
To: Cesca, Chris <c-cesca@wiu.edu>

Chris -

Thank you for reaching out to me. I am sorry you had this experience  over the weekend . I will investigate to learn more about what occurred and get back to you as soon as I can.
**[Quoted text hidden]**

---

**Abraham, Martin** <ma-abraham@wiu.edu>                                        Tue, Oct 1, 2019, 21:47
To: Cesca, Chris <c-cesca@wiu.edu>

Chris -

I am sorry to hear about this incident at the library. I wanted you to know that I am working to collect further information so that we can properly respond and take any indicated follow-up actions. I hope to have this work completed by the end of the week and ask for your patience as I gather the needed information.
**[Quoted text hidden]**

Exhibit 20

**Date : 9/28/2019 6:30:35 PM**
**From : "Cesca, Chris"**
**To : "Sarah Worthington"**
**Cc : "Angela LaFrance" , "Derek Watts" , "Douglas E." , "Elizabeth Duvall"**
**, "Matthew Seaver" , "Michael Lorenzen" , "Tracy Slater" Subject : ongoing**
**and new concerns**

Ms. Worthington,

I am reaching out to you again in the hopes of clarifying some information
pertinent to some concerns I am having.

I had emailed you September 20th, at 1145, though I have yet to receive any response,
over a week subsequent. Allowing for benefit of the doubt, I am assuming this lack of a
response is the result of a clerical error or administrative misstep, not due to gross
organizational and/or institutional misconduct or characteristic incompetence.

Regardless, I am still interested in receiving a copy of the report detailing the 082719
incident.

Furthermore, today, around 1330, I was forced to vacate Malpass Library (which I
understand is a public facility) on the basis of my utilizing a service dog. It should be
noted that, despite the lack of any legal requirement that my service dog wears any
identifying material, including, but not limited to: vests, patches, identification cards,
etc., in the interest of avoiding harassment, I have equipped him with a vest, which
displays, in conspicuous lettering, and in two places, "SERVICE DOG". It had been my
hope that Mr. Endres would have noticed this identification, but I may have been
foolish to assume that he, a librarian, would know how to read.

If my understanding is correct, Mr. Slater and Mr. Seaver from your office arrived to
respond to a call placed to OPS by Mr. Endres at the library.

Additionally, in being subjected to this extraordinary malfeasance and misconduct, it
should be realized that my civil rights, as well as any and all such related rights
protected by federal law, have been grossly, brazenly violated. I would hope that library
staff at this illustrious institution would be familiarized with the law, although, given the
ostensible difficulty they have understanding two words, the material laid forth within
the Americans With Disabilities Act (ADA) may prove
altogether too challenging.
I have attached and apprised Ms. LaFrance, my advisor within the DRC/Student
Development and Success Center, to today's incident. She is aware of my utilization of a
service dog, and can verify that my service dog has been registered with the University
for some time now. Certainly, this registration is a formal courtesy, as it is my legal right
to have my service dog with me in any public building.

Pursuant to this incident, I requested that Mr. Slater and Mr. Seaver document said incident accordingly. It is my expectation that I will be able to obtain a copy of the resulting report, preferably sooner than over a month from today.

Please respond in an appropriate length of time, and I will be looking forward to gaining resolution of the above concerns.

If you have any questions for me, or require any additional information, please do not hesitate to let me know.

Thank you,

Chris

--
Chris Cesca
c-cesca@wiu.edu 872.256.278



Cesca, Chris <c-cesca@wiu.edu>

## FOIA Request from C. Cesca
3 messages

---

**Cesca, Chris** <c-cesca@wiu.edu>                                    Mon, Nov 29, 2021 at 7:00 AM
To: Liz Duvall <el-duvall@wiu.edu>

Please see attached request letter.--

Chris Cesca
[c-cesca@wiu.edu](mailto:c-cesca@wiu.edu)
872.256.2789

The reasonable man adapts himself to the world; the unreasonable one persists in trying to adapt the world to himself. Therefore all
progress depends on the unreasonable man.

G. B. Shaw

---

 **CCESCA FOIA REQUEST RE 092819.pdf**
1000K

---

**Duvall, Liz** <el-duvall@wiu.edu>                                    Mon, Nov 29, 2021 at 7:59 AM
To: "Cesca, Chris" <c-cesca@wiu.edu>, FOIA Requests <wiufoia@wiu.edu>, Darcie Shinberger <dr-shinberger@wiu.edu>

Good Morning,

I acknowledge receipt of your request, which was filed via email today. You shall receive a
response within five working days as allowed by the statute.

Liz

Elizabeth Duvall
Western Illinois University
General Counsel
Freedom of Information Act Officer
Sherman Hall 208
1 University Circle
Macomb, IL  61455
P: 309-298-3070
F: 309-298-3080

*pronouns: she/her/hers*

[Quoted text hidden]

---

**Duvall, Liz** <el-duvall@wiu.edu>                                    Mon, Dec 6, 2021 at 11:41 AM
To: "Cesca, Chris" <c-cesca@wiu.edu>, FOIA Requests <wiufoia@wiu.edu>, Darcie Shinberger <dr-shinberger@wiu.edu>

Good Morning Chris,

1.  I do not have any responsive records for this request. The Office of Public Safety does not maintain records from the
library cameras. The library maintains their own records and recordings are only kept for 30 days.

2. The only responsive record is the police report and it is attached to this email. It has been redacted pursuant to the Illinois
Freedom of Information Act section under 5 ILCS 140/7(1)(b) private information and 5 ILCS 140/7(1)(c) personal
information contained within public records, the disclosure of which would constitute a clearly unwarranted invasion of

personal privacy. You requested emails and your request as currently written is unduly burdensome. I am requesting that you narrow that request and provide us with a list of Western Illinois University email addresses that you want searched.

3. http://www.wiu.edu/vpaps/university_relations/foia/  This link is to our website that includes links to the list of public records available, meeting minutes, references documents and tabs for Statistics & Data that are provided on our website. You can also review http://wiu.edu/IRP/  This link includes links on the left side of the screen to reports that are available to the public.

 This email serves as confirmation that your request has been completed.

Liz

Elizabeth Duvall
Western Illinois University
General Counsel
Freedom of Information Act Officer
Sherman Hall 208
1 University Circle
Macomb, IL  61455
P: 309-298-3070
F: 309-298-3080

*pronouns: she/her/hers*

[Quoted text hidden]

---

📄 **WI-19-006513 FOIA Other- CESCA (1).pdf**
136K

Exhibit 21

 Gmail

**Chris Cesca <c-cesca@wiu.edu>**

---

## Malpass Library
2 messages

---

**Lorenzen, Michael** <mg-lorenzen@wiu.edu>                    Thu, Oct 10, 2019, 11:09
To: Chris Cesca <c-cesca@wiu.edu>, Martin Abraham <ma-abraham@wiu.edu>

Mr. Cesca,

As the dean of the WIU Libraries, I offer my apologies for what occurred at the Malpass Library on 10/5/2019. Service animals are certainly allowed, and welcome, in WIU Libraries. I have spoken to my staff to ensure this type of situation does not happen again. Thank you for bringing this to our attention.

Best wishes,
[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                            Fri, Oct 11, 2019, 07:30
To: Lorenzen, Michael <mg-lorenzen@wiu.edu>
Cc: Martin Abraham <ma-abraham@wiu.edu>

Dr. Lorenzen,

I would say I appreciate the sentiment, but that would only mimic the muted diplomacy I have heretofore been compelled to exhibit, in lieu of the righteous indignation I feel.

Notwithstanding the boilerplate, seemingly scripted nonsense that is concluding your response to such an excruciating incident with "Thank you for bringing this to our attention", I am unsure of what you are referring to when you write "what occurred at the Malpass Library on 10/5/2019". Was there another incident at Malpass library on October 5th, 2019, in which one of your employees violated the civil rights of a different student? I ask this because I was not present at the Malpass library on October 5th, 2019, due to having been forcibly removed for utilizing my service dog on September 28th, 2019.

I understand that you may think what happened to me is some kind of innocuous and mundane mishap or oversight. I should make it very clear to you that the incident in which I was involved, WHICH OCCURRED ON SEPTEMBER 28TH, 2019, was traumatic, and has had a profoundly negative impact on me. Perhaps it is this damage that makes what transpired so vividly clear to me, and contributes to the degree of seriousness I feel should be being observed here. Furthermore, it is unconscionable to me how an ostensibly highly educated individual, in the position of *DEAN*, such as yourself, could make such a clear error as

misrepresenting the actual date of the incident to which I was subjected. Giving the benefit of the doubt, you didn't care enough about this issue to review your email before sending it. Alternatively, this error is the result of errant incompetence.

Subsequent to the misconduct I endured at Malpass on September 28th, 2019 (almost two full weeks ago), I have had to go without the use of the library, even as I do not have internet access at home, and your lazy, lackadaisical email does not inspire trust or confidence in me that the library is an environment I can feel safe to use.

At this time, I would like to seek material resolution with Dr. Abraham, who I will contact directly in a separate email. It is my expectation that we will come to a salient understanding which will productively precipitate an environment in which I will once again feel confident and safe to use the publicly accessible facilities for which I am paying a tremendous amount of tuition.

"Best wishes",

Chris
**[Quoted text hidden]**

Exhibit 22

 Gmail

**Chris Cesca <c-cesca@wiu.edu>**

---

## Attendance
2 messages

---

**Ekici, Niyazi** <n-ekici@wiu.edu>                                    Fri, Feb 14, 2020, 17:31
To: Cesca, Chris <c-cesca@wiu.edu>

Hi Chris,
It came to my attention that it will not be fair to remove your attendance requirement for my class; so, starting from
Monday February 17 I want you be in class.
Of course, I'll continue working with you on the points that are not clear to you, but will not entirely covering my
lectures to you in my office hours.
This is to be fair to myself and all other students.
I hope this helps.
Thanks
Dr. Ekici

Note: Your office hours use to date are counted towards your attendance. No worries for that.
[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                    Mon, Feb 17, 2020, 07:15
To: Ekici, Niyazi <n-ekici@wiu.edu>
Cc: Angela LaFrance <ad-lafrance@wiu.edu>

Dr. Ekici,

Thank you for providing me with this information.

I am looking forward to seeing you in class later today.

While we are on the subject of fairness to all students, does this mean that I can also expect to be treated fairly? If
so, my hope and expectation is that I will be able to participate in your class without the flagrant and brazen
violations of the class contract which precipitated my choice to have class with you one-on-one. As I discussed
with you in the beginning of the semester, it is exceedingly difficult for me to focus when others are talking, and/or
playing on their phones. I understand it is near impossible to curb every single distraction in a given classroom, but
I feel that my request/need to have a distraction-minimized learning environment is not unreasonable, and certainly
not unfair.

Alternatively, does your policy still stand that we are allowed to come at the beginning of class, sign in, and then
leave?

Please advise,

Chris
[Quoted text hidden]

Exhibit 23

 **Chris Cesca <c-cesca@wiu.edu>**

---

## Grade Change for Professor Butts' Class

---

**Mossman, Mark** <ma-mossman@wiu.edu>                                   Mon, Sep 21, 2020, 13:07
To: Cesca, Chris <c-cesca@wiu.edu>
Cc: Jonathan Butts <JL-Butts2@wiu.edu>, Jill Myers <jj-myers@wiu.edu>, Lynn, Angela <an-lynn@wiu.edu>

Chris,

I have received word from Professor Butts regarding our discussion of your performance in his LEJA course:

1.  He is willing to change LEJA course grade from an FW to an I;
2. To complete the course he requires that you prepare for and then complete the test from April and the final exam from May, which are the final items left unfinished in the course.  He notes that the scores from both of these exams would then be incorporated into the final grade for the course.  Further, a penalty for tardy work would be applied to both the test and for the final exam as stated in the course syllabus.

I have copied the Registrar on this email so that she is aware of the grade change request that will be forthcoming.

Best,

Mark Mossman
[Quoted text hidden]

Exhibit 24
**Chris Cesca <c-cesca@wiu.edu>**



### productive communication

3 messages

**Cesca, Chris** <c-cesca@wiu.edu>                                        Mon, Aug 23, 2021, 13:37
To: Myers, Jill <jj-myers@wiu.edu>
Cc: Glenn Daugherty <gr-daugherty@wiu.edu>, Patricia Walton <pa-walton@wiu.edu>, Samantha Klingler <sj-klingler@wiu.edu>

Drs. Myers, Daugherty, and Walton,

In the event that you, individually or as a group, are ever interested in including me in one of your incendiary gossip sessions, in which you appear to wax parochial about my academic situation and struggle, or concoct misguided notions of my issues at this school, please feel free to do so, and I will do my best to unburden you of the extremely harmful and detrimental philosophies you evidently have in regard to learning disabled students. If you are uninterested in including me in one of these ridiculous confabulations, I would respectfully ask that you hold such meetings privately in the future, such that I am not forced to listen as three professors disparage me while I wait for another to be available.

Dr. Daugherty, I am not upset with you as much as I am disappointed in you, insofar as your seeming exuberance to run to Dr. Myers not minutes after the unceremonious conclusion of our meeting to share with her what I discussed with you appeared. This action severely, if not prohibitively, damaged my trust in you. Further, let me be clear that at no point did Dr. Entzminger offer me one-on-one tutoring, as you seemed to derive from our conversation. He simply engaged with me through videochat, a practice so many of your peers were inexplicably unwilling to do in the infancy of the pandemic, but are now all too willing to accommodate. Frankly, even with the videochatting resource he provided, I had tremendous difficulty with the material. As I have clarified many times in the past, I am unable (read: not unwilling, but *unable*) to reasonably learn through online formats.

Dr. Walton, it is unconscionable to me that you feel it is appropriate to discuss or comment on a student you have never had in class, to the degree that you evidently do. As far as your numerously-reiterated sentiment about my work ethic is concerned, I would be happy to review my transcript with you at your convenience, as it pertains to empirical evidence of my hard work. You care about evidence, right? If that is not enough, I would also be obliged to provide references from the numerous other professors I have had that I believe would be readily willing to speak to my unflappable work ethic. Perhaps you could ask Glenn about the three classes of his I have aced.

Dr. Myers, the way that you have handled my situation is utterly reprehensible, discriminatory, ableist, bigoted, and harmful. It is further substantially disconcerting that you feel it necessary to continue engaging, socially or otherwise, with other professors, particularly those I have never had before in class, in conversation pertaining to my ongoing dilemma with the LEJA department and its pertinence to my disabilities.

I know that this concept will likely be foreign to all of you, based on your behavior throughout the goings-on of this issue, but equality does very little to help marginalized individuals like myself. All I have ever asked for is *equitable* treatment, which has been met with baffling recalcitrance, singularly by this department and you, Dr. Myers.

As I mentioned to Dr. Daugherty during our meeting today (though I doubt this was brought up during the aforementioned ridiculous gathering the three of you were having), if nothing else, the experience I have had with this department has emboldened me to pursue a career involving advocacy, as I believe this is an element of conversation and practice woefully absent in the law enforcement community. While I have no doubt your prior careers involved ostensible reactive positivity, I plan on pursuing a law enforcement career engaged in *proactive* work and benefit for the public, particularly for those in marginalized communities.

Again, if any of you have any questions about how a student with severe learning and other disabilities successfully navigates an academic environment, please do not hesitate to contact me at your convenience and I will be happy to engage in a productive conversation with you. Alternatively, I would invite you to speak with Samantha Klingler at the SDSC for further clarification on how best to approach and accommodate learning disabled students.

Regards,

Chris
[Quoted text hidden]

---

**Daugherty, Glenn** <gr-daugherty@wiu.edu>                                  Mon, Aug 23, 2021, 14:59
To: Cesca, Chris <c-cesca@wiu.edu>

Video conferencing with regard to course information is tutoring.

[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                    Mon, Aug 23, 2021, 15:05
To: Daugherty, Glenn <gr-daugherty@wiu.edu>

If you feel that Dr. Entzminger making contact with me through videochat, a method
with which I am able to more effectively and reasonably communicate, constitutes "tutoring",
I doubt I am in a pragmatic position to change your clearly biased viewpoint. Regardless,
even if your claim was valid, I asked for absolutely nothing that either could not or should not
have been provided to other students (equally *and* equitably), particularly those of us with
prohibitive disabilities.

Please let me know if I can be of further assistance in helping you understand both the
egregious nature of your little powwows, and/or the very real circumstances of learning
disabilities as they apply to the marginalized community at large, myself included.

[Quoted text hidden]

 Gmail

**Chris Cesca <c-cesca@wiu.edu>**

### Response to your letter

4 messages

---

**Walton, Patricia** <pa-walton@wiu.edu>                                                      Tue, Aug 24, 2021, 14:41
To: Chris Cesca <c-cesca@wiu.edu>

Mr. Cesca:

I am greatly disturbed by your attack on  Director Myers, Professor Daugherty and myself.  First, I happened to walk into  Director Myer's office yesterday where Professor Daughtery was seated, visibly upset.  I asked Professor Daugherty if he was doing okay and he proceeded to inform Director Myers and me about what had transpired with you in his office.  You barged your way into Director Myer's office, without permission, and were told to leave by Professor Daugherty.

Second, I believe you are referring to the phrase "wax poetic", rather than wax parochial. Nothing is further from the truth.  Professor Daughtery expressed his outrage and disappointment over your attempts to make disparaging remarks about members of the School of LEJA while in his presence.  There was no discussion of you as a student, only your behavior.  If a professor who has over 30 years experience in law enforcement finds your behavior to be disrespectful and disturbing, it is a concern to the entire School of LEJA.

You are correct in the statement that I have never had you in a class.  However, I did have a conversation with you at the beginning of the Fall 2020 semester in the hallway outside of Professor Butt's office.  I asked you how the Spring 2020 semester was and your comment was "it was a fucking abortion".  I was taken aback by that statement, and frankly, found it offensive.  You went on to inform me that you were unable to complete your coursework in an online format.

Later that semester, I saw you during a Macomb City Council meeting.  We had a short conversation, during which time you attempted to discredit professors within the School of LEJA.  I responded by indicating that the best way to do well in a course is to complete the coursework.  You immediately became angry and accused me of having communication with other faculty.  To the contrary, my knowledge of the issue came from that which you had personally informed me of during our earlier conversation outside Professor Butt's office.

I find it unconscionable that you would speak to members of the LEJA faculty in such a condescending and inflammatory manner.  It is clear that when you are not able to control a situation or a faculty member, you attempt to achieve the desired result by intimidation.  Perhaps you feel that this is acceptable behavior when you are addressing female faculty members.  I can assure you that your spiteful allegations are erroneous.  Director Myers had dedicated 18 years of her career teaching and mentoring students at WIU. None of those students have ever treated her so disrespectfully and rudely.  I believe an apology to Director Myers, Professor Daughtery and myself.

Professor Walton

---

**Cesca, Chris** <c-cesca@wiu.edu>                                                      Tue, Aug 24, 2021, 19:48
To: Walton, Patricia <pa-walton@wiu.edu>

Dr. Walton,

Frankly, your ongoing involvement in this matter is unnecessary and inappropriate. However, from the standpoint that I would like to clarify the misguided and manipulative narrative you seem to be conveying

here, I would like to respond to your message. I believe any further communication between us, pertinent to this issue, will be superfluous and unproductive.

As alluded to above, your narrative, and specifically, much of the language you used in your message to me, is wildly manipulative and misleading.

Yesterday, when I returned to the LEJA office to speak with another professor, I couldn't help but overhear a discussion about me that was, at best, critical in nature, and at worst, disparaging. Notwithstanding the reasonable expectation that my previous discussion with Dr. Daugherty would be treated with confidentiality, or at least a modicum of discretion, there is no circumstance under which any student should have to hear three professors (including an ill-fitting department chair) essentially berating him or her in perceived absentia. When I heard this, in the capacity and context of self-advocacy, I approached the doorway to Dr. Myers' office and attempted to correct what misinformation I had inadvertently observed. For you to state that I "barged [my] way into Director [Myers'] office" is willfully embellishing and misleading.

As for your next claim, please do not attempt to chide or correct my choice of language. I chose my words very carefully and deliberately, if only out of what rhetorical respect I feel you may believe is due. From my perspective, the three of you were waxing parochial, in that you were (according to the Oxford English Dictionary) "speak[ing]...about something in the specified manner", the specified manner being "parochial", or (according to the Oxford English Dictionary) "having a limited or narrow outlook or scope". I believe this from the standpoint that your individual and collective demonstrated perspectives toward my situation are narrow-minded, misguided, discriminatory, ableist, and bigoted. Further, I have not attempted to disparage anyone within the LEJA department; rather, I have voiced my profound concerns to those on whose discretion I believed I could count. Again, please do not misconstrue criticism for disparagement. It is manipulative and abusive for you (or anyone in the LEJA department) to critique my "behavior" as disrespectful and disturbing, particularly when the predicating source of my righteous indignation is utter incompetence and discrimination within both the LEJA department and the university administration. For what it may be worth, by criticizing my reasonable feedback, you are engaging in a behavior referred to as "tone policing," which is, "a conversational tactic that dismisses the ideas being communicated when they are perceived to be delivered in an angry, frustrated, sad, fearful, or otherwise emotionally charged manner." This approach is, again, abusive and manipulative, and I would respectfully ask that you consider this before dismissing the next marginalized student who is subjected to discrimination at this school.

Regarding your claim that I described the Spring 2020 semester as a "fucking abortion", I cannot specifically recall the wording I may have used, but I am confident that I did not use any language, or

demonstrate any behavior that would have been inconsistent with the ostensible rapport we may have had, such as it may have been. However, had I used that language, I cannot imagine my sentiment would have been unreasonable, as that semester was, effectively, an utter nightmare, or, in the context of the wording you seem to remember, an abortion, or (according to Oxford English Dictionary) "an object or undertaking regarded by the speaker as unpleasant or badly made or carried out". Especially given the detrimentally negligible preparation this university had done to handle the impacts of the pandemic, the Spring 2020 semester was, among other qualifiers, very badly made *and* carried out. Additionally, I very likely stated that I was unable to complete my coursework in an online format, as this is an empirically supported fact pursuant to my disabilities. At this juncture, I am compelled to believe that you unequivocally *do not* believe this assertion, such that if you did, you may be advocating for me, instead of engaging in harmful behavior toward me.

When we met at the city hall event, after expressing my frustration over the handling of learning-disabled students by the LEJA department alone you stated, "well, from what I heard, you just didn't finish the work you were supposed to do.", and, "I had many students who had difficulty after the switch to online learning", *verbatim*. These were horrifying sentences to hear from you, a professor I had never before had in class, because they communicated a number of realities to me. They communicated that your friend and superior, Jill Myers, and/or others, had discussed my private, FERPA-protected academic information with you. They communicated that you held (and apparently still hold) a grossly misguided, archaic mindset toward the education of learning disabled students, antithetical to our academic benefit, growth, or success. Finally, your statements caused a sense of substantial anxiety that I might ever be in a position in which you would be responsible for evaluating my work and assigning me a grade. In short, your statements served only to further denigrate my trust in a department so substantially fraught with ableist and discriminatory practices. While you may have had some notion of my struggles subsequent to the brief conversation we had outside of John Butts' office, I know that, by your own admission, my private goings-on have been discussed openly among your colleagues. Further, at the town hall meeting encounter, you went on to state, "There is no condition of confidentiality when it comes to discussing students." Your memory of your statements may be hazy, but the tree remembers what the ax forgets.

As for your claim that I am or have been "speak[ing] to members of the LEJA faculty in such a condescending and inflammatory manner", I would like to remind you that, despite what your ostensibly illustrious career or other nebulous acumen may otherwise compel you to believe, neither you, nor any of your colleagues, are beyond reproach, especially when you are engaging in empirically discriminatory behavior, at the expense of an entire marginalized community, myself included. You followed this claim by stating that, "it is clear that when you are not able to control a situation or faculty member, you attempt to achieve the desired result by intimidation," which is a woefully derivative, misguided, and manipulative way of painting my self-advocacy and use of assertive language in a nefarious and

castigating light. I am not really even sure how to address your next statement, in which you seemed to suggest that my frustration is somehow disproportionately expressed toward "female faculty members". You stated, "Perhaps you feel that this is acceptable behavior when you are addressing female faculty members." I am flabbergasted by the moral turpitude that predicates lazily (and without empirically supportive evidence) involving gender as a potential motivator in my expression of frustration. How dare you suggest that I am engaging in anything even slightly resembling misogyny, sexism, or inequitable treatment, *particularly* on the basis of gender. This claim of yours is utterly despicable and disgusting. Try to also consider that in terms of my relationship with the LEJA department, and the school, *I* am in the position of lesser power. I am the one suffering from the power imbalance presented when those responsible for evaluating my academic performance are demonstrably and brazenly ableist, bigoted, and discriminatory.

I cannot speak to your claim regarding Dr. Myers' mentorship and handling of students over the last eighteen years. However, as I stated in an email I wrote to the recently "reassigned" Martin Abraham when he was incompetently occupying the position of interim president, "It is easy and convenient to laud the efforts and achievements of students who approach this environment free from intellectual disabilities. However, just as a chain is only measured by its most limited link, the quality and strength of an academic institution or department should only be measured by the success of its most disadvantaged student." Please consider that concept before continuing to obsequiously praise Dr. Myers' accomplishments, such as they may be.

Respectfully,

Chris
[Quoted text hidden]

---

**Walton, Patricia <pa-walton@wiu.edu>**                                           **Wed, Aug 25, 2021, 13:52**
**To: Cesca, Chris <c-cesca@wiu.edu>**

Mr. Cesca:

I will not engage in any further discourse with you after this response, as it appears we have a drastic difference of opinion in regard to the pertinent facts. There are two areas that I wish to clarify, however.  First, you chose to involve me in your complaints, not the other way around.  Second, you have misrepresented what transpired at the city council meeting.  You personally informed me that you had not completed the coursework in your classes.  You volunteered that information, despite the fact that you were not a current or former student in any of my classes. This occurred during our discussion in the LEJA hallway in the Fall of 2020, which preceded  in time, the city council meeting. I never made the statement "from what I have heard".  Likewise, I never stated that there was "no student confidentiality". Having presided in juvenile court for twenty-five years, I am well-versed in the principles of confidentiality.  My statements to you were solely based upon the information that you personally provided. Interestingly, you have an amazingly vivid recollection of the city council meeting conversation, yet no specific memory of the one that occurred in the hallway.

I stand by my statements in my previous email.  You have no personal knowledge of my career or my community

involvement; yet you are so bold as to accuse me of being bigoted and discriminatory.  Unfortunately, we have nothing further to discuss.

Professor Walton

[Quoted text hidden]

---

**Cesca, Chris** <c-cesca@wiu.edu>                                    Mon, Aug 30, 2021, 07:00
To: Walton, Patricia <pa-walton@wiu.edu>

Dr. Walton,

I feel I could not have been more pragmatically explicit in my sentiments regarding further communication from you than stating, *in the first line of my previous message to you, no less*, "Frankly, your ongoing involvement in this matter is unnecessary and inappropriate...," though I can appreciate your seeming need to drive the point home by illustrating your own oblivious and recalcitrant bigotry.

Regardless, while we may have starkly disparate philosophies regarding pertinent facts in this matter, I feel I have sufficient written evidence supporting my claims, while yours are ostensibly based largely, if not exclusively, in subjective perception. As far as purportedly informing you that I "had not completed the coursework in [my] classes", you are conveniently (and manipulatively) neglecting to include the critical element of my disabilities as they pertain(ed) to such coursework completion. If I have not been clear enough thus far, allow me to again reiterate that I was unable, *not unwilling*, but unable, to complete coursework for the three LEJA classes in question, specifically predicated by the university's inequitable switch to online learning in response to the pandemic. If I offered this information, it was to a professor with whom I had some semblance of rapport, whose absent integrity was unbeknownst to me at the time. As far as your having presided in juvenile court for over twenty-five years, I cannot begin to fathom the number of learning disabled youths that were processed through the system over which you had at least some influence that are, even now, worse off for having been subjected to your misguided and uninformed notions as they pertain to this marginalized community. If nothing else, it is thanks to people like you that I feel so strongly about a career involving advocacy for future generations with similar struggles to my own. Notwithstanding your haphazard and discriminatory suggestion regarding my integrity, in which you stated, "interestingly, you have an amazingly vivid recollection of the city council meeting conversation, yet no specific memory of the one that occurred in the hallway," it would occur to me that a purported educator with as illustrious a career as you ostensibly have would understand and appreciate the nature of memory retention associated with a 'flashbulb memory', i.e. one in which a professor makes ableist and uninformed comments about a student's integrity and work ethic, versus those associated with a casual conversation about the failings of an almost ubiquitously discriminatory department and university.

Stand by whatever you like - I am more informed than you may realize, but that is another topic for another day. By contrast, you have demonstrated your bigotry and ableism over the course of our conversations, both in person, and through email, insofar as you continue to espouse the notion that what occurred during and subsequent to the pandemic semester was somehow my fault, and my responsibility to correct, despite my being systematically deprived of the necessary and appropriate resources for academic success. As I stated in the email which predicated this thread, if you ever have a moment of clarity and decide to engage in advocacy for me, or for the learning disabled community at large, feel free to let me know. However, until such time as that is the case, I am afraid you may be correct that our philosophical differences are too significant to allow for any further pertinent discussion.

Regards,
**[Quoted text hidden]**

Exhibit 25

 Gmail

**Chris Cesca <c-cesca@wiu.edu>**

---

### Failure to complete mandated weekly gateway testing

**Student Rights and Responsibilities** <srr@wiu.edu>                    Thu, Jan 27, 08:04
To: <C-Cesca@wiu.edu>

Per previous communications, WIU faculty, staff, and students* who are returning to campus this spring (including those vaccinated) are required to participate in gateway testing each week through the month of January. Our records indicate that you did not complete COVID-19 testing at WIU during the week of **Monday, January 17th - Sunday, January 23rd**.

This is your first written warning/letter of reprimand for the record for failure to complete the mandated weekly gateway testing requirement. Failure to complete weekly testing in subsequent weeks for the duration of the testing program will result in the inability to use the Campus Recreation Center or the ability to work on campus employment hours. Additionally, students will be subject to progressive disciplinary action from the Office of Student Rights and Responsibilities, including possible discharge from WIU.

Spring 2022 test clinics on the Macomb campus will be in the WIU-Macomb Student Recreation Center MAC Gym (south gym):
**Mondays & Tuesdays: 9 a.m.-6 p.m.**
**Wednesdays & Thursdays: 7 a.m.-4 p.m.**

WIU-QC students, faculty, and staff can pick up a test kit at Riverfront Hall reception desk:
**Mondays, Wednesdays & Thursdays: 8 a.m.-4:30 p.m.**
**Tuesdays: 8 a.m.-6 p.m.**
**Fridays.: 8 a.m.-3 p.m.**

***Any individual who is physically present on either WIU campus, no matter the length of time, is responsible for testing for that respective week.***

Individuals who have tested positive for COVID-19 in the last 90 days do not need to participate in gateway or weekly testing and should submit their documentation to **covidstudenthelp@wiu.edu.**

Individuals can elect to conduct their test at an off-campus location; however, the test must be a PCR-based test to be equivalent to the test modality provided at the on-campus testing clinics. The PCR based test can be either a saliva or nasal swab test. Once results are received, they can be sent to the Off-Campus COVID-19 Test Results Portal. In order to be compliant, test results must be received by 11:59 p.m. Sunday evenings.

Individuals on the Macomb campus should register in advance at
**https://www.wiu.edu/covidtest/**. Quad Cities faculty, staff, and students do not need to register
in advance for the CRL brand tests used at the QC campus.

Vaccine clinics will be held on the Macomb campus for WIU students and employees. Visit
wiu.edu/coronavirus and click "Return to Campus."

If you feel you have received this message in error, please contact
**covidstudenthelp@wiu.edu** with a thorough explanation as to why.

 Thursday, January 27, 2022 08:04:40 TAG#JDE MSE505J JOB02589

Exhibit 26

**Date : 10/19/2018 8:46:28 PM**
**From : "Western EMS"**
**To : "Alex Bogdan" , "Alexander Carras" , "Alexander Kraus" , "Ashley**
**Mas" , "Bradley Young" , "Brett Henry" , "Chad Sims" , "Chloe Layne" ,**
**"Chris Martin" , "Colin Parker" , "Connor Rutherford" , "Corey Sims" ,**
**"Dallas Trone" , "Danielle Wright" , "Darren Bourke" , "Devin Zeugner" ,**
**"Dioseline Sanchez" , "Donovan McIntire" , "Emily Diller" , "Jazmin Leal" ,**
**"Jennifer Klem" , "Jessica Karalow" , "Joseph Biallas" , "Joseph Furrer" ,**
**"Joshua Hill" , "Konstantin Mikalayenia" , "Kyle Mustiful-Brumfield" ,**
**"Larsen, Anna" , "Luke Reuss" , "Madison Merritt" , "Manuel Luna" ,**
**"Mark Pedzimaz" , "Mary Lombardi" , "Mary O'Brien" , "Matthew**
**Chobak" , "Maxwell Hoadley" , "Megan Solner" , "Michael Doran" ,**
**"Nathan Leff" , "Nicholle Welch" , "Nikolas Sharp" , "Payton Huffman" ,**
**"Sara Stimmell" , "Sarah Schmitt" , "Shay Bowser" , "Tate Dowell" , "Tyler**
**Dudek" , "Victoria Ketterer" , "William Boudreau" , "William Groves" ,**
**"Chris Cesca" , "Niko Petrone"**
**Cc : "James Van vlymen" , "Ted Anderson"**
**Subject : November Schedule**
**Attachment : WEMS Day Schedule November 2018.docx;WEMS Night**
**Schedule November 2018.docx;**

Hello everyone,

Attached are the November day and night schedules. As it always is, availability is
always due on the 15th, so I went ahead and made the schedule and if you were one
of the 12 people that did not send it to my by the 15th, you were either placed
where I needed you or not at all. Lets all please try to have availability in on time
for next month. Remember if you can't work on one of your scheduled days it is
your responsibility to make sure that you get it covered. Also make sure you are
checking both day and night crew schedules. This is also a reminder that your
October monthly checks are due by the end of the month so if you have not already
done so, please work on them and sign and date the sheet in the office upon
completion. If you have any questions please let me know.

Thank you,

Austin Groves- Executive Officer