UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| CHRISTOPHER CESCA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23-cv-04043-SLD-JEH |
| | ) | |
| WESTERN ILLINOIS UNIVERSITY | ) | |
| BOARD OF TRUSTEES & PRESIDENT | ) | |
| GUIYOU HUANG, in both their Individual | ) | |
| and Official Capacities, | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

Plaintiff Christopher Cesca is a student with disabilities pursuing undergraduate degrees from Western Illinois University ("WIU") in Law Enforcement & Justice Administration ("LEJA") and Economics. *See, e.g.*, Compl. ¶¶ 22, 46–67, 296, ECF No. 1. Plaintiff was last enrolled for classes at WIU during the Spring 2022 semester but is precluded from reenrolling due to outstanding debts, which Plaintiff argues were unfairly assessed. *E.g., id.* ¶¶ 52–53, 107–08. Plaintiff hopes to reenroll at WIU and take classes during the Spring 2024 semester, which begins on January 16, 2024. Pl.'s Am. Mot. Prelim. Inj. 2, ECF No. 24. Plaintiff seeks a preliminary injunction against WIU's Board of Trustees ("Board") and WIU's President, Dr. Guiyou Huang (collectively "Defendants"), in their individual and official capacities. *Id.* at 1.

Plaintiff's requested injunction would mandate many actions. As relevant to the counts for which Plaintiff argues he has demonstrated a likelihood of success on the merits, Plaintiff seeks a preliminary injunction that: (1) mandates that Defendants allow Plaintiff to retake certain classes—at no cost or penalty to Plaintiff—and requires his preferred accommodations for those classes, (2) makes various adjustments to Plaintiff's transcript and grades, (3) gives Plaintiff

1

financial aid packages and grants and orders reimbursement of certain "illegal payments," all with statutory interest and (4) appoints a Special Master to monitor ongoing compliance with such an order. Am. Proposed Order Prelim. Inj. 6–9, ECF No. 24-2; *see also* Compl. 107–116 (specifying the injunctive relief originally sought by Plaintiff). For the reasons that follow, Plaintiff's motion for a preliminary injunction is DENIED.

## BACKGROUND[1]

Both Plaintiff's complaint and preliminary injunction motion are detailed and sprawling, and the Court summarizes only those factual allegations relevant to how Plaintiff justifies his requested injunction.[2] The Court starts by listing Plaintiff's disabilities. Next, the Court details WIU's procedures for granting students with disabilities reasonable accommodations as well as Plaintiff's dissatisfaction with those procedures and his approach to requesting accommodations and appealing the denial of those accommodations. The Court then describes accommodations Plaintiff did receive from WIU before turning to the litany of accommodations which Plaintiff

---

[1] No genuine issues of material fact were created by Defendants' response and the Court did not hold an evidentiary hearing. *See Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997) (holding that no evidentiary hearing is required in these circumstances). This section does not constitute binding findings of fact for future motions or orders. *Cf. Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits . . . ."). These allegations are largely drawn from the complaint, Plaintiff's motion for a preliminary injunction, and the exhibits attached therein. The Court also takes judicial notice of certain webpages within WIU's website. *See Cook Cnty. Republican Party v. Pritzker*, 487 F. Supp. 3d 705, 713 n.3 (N.D. Ill. 2020) (taking "judicial notice of the existence of the news articles cited by the parties" in resolving a preliminary injunction motion). The Court "may take judicial notice on its own." Fed. R. Evid. 201(c)(1). "A court may take judicial notice of information publicly announced on a party's web site, so long as the web site's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" *Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) (quoting Fed. R. Evid. 201(b)); *see also Patterson v. Respondus, Inc.*, No. 20 C 7692, 2022 WL 7100547, at *8 & n.12 (N.D. Ill. Oct. 11, 2022) (taking judicial notice of a university's website's claims regarding the percentage of students receiving financial aid). Plaintiff cites to and quotes from WIU's website in its complaint and preliminary injunction motion—therefore the site's authenticity is not in dispute. *See, e.g.*, Pl.'s Am. Mot. Prelim. Inj. 4 n.3 (quoting *Disability Resources Overview*, Western Illinois University, https://www.wiu.edu/ student_success/disability_resources (last visited Jan. 11, 2024)); Compl. ¶ 110 n.17 (same). The information noticed by the Court is also capable of accurate and ready determination as the Court quotes text from that website.

[2] For example, the Court does not detail the incidents of claimed discrimination stemming from Plaintiff's interactions with certain student organizations, Compl. ¶¶ 169–260, interference with Plaintiff's ability to be accompanied by his service animal, *id.* ¶¶ 345–87, nor the statements and materials which Plaintiff claims create a protectible property interest in his continued education, *e.g.*, *id.* ¶¶ 495–99.

did not receive, detailing some of the incidents stemming from such denials.  Plaintiff's complaints about the LEJA department are discussed.  The Court concludes this section by listing the causes of action in Plaintiff's complaint.

## I.       Plaintiff's Disabilities

Plaintiff is 36 years old and has disabilities, including Attention-Deficit/Hyperactivity Disorder ("ADHD"), a learning disability which "manifests as a severe reading comprehension deficit," executive functioning disorder, anxiety, and depression.  *E.g.*, Compl. ¶¶ 46, 55–59; Feb. 22, 2021 Letter from Larry S. Wexler to Guiyou Huang, Compl. Ex. 1, ECF No. 1-1 at 1–2; Accommodation Request Form Disability Resource Center (DRC), Compl. Ex. 7, ECF No. 1-1 at 24–40.  Plaintiff has been further diagnosed with Aspergers Syndrome, Compl. ¶ 59; Decl. Chris Cesca 2, Pl.'s Am. Mot. Prelim. Inj. Ex. 27, ECF No. 24-1 at 1–24, and sleep apnea, Compl. ¶ 61.  Stemming from an incident at a library, Plaintiff also has Post-Traumatic Stress Disorder.  *Id.* ¶¶ 37, 379, 387.  These disabilities limit Plaintiff's ability to read, learn, socialize, focus, and communicate, amongst other major life activities.  *E.g.*, Decl. Chris Cesca 2; Compl. ¶¶ 50, 57–61.  Plaintiff struggled academically in the past, and he did not receive his ADHD diagnosis until he was 28 years old.  Compl. ¶¶ 54–55; *see also* Sept. 30, 2019 Email from Chris Cesca to Martin Abraham 18, Compl. Ex. 15, ECF No. 1-2 at 18–21.[3]  Plaintiff also struggles with deadlines and discerning important dates and tasks from written communications.  *E.g.*, Compl. ¶ 162–65, 444.  Although not a disability, Plaintiff is a low-income student, and his poverty is exacerbated by his inability to reenroll for classes and receive financial aid packages and grants.  *E.g.*, *id.* ¶¶ 62–71.

---

[3] Page citations for email exhibits refer to the page of the group exhibit within CM/ECF.

## II.  WIU's Procedures for Accommodations and Plaintiff's Approach

WIU has a system for students with disabilities to request reasonable accommodations. Students register with the Student Development and Success Center ("SDSC")—formerly known as the Disability Resource Center ("DRC")—and the SDSC is charged with "work[ing] with students through an interactive process to determine disability and hear requests for reasonable accommodations."  Compl. ¶¶ 109–10, 110 n.17 (quoting *Disability Resources Overview*, Western Illinois University, https://www.wiu.edu/student_success/disability_resources (last visited Jan. 11, 2024) (emphasis omitted)).  Students submit an Accommodation Request form and once appropriate accommodations have been determined, the SDSC trains students "on how to notify faculty of their accommodations."  *Students: Accommodation Process*, Western Illinois University, https://www.wiu.edu/student_success/disability_resources/students.php (last visited Jan. 11, 2024).  SDSC notifies students that certain "professors have been notified of [the student's] accommodations requests" and instruct students to "communicate with [their] professors to discuss accommodation arrangements."  Sept. 23, 2021 Email from SDSC to Chris Cesca 37, Pl.'s Am. Mot. Prelim. Inj. Ex. 32, ECF No. 24-1 at 37.

Plaintiff initially worked within the DRC/SDSC process for requesting accommodations. *See* Accommodation Request Form Disability Resource Center (DRC) (documenting Plaintiff's disabilities and some of Plaintiff's requests for reasonable accommodations); Pl.'s Am. Mot. Prelim. Inj. 4 n.44 (noting that "Plaintiff submitted to the multiple meetings the DRC/SDSC had him attend, and he was provided some minimal information").  He also frequently worked with Angela LaFrance, Coordinator of SDSC, on accommodations but this relationship soured. *Compare* Meeting with WIU President Dr. Martin Abraham: Opening Thoughts 6, Compl. Ex. 2, ECF No. 1-1 at 3–11 ("Ms. LaFrance is not only intimately familiar with the law, but she also

4

exhibits a standard of integrity that is beyond reproach, which arguably exalts her as a rare exception at this university."), *with* Decl. Chris Cesca 7 ("While Ms. LaFrance had been very cordial and friendly with me, this delayed my realization until much later when she became unhelpful, unfriendly, & hostile.  She may know the law but does not follow it, apparently due to pressures from the higher powers within WIU.").

Plaintiff describes WIU's reasonable accommodation process as not centralized in the DRC/SDSC but rather as an ad-hoc, teacher-by-teacher system.  Compl. ¶¶ 35, 109–20, 397–402.[4]  Plaintiff says that reasonable accommodations are subject to DRC/SDSC's "staff's subjective notions of acceptability."  *Id.* ¶ 110.  Plaintiff started going outside DRC/SDSC once he realized that DRC/SDSC did not have ultimate control over whether his preferred accommodations would be strictly enforced or that SDSC staffers might side with the instructors and professors on issues of reasonableness.  *See, e.g.*, Decl. Chris Cesca 8.  Plaintiff's approach was to make verbal requests for reasonable accommodations to professors and teaching assistants, and if that proved unsuccessful, appeal up the "chain of command" of department chairs, administrators, and WIU presidents.  Compl. ¶¶ 124–29; *see also* Decl. Chris Cesca 22 ("At no time did either President, Ms. LaFrance, or anyone from DRC tell me I could not request accommodations from Instructors or other WIU program officials, and they all seemed to accept

---

[4] Plaintiff repeatedly alleges that Dr. Huang admitted to Plaintiff that "instructors have the authority to determine [reasonable accommodations] on their own for students with disabilities in courses they teach."  Compl. ¶ 35 n.7; *see also id.* ¶¶ 111, 397.  Plaintiff's evidence for this assertion is an hour-long video recording of a meeting between Dr. Huang, Plaintiff, and others.  *See* May 6, 2021 Video Recording of Meeting with Plaintiff, Pl.'s Am. Mot. Prelim. Inj. Ex. 38, on file with the Court.  The meeting participants are wearing masks and it is difficult to hear Dr. Huang.  Unlike his citations to the audio recording of his meeting with Interim President Dr. Martin Abraham, Plaintiff provides no pincite to the point in the video when this admission allegedly occurred.  *Compare* Pl.'s Am. Mot. Prelim. Inj. 8 ("Ex. 39, 191115 Audio of Interim Pres. Abraham Mtg at 31 min, 30 sec.")., *with* Compl. ¶¶ 35, 111, 397 (failing to provide a pincite).  Further, the Court reviewed this video multiple times and finds that it does not support Plaintiff's assertion as it cannot discern Dr. Huang making any such admission.  The Court does not consider this to be a well-pleaded assertion and disregards it in disposing of this motion.  *Cf. Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (holding that the court below erred in viewing facts in favor of non-movant on summary judgment when those facts were directly contradicted by the video evidence); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in [videos].").

my pattern of requesting, then being denied accommodations, from those individuals."). Plaintiff says this ad-hoc system results in "effectively discriminatory criteria and methods of administration being applied to [Plaintiff's reasonable accommodation] requests without institutional controls." Compl. ¶ 113.

Relatedly, WIU utilizes the Council on Admissions, Graduation, and Academic Standards ("CAGAS") to process appeals on several topics, including "Grade Appeals and Academic Integrity Appeals." *Id.* ¶ 18 n.5 (quotation marks omitted). Plaintiff has been directed by WIU officials, including Dr. Huang, to submit appeals to CAGAS so that WIU may address Plaintiff's issues with his incomplete and withdrawn classes. *E.g.*, June 7, 2021 Email from Guiyou Huang to Chris Cesca 36, Pl.'s Am. Mot. Prelim. Inj. Ex. 31, ECF No. 24-1 at 36 (noting it "would undermine our shared governance model, the integrity of grades, and the larger principles of our University community for me to simply change your grades as the President and allow you to retake the courses without the appropriate appeal made to do so").

Plaintiff views appeals via CAGAS as futile. *See, e.g.*, Compl. ¶ 18 n.5 (stating CAGAS has no authority over reasonable accommodations, "making appeals of matters requiring [reasonable accommodations] for their full resolution quite futile there"). Plaintiff similarly states that his "very lengthy appeals to the institutional chain of command shows it is futile to appeal since his appeals have proven the process is arbitrary & capricious." *Id.* ¶ 305; *see also* Decl. Chris Cesca 20 ("I have attempted to use WIU's appeal process beyond the point of futility, but I have found that WIU appeals processes are fatally flawed and that I am prevented from being made whole by them."). Plaintiff repeatedly claims that WIU officials failed to engage in the required interactive process for reasonable accommodations, Compl. ¶¶ 7, 13, 91, 110, 193, 262, 328, 398–99, 451, 453, 513, and that WIU's failures to provide written

reasons for denials frustrates his appeals, *e.g.*, Decl. Chris Cesca 20 ("Failure to provide written reasons for denials of accommodations thereby immunizes WIU from possible appeal and promotes deliberate mischaracterization and stigmatization of me as a disgruntled student and advocate who is just a sore loser who likes to gripe when I don't get my way.").

## III.     Accommodations Given to Plaintiff by WIU

WIU has provided several accommodations to help Plaintiff overcome the academic challenges posed by his disabilities.  For example, Dr. Huang offered to defer the costs of courses in which Plaintiff reenrolled via a "Presidential Tuition Waiver of approximately $1500.00."  June 7, 2021 Email from Guiyou Huang to Chris Cesca 36.  The DRC also granted Plaintiff a tutor, albeit on a temporary basis.  Decl. Chris Cesca 13.  Further, Plaintiff received exam/quiz accommodations allowing him time-and-a-half and a semi-private exam room, textbook conversion assistance, note-taking assistance in the form of allowing Plaintiff to use his laptop or other device for notes and to record class, reasonable flexibility with regards to deadlines, and to bring his service animal, Ned, to class.  *E.g.*, Compl. ¶¶ 123, 267; Sept. 12, 2019 Email from Angela LaFrance to Chris Cesca 41, Pl.'s Am. Mot. Prelim. Inj. Ex. 35, ECF No. 24-1 at 41.  Plaintiff derides these accommodations as "boilerplate."  Compl. ¶¶ 116, 123, 140, 453.  These accommodations "are widely applied" and "fail to reflect the complexities of the educational needs of students due to their disabilities, and they are typically unresponsive to all of the documented needs of [Plaintiff]."  *Id.* ¶ 123.

Plaintiff is capable of academic success—receiving a 4.0 GPA in multiple semesters at WIU—and Plaintiff states that his grades are directly correlated with the accommodations that he receives.  *E.g.*, Compl. ¶¶ 299–303, 449–51; Official Academic Tr., Compl. Ex. 9, ECF No. 1-1 at 42–47 (documenting a 4.0 semester GPA in Spring 2019, Summer 2019, Fall 2020, and Spring

2021); Decl. Chris Cesca 13–15.  Plaintiff points to instances where individual professors and instructors went above and beyond the boilerplate.  *See* Compl. ¶¶ 33, 316–19, 430.  Where instructors take the time to give Plaintiff "1:1 instruction in coursework," Plaintiff "does very well in such classes and obtain[s] an 'A' grade."  *Id.* ¶ 430; *see also id.* ¶¶ 295–98 (noting that the encouragement of "student group learning" and strict enforcement of the Misuse of Electronic Devices Policy allowed Plaintiff to get an A).  Plaintiff frequently describes one professor or department granting an accommodation as setting a precedent that such accommodation is reasonable.  *See id.* ¶¶ 72, 143, 430, 436, 483–84.

## IV.        Denials of Plaintiff's Preferred Accommodations

Plaintiff's requests for other accommodations were often denied.  For example, Plaintiff says that requests for assistance in forming peer groups, taking lecture notes, and assistance with his inability to manage his time were typically denied.  *Id.* ¶¶ 442–44, 452.  The Court details four requests for accommodations relevant to resolution of the preliminary injunction motion.

### A.  Verbal Alerts

Plaintiff complains that his requests for verbal notices of important information have been routinely denied.  *Id.* ¶¶ 129, 151, 159–61, 164–67, 236–44, 257.  Plaintiff says "[t]here is a widespread WIU insistence on email or other written communications as the only notice given to students," which he cannot "reliably recognize . . . as important or time-critical" due to his disabilities.  Decl. Chris Cesca 9.  Plaintiff's preferred accommodation is a separate "verbal alert," consisting of being told of important information multiple times: first verbally in-person, then via video chat, then via phone call, along with an email copy for recordkeeping purposes. *Id.* at 9–10.  Plaintiff claims that WIU's frequent failures to provide these verbal alerts has caused him many harms, such as failing to meet a deadline to opt-out of WIU's student health

insurance program, causing Plaintiff to incur an "extra approximate $842.00 charge." *Id.* at 10. In addressing Plaintiff's complaints about this charge, Plaintiff was told that one WIU employee questioned whether Plaintiff even knew how to read, which Plaintiff found to be outrageous and hurtful. Compl. ¶¶ 465–69.

### B. Suspension of Parking Rules as Applied to Plaintiff

Plaintiff's requests regarding accommodating his disability with respect to parking rules were denied. *Id.* ¶¶ 85–106. Plaintiff's disabilities make it difficult to predictably plan when to leave his apartment to walk to and arrive on time for class, so he must drive. *Id.* ¶ 85. Plaintiff's executive function deficit renders "the parking signs visually inscrutable" to him, resulting in parking fines. *Id.* ¶¶ 88–89; *see also* Parking Citation, Pl.'s Am. Mot. Prelim. Inj. Ex. 28, ECF No. 24-1 at 25. WIU denied Plaintiff's appeal of one $50.00 fine, and Plaintiff claims he was coerced into accepting a reduction of that fine to $10.00 in exchange for Plaintiff's purchase of a $70.00 "hang tag," which indicates Plaintiff is a student at WIU. Compl. ¶¶ 90–93. Plaintiff's vehicle has been towed for parking violations and Plaintiff "retains a constant sense of anxiety" that it will be towed again. *Id.* ¶¶ 96, 106. Plaintiff requested an accommodation "in the form of parking without penalty or undue cost in any open parking space that was not legally required to be allocated to other parties or for special purposes." *Id.* ¶ 98. Meetings with multiple WIU agents did not result in this request for an accommodation being granted. *Id.* ¶¶ 98–103.

### C. Misuse of Electronic Devices Policy

Plaintiff also insists on strict enforcement of WIU's "Misuse of Electronic Devices Policy." *E.g.*, Compl. ¶ 265; Decl. Chris Cesca 11; *see also Code of Student Conduct: Policy Statement I – Misuse of Electronic Devices*, Western Illinois University, https://www.wiu.edu/student_success/srrri/codeofconduct.php (last visited Jan. 11, 2024)

(showing the Misuse of Electronic Devices Policy states "[c]ellular phones, pagers, and other electronic devices may not be used in a manner that causes disruption in the classroom, library, or within college-owned or operated facilities"); Compl. ¶ 265 n.33 (directing the Court to this webpage).  WIU's "Recruitment and Retention" initiative—designed to combat falling enrollment at WIU—harmed Plaintiff because it "encouraged professors to relax enforcement of school policies," like the Misuse of Electronic Devices Policy.  Compl. ¶¶ 333–36.  Other students using their cell phones, laptops, and smart watches are distracting to Plaintiff, *e.g.*, *id.* ¶ 60, yet Plaintiff's frequent requests that his professors and instructors strictly enforce WIU's stated policy regarding those devices were routinely ignored or ridiculed, *id.* ¶¶ 263–75, 333–39, 447–48, 457–62.  For example, Plaintiff once met with Professor Macherie Placide before class to ask for reasonable accommodations, including strict enforcement of the Misuse of Electronic Devices Policy.  *Id.* ¶¶ 457, 462.  Professor Placide was hostile to this request, and rearranged Plaintiff's desk "by placing it four to five feet in front of the first row of seats of the class and in the front of the class."  *Id.* ¶ 461.  She then ridiculed Plaintiff in front of his peers.  *Id.* ¶ 462.

On at least one occasion, Plaintiff took it upon himself to help enforce the Misuse of Electronic Devices Policy, demanding that another student comply with a professor's instruction to put away her cell phone.  *Id.* ¶¶ 276–80; *see also* Western IL University Police Incident Report Form 3, Compl. Ex. 12, ECF No. 1-2 at 1–4 (documenting that the other student claimed that Plaintiff said "[the professor] shouldn't have to fucking ask you to put it away, its [sic] in the syllabus!").  Plaintiff says that the other student "physically threatened [Plaintiff] loudly in front of the entire class," constituting assault.  *Id.* ¶¶ 281–82.  Plaintiff reported this incident to the WIU Office of Public Safety ("OPS") and claims that OPS's investigation was insufficient and inaccurate.  *Id.* ¶¶ 283–92.  Plaintiff claims that "WIU subsequently removed the offending

student from that Economics Course," *id.* ¶ 289, but OPS's report indicates that the other student switched sections to avoid Plaintiff and "avoid further confrontation as she feels [Plaintiff] has something against her," Western IL University Police Incident Report Form 3–4.

### D. Text-to-Speech Software

Finally, Plaintiff's requests that WIU provide viable assistive technologies to help students with "vision-based communication disabilities" were denied. Compl. ¶¶ 130–46. Plaintiff says the various websites and course management software utilized by WIU are not compatible with certain text-to-speech software, *id.* ¶¶ 130–33, nor the current version of the Web Content Accessibility Guidelines, *id.* ¶ 139. Plaintiff asked uTech—WIU's information technology group—if WIU had a free or discounted version of Speechify, a text-to-speech program that Plaintiff prefers. *Id.* ¶¶ 134–35; Sept. 19, 2021 Email from Matthew Clark to Chris Cesca 41, Compl. Ex. 8, ECF No. 1-1 at 41. uTech personnel informed Plaintiff that it did not "have access to [Speechify] [n]or the ability to purchase it," and directed Plaintiff to Office 365 and Windows 10 for voice to text capability. Sept. 19, 2021 Email from Matthew Clark to Chris Cesca 41. Another WIU employee, Angie (presumably Angela LaFrance) stated that "[t]his is not related to any accommodations we provide" and that Plaintiff was "responsible [for] providing [his] own software programs for additional access." Sept. 20, 2021 Email from Angie to Chris Cesca 41, Compl. Ex. 8, ECF No. 1-1 at 41. Plaintiff purchased the premium tier of Speechify, but it did not work well with certain WIU websites, and he was unable to get a refund. Compl. ¶ 137. Plaintiff says the shift to online-only learning during the COVID-19 pandemic exacerbated these issues. *Id.* ¶¶ 141–43.

11

V.        **The LEJA Department**

Plaintiff says "[t]he LEJA Dept. stood alone in its recalcitrant refusals of [reasonable accommodations] regarding retaking of classes," and its deliberate indifference to Plaintiff's disabilities, as compared to other departments. *Id.* ¶¶ 489–92.  Plaintiff recounts many incidents where professors and instructors within the LEJA department, especially Chairperson Jill Myers, refused Plaintiff's requests. *Id.* ¶¶ 324–32, 336–39, 430–48, 463–64, 487–92; *see also* Mar. 18, 2021 Email from Chris Cesca to Guiyou Huang, Pl.'s Am. Mot. Prelim. Inj. Ex. 30, ECF No. 24-1 at 30–35 (describing the LEJA department as "woefully run by an objectively ableist bigot"). For example, Chairperson Myers issued a directive telling LEJA instructors to not communicate with students by phone—frustrating Plaintiff's requested accommodation of verbal alerts from his instructors—even though Chairperson Myers "was aware [that Plaintiff] was requesting [reasonable accommodations] for verbal communication," and this directive would harm Plaintiff.  Compl. ¶¶ 324–25, 329–32; *see also* Mar. 30, 2020 Email Exchange between Chris Cesca and Phillip Entzminger 22–23, Compl. Ex. 16, ECF No. 1-2 at 22–24.  Chairperson Myers also intervened and prevented Professor Niyazi Ekici from allowing Plaintiff to attend Professor Ekici's office hours in lieu of attending class.  Compl. ¶¶ 430–35; *see also* Feb. 14, 2020 Email from Niyazi Ekici to Chris Cesca 44, Compl. Ex. 22, ECF No. 1-2 at 44.  Yet Chairperson Myers "encouraged the lax enforcement of rules," spurred by WIU's Recruitment and Retention initiative, harming Plaintiff via more distractions in class.  Compl. ¶¶ 336–39.

Plaintiff characterizes the LEJA department as hostile to allowing Plaintiff to retake classes in which he received incomplete grades.  *See, e.g.*, Sept. 2, 2020 Email from Chris Cesca to Mark Mossman 28, Pl.'s Am. Mot. Prelim. Inj. Ex. 29, ECF No. 24-1 at 26–28 (describing the responses to Plaintiff's efforts to retake certain classes as "var[ying] from extremely helpful and

accommodating (Economics department) to abjectly obdurate and obstructive (LEJA department)").  More specifically, Chairperson Myers prevented Plaintiff from retaking a class "without penalty during the delay in bureaucratic decision-making on the administrative details of retaking classes," by rejecting his submission of a homework assignment because he was not registered for that class.  Compl. ¶¶ 326–27; Aug. 27, 2020 Email from Chris Cesca to Jill Myers 25, Compl. Ex. 17, ECF No. 1-2 at 25–30.  Plaintiff also feels mistreated by LEJA instructors.  Plaintiff overheard a "disparaging private discussion among LEJA staff" regarding Plaintiff, Compl. ¶ 487, resulting in a flurry of combative emails between Plaintiff and LEJA faculty, Aug. 23, 2021 Email from Chris Cesca to Jill Myers 47, Compl. Ex. 24, ECF No. 1-2 at 46–54 ("All I have ever asked for is *equitable* treatment, which has been met with baffling recalcitrance, singularly by this department and you, Dr. Myers.").

VI.      **Plaintiff's Causes of Action**

        Plaintiff filed his complaint on March 16, 2023.  Compl. 1.  The complaint alleges five counts: (I) violation of section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12134, by disability discrimination through failure to provide an interactive process for reasonable accommodations, *id.* ¶¶ 515–25; (II) violation of section 504 and Title II of the ADA by use of discriminatory criteria and methods of administration, *id.* ¶¶ 526–29; (III) violation of section 504 and Title II of the ADA by hostile educational environment, *id.* ¶¶ 530–39; (IV) violation of section 504 and Title II of the ADA by interference, threats, coercion, intimidation, and/or retaliation, *id.* ¶¶ 540–46; and (V) deprivation of rights under the Fourteenth Amendment of the Constitution of the United States, *id.* ¶¶ 547–73.  Plaintiff did not move for a preliminary injunction until December 18, 2023.  Pl.'s Mot. Prelim. Inj., ECF No. 22.

13

**DISCUSSION**

As an initial matter, clarification of Local Civil Rule 7.1 is necessary.  The Local Civil Rules require that motions "raising a question of law" must include a separate memorandum of law.  Civil LR 7.1(B)(1).  That memorandum of law must comply with certain limitations on length, typically imposing a maximum length of fifteen pages.  *Id.* 7.1(B)(4).  The requirement for a motion and separate memorandum is not meant to enable parties to make two overlapping sets of legal arguments in both the motion and memorandum.  Rather, legal arguments go in the required memorandum.  Plaintiff's motion for a preliminary injunction is twelve pages and it recounts background facts and includes legal argument.  Pl.'s Am. Mot. Prelim. Inj. 1–12.  Plaintiff goes on to include the required memorandum of law, containing an additional fifteen pages of legal argument.  Am. Mem. L. Supp. Pl.'s Am. Mot. Prelim. Inj. 6–20, ECF No. 24-1 at 47–70.  This practice circumvents the Local Civil Rule's page limits.  *See* Civil LR 7.1(B)(4).  Plaintiff may not continue this practice in subsequent motions and memoranda of law.

I.     **Legal Standards**

A.  **Preliminary Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "[A]lthough the party seeking the injunction need not demonstrate likelihood of success by a preponderance of the evidence, that party must nevertheless make a strong showing that reveals how it proposes to prove its case.  Similarly, a mere possibility of irreparable harm will not suffice."  *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quotation marks omitted).  The irreparable harm inquiry involves

14

considering whether "traditional legal remedies would be inadequate, such that [the movant] would suffer irreparable harm without injunctive relief." *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 843 (7th Cir. 2023). If the movant satisfies the required showings of likelihood of success and irreparable harm, "the court weighs the harm of denying an injunction to the movant against the harm of granting an injunction to the nonmovant," and uses "a sliding scale—the greater the movant's likelihood of success on the merits, the less the harms need be in its favor." *Id.* at 844. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation marks omitted).

### B. Appointment of Special Master

Excepting specific statutory authority, a court may appoint a master only to:

(A) perform duties consented to by the parties; (B) hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by: (i) some exceptional condition; or (ii) the need to perform an accounting or resolve a difficult computation of damages; or (C) address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district.

Fed. R. Civ. P. 53 (a)(1). The "use of special masters should be the exception rather than the rule." *Trans Union, LLC. v. Credit Rsch., Inc.*, No. 00 C 3885, 2003 WL 1338131, at *2 (N.D. Ill. Mar. 11, 2003) (citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962)); *see also* Fed. R. Civ. P. 53 advisory committee's notes to 2003 amendment ("The core of the original Rule 53 remains, including its prescription that appointment of a master must be the exception and not the rule.").

II.        **Analysis**

    **A. Preliminary Injunction**

        **1.  Irreparable Harm and Traditional Legal Remedies**

Plaintiff has not shown that he will suffer irreparable harm in the absence of preliminary injunctive relief.  Crucially, Plaintiff does not explain why he waited until December 18, 2023, to seek this preliminary injunction, Pl.'s Mot. Prelim. Inj. 1, when he has not been enrolled in courses at WIU since the Spring 2022 semester, *see* Compl. ¶¶ 52–53, 108, and he filed his complaint on March 16, 2023, *id.* at 1.  "[T]he likelihood of irreparable harm takes into account how urgent the need for equitable relief really is."  *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011).  "[U]nexcused delay on the part of parties seeking extraordinary injunctive relief is grounds for denial of a motion because such delay implies a lack of urgency and irreparable harm."  *Ixmation, Inc. v. Switch Bulb Co., Inc.*, No. 14-cv-6993, 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23, 2014) (quotation marks omitted).  This delay is even more significant when the movant has "knowledge of the pending nature of the alleged irreparable harm."  *Id.* (quotation marks omitted).

Plaintiff says he hopes to secure employment as a federal law enforcement official upon graduation and that the delay in his graduation created by his need to retake certain courses constitutes irreparable harm because he will be too old for such a position.  *See* Compl. ¶ 46 n.10 ("Federal law enforcement positions have a maximum starting age of 37 years old at hiring; [Plaintiff] intends to apply for a job with the Bureau of Alcohol, Tobacco, Firearms and Explosives ('AFT') [sic]."); *id.* ¶ 71 ("Chris knows that the graduation delays have and are diminishing his opportunities [to secure federal law enforcement employment] . . . .").  Plaintiff knew of the risk to his desired employment when he filed his complaint but waited nine more

16

months before requesting the Court take extraordinary action to remedy this harm. This counsels strongly against issuing Plaintiff's desired preliminary injunction. *See Ixmation*, 2014 WL 5420273, at *7. Even if Plaintiff had timely moved for this relief, he has not shown that he would otherwise qualify for his desired job if he graduated on time, and this harm is speculative at best. *See Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 846 & 846 n.3 (7th Cir. 2005) ("[I]nability to find another job, which [the plaintiff] has claimed, is not irreparable harm." (footnote omitted)).

Plaintiff's other arguments concerning irreparable harm are similarly unpersuasive. He argues that "[t]he limited compensation allowed by law would be seriously deficient compared to the harm the Plaintiff has suffered, and [would] not fully compensate him." Am. Mem. L. Supp. Pl.'s Am. Mot. Prelim. Inj. 19 n.44. Much of his harm is "emotional damages which tend to be disfavored under [the ADA and Rehabilitation Act]." *Id.* Plaintiff argues that any damages award at the end of the case would be "seriously deficient" compared to his harms in "lost time, money, & job opportunities; extra college & living expenses, & debt." *Id.* Plaintiff claims "he is unable to get a professional job without completing his degree program," and that he is so poor that he is "threatened with destitution before he may obtain his final remedy in court." Pl.'s Am. Mot. Prelim. Inj. 9 n.9

Most of the harms Plaintiff complains are irreparable are monetary harms. "An injury compensable in money is not 'irreparable', so an injunction is unavailable." *Classic Components Supply, Inc. v. Mitsubishi Elecs. Am., Inc.*, 841 F.2d 163, 164–65 (7th Cir. 1988). Plaintiff claims he meets the exceptions to this rule.

> There are four possible exceptions to this rule: (1) the plaintiff is so poor that he would be harmed in the interim by the loss of the monetary benefits; (2) the plaintiff would be unable to finance his lawsuit without the money he wishes to recover; (3) the damages would be unobtainable from the defendant because it will be insolvent

prior to the final judgment; and (4) the nature of the plaintiff's loss may make damages very difficult to calculate.

*Hamlyn v. Rock Island Cnty. Metro. Mass Transit Dist.*, 960 F. Supp. 160, 162 (C.D. Ill. 1997). Plaintiff focuses on (1), (2), and (4).

First, Plaintiff argues that WIU granting him a financial aid package when he was still enrolled at WIU demonstrates that he qualifies "as a low-income federal grant recipient." Pl.'s Am. Mot. Prelim. Inj. 9–10. Defendant points out that Plaintiff's claim of poverty is vague and notes that Plaintiff has not received a financial aid package from WIU since the Spring 2022 semester—nearly two years ago—but has not suffered any irreparable consequences. Defs.' Mem. L. Opp'n Pl.'s Am. Mot. Prelim. Inj. 10–11. The court in *Hamlyn* demanded a much more stringent standard of proof than what Plaintiff has mustered to satisfy the exception for irreparable poverty. 960 F. Supp. at 162. *Hamlyn* concerned the Metro Link Reduced Fare Program, and the court required proof from the plaintiff demonstrating:

> (1) The number of times per week or month that he would use the bus if he had received a reduced fare pass; (2) The amount of money saved on each bus trip by use of such a pass; (3) Plaintiff's income and worth (i.e. savings, checking) for the relevant period of time; and (4) Plaintiff's expenses for the relevant period of time.

*Id.* Plaintiff submitted a record of expenses charged to his student account—with entries ending in 2021—but no other documentary evidence about his finances. Western Illinois University History Snapshot Transaction Detail, Compl. Ex. 4, ECF No. 1-1 at 16–18. Plaintiff has not established that he is so impoverished that his monetary damages constitute irreparable harm.

Second, Plaintiff claims he is unable to fund his lawsuit without the return of "substantial monies owed to the Plaintiff by WIU due to its discriminatory actions, including the illegal $842.00 insurance surcharge." Pl.'s Am. Mot. Prelim. Inj. 10. Plaintiff's failure to provide any sort of comprehensive view of his finances undermines this claim. Further, Defendant counters

that although Plaintiff alleges that he cannot obtain his preferred professional employment,
Plaintiff does not claim that he is unable to work in general.  Defs.' Mem. L. Opp'n Pl.'s Am.
Mot, Prelim Inj. 10; *see also, e.g.*, Compl. ¶ 233 (stating that Plaintiff has extensive experience
"in bar and venue security, as an EMT [working] with combative psychiatric patients, and in
many other client-facing paid positions").  Plaintiff has not shown that he is incapable of funding
his lawsuit.

Finally, Plaintiff claims that his damages will be difficult to calculate, citing mental
health harms, emotional harms, lost income, increased expenses and debt, and ineligibility for
age-dependent federal jobs.  Pl.'s Am. Mot. Prelim. Inj. 10–11.  Plaintiff provides no reason to
conclude that his emotional and mental harms will be any more difficult to calculate than the
mine-run of tort causes of action which result in monetary judgments.  That Plaintiff's recovery
under the ADA may be insufficient does not dictate an inference that such recovery will be
uniquely difficult to calculate.  Plaintiff has failed to establish that monetary damages are
insufficient to address his harms and that he will suffer irreparable harm in the absence of
preliminary injunctive relief.

### 2.  Likelihood of Success on the Merits

Even if Plaintiff had shown that he would suffer irreparable harm without preliminary
injunctive relief, the Court finds that on this limited preliminary record he has not shown a
likelihood of success on the merits.  *See Bevis*, 85 F.4th at 1188.  Plaintiff only makes arguments
under this prong for Count I, regarding Defendants' denial of "a complete interactive process
resulting in reasonable accommodations," and Count II, regarding Defendants' use of
discriminatory criteria and methods of administration which either discriminate against Plaintiff
or deny Plaintiff meaningful access to WIU's degree program.  Pl.'s Am. Mot. Prelim. Inj. 1–2.

Defendants counter that Plaintiff was offered reasonable accommodations—just not his preferred accommodations—and that any breakdown in the interactive process was the fault of Plaintiff. Defs.' Mem. L. Opp'n Pl.'s Mot. Prelim. Inj. 5–7, ECF No. 25.

### a.   Count I: Interactive Process for Reasonable Accommodations

Both the ADA and Rehabilitation Act prohibit discrimination on the basis of disability. "Under Title II of the ADA, 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *H.P. v. Naperville Cmty. Unit Sch. Dist. #203*, 910 F.3d 957, 960 (7th Cir. 2018) (quoting 42 U.S.C. § 12132).  Similarly, section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Given the similarities between the statutes, [courts within the Seventh Circuit] apply the same analysis to a plaintiff's claim under either one." *H.P.*, 910 F.3d at 960.  Defendants admit that WIU is a covered entity under the ADA and Rehabilitation Act.  *See* Defs.' Answer ¶ 75, ECF No. 18; 42 U.S.C. § 12131(1)(B); 29 U.S.C. § 794(b).

"In the higher education context, a plaintiff alleging failure to accommodate . . . must establish that (1) she is a qualified individual with a disability; (2) the defendant was aware of her disability; and (3) the defendant failed to reasonably accommodate her disability." *Carlson v. Carroll Univ.*, No. 09-C-551, 2011 WL 5921445, at *8 (E.D. Wis. Nov. 28, 2011) (identifying this standard for section 504 claims); *see also Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 31 (1st Cir. 2019) (applying the same inquiry to an employment claim under the ADA); *accord Khan v.*

*Midwestern Univ.*, 879 F.3d 838, 843 (7th Cir. 2018), *as amended on denial of reh'g* (Feb. 26, 2018). The Court addresses each prong in turn.

First, Defendants do not contest that Plaintiff is likely "disabled" as that term is used in the ADA and Rehabilitation Act. The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff's allegations cover the waterfront, pointing to facts which would qualify under each part of section 12102(1). *See, e.g.*, Compl. ¶¶ 47–51. Plaintiff has preliminarily shown that he is disabled for purposes of the ADA and Rehabilitation Act.

Second, Plaintiff's grades demonstrate that he may be an "otherwise qualified individual," but his outstanding debts complicate that conclusion. "In the context of postsecondary education, a disabled person is qualified if he shows that he 'meets the academic and technical standards requisite to admission or participation in the [school's] education program or activity.'" *Class v. Towson Univ.*, 806 F.3d 236, 246 (4th Cir. 2015) (quoting 45 C.F.R. § 84.3(l)(3)); *accord Khan*, 879 F.3d at 844. "The term 'technical standards' refers to *all* nonacademic admissions criteria that are essential to participation in the program in question. And a nonacademic eligibility criterion is essential if it bear[s] more than a marginal relationship to the [program] at issue." *Class*, 806 F.3d at 246 (alterations in original) (quotation marks omitted). Plaintiff has achieved many A's in classes at WIU, demonstrating that he can handle the academic rigor of his coursework when accommodated. *See* Compl. ¶¶ 299–303, 449–51; Official Academic Tr.; Decl. Chris Cesca 13–15; *Cf. Khan*, 879 F.3d at 847 (finding a student was not otherwise qualified because she failed her courses, both with and without accommodations). However, Plaintiff has not paid his debts to WIU, *see* Compl. ¶¶ 52–53, 67,

21

107–08, and the requirement that students pay required fees bears at least a marginal relationship to WIU's degree programs, *cf. Watson v. St. Luke Acad.*, No. 04 C 2472, 2005 WL 281227, at *3 (N.D. Ill. Feb. 2, 2005) ("[The plaintiff] is not otherwise qualified to attend the [school].  In fact, it is hard to imagine anyone being qualified to attend a private school who is unwilling to pay the tuition.").  Plaintiff has not made a strong showing on this element of his claim regarding the interactive process.

In any event, the main issue with Plaintiff's argument is whether Defendants failed to reasonably accommodate Plaintiff's disabilities.  Count I alleges that Defendants are liable because they failed to provide an interactive process for reasonable accommodations.  Compl. ¶¶ 516–25.  "[T]here is no independent cause of action for breakdown of the interactive process under the ADA."  *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 961 (7th Cir. 2021).  However, a breakdown of the interactive process "is actionable if it prevents identification of an appropriate accommodation for a qualified individual."  *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014) (quotation marks omitted).  The Court construes Count I as alleging a failure to accommodate claim arising from Defendants' failure to engage in the interactive process to identify an appropriate accommodation for Plaintiff.

A student initiates the reasonable accommodation process by notifying his university of his disabilities.  *See id.* at 1061; *see also Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 190 (2d Cir. 2015) (extending principles of ADA interpretation from the employment to the educational context).  Disclosing the disability requires the university to "engage with the [student] in an interactive process to determine the appropriate accommodation under the circumstances."  *Spurling*, 739 F.3d at 1061 (quotation marks omitted).  Department of Justice guidance states that a public entity's "decision that a particular aid or service would result

22

in an undue burden must be made by a high level official, no lower than a Department head, and must include a written statement of the reasons for reaching that conclusion." Compl. ¶ 143 n.24 (quoting *ADA Requirements: Effective Communication*, U.S. Department of Justice Civil Rights Division, https://www.ada.gov/resources/effective-communication/ (last updated Feb. 28, 2020)).[5] Where the parties pursued the interactive process, but it eventually broke down, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Courts should look to "signs of failure to participate in good faith," obstruction or delay, failure to communicate, or withholding of information within one party's sole control. *Id.* at 1135–36. "The determination must be made in light of the circumstances surrounding a given case." *Id.* at 1136.

The Court finds that Plaintiff has not sufficiently shown that any breakdown or denial of the interactive process was so clearly WIU's fault as to justify a "strong" showing of likely success on the merits of Count I. *See id.* at 1135–36; *Bevis*, 85 F.4th at 1188. WIU's procedure for engaging in the interactive process required by the ADA is to direct students with disabilities to SDSC. *See* Compl. ¶ 110 n.17 ("[T]he SDSC is the campus department designated by the University to work with students through an interactive process to determine disability and hear requests for reasonable accommodations." (emphasis omitted) (quoting *Disability Resources Overview*, Western Illinois University, https://www.wiu.edu/student_success/ disability_resources (last visited Jan. 11, 2024))). Plaintiff asserts that SDSC's "promoted role

---

[5] The Court assumes without deciding that Plaintiff is correct in stating that this policy statement deserves deference. *See* Am. Mem. L. Supp. Pl.'s Am. Mot. Prelim. Inj. 15 n.29 ("DOJ's interpretation of its regulations gets substantial deference." (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984), *and Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 (1999)). But the Court also notes that Plaintiff fails to undergo the required inquiry under *Chevron* regarding statutory ambiguity and that Plaintiff's cited source should mostly likely be analyzed under *United States v. Mead Corp.*, 533 U.S. 218 (2001), not *Chevron*. *See Brumfield v. City of Chicago*, 735 F.3d 619, 625–26 (7th Cir. 2013) (articulating the inquiry under *Chevron* and denying *Chevron* deference to DOJ's interpretation of the ADA because the relevant statutory provision was not ambiguous).

of handling accommodation requests of disabled students broadly exceeds its actual function"

and that it "has not provided proper interactive process because it too does not state clear reasons

for denying or reducing [reasonable accommodation] requests," *id.* ¶ 110 (footnote omitted).

Plaintiff argues that WIU officials did not "attempt to dissuade [Plaintiff] from making requests

outside of [DRC/SDSC] to those Instructors & other WIU officials," but does not explain why

his refusal to pursue established procedures absolves him from responsibility for breakdowns in

the process. *See* Decl. Chris Cesca 8. Instead, the Court finds that Plaintiff has not sufficiently

shown that he may opt out of Defendants' established procedures for accommodating its

students. *Cf. Edwards v. U.S. E.P.A.*, 456 F. Supp. 2d 72, 103 (D.D.C. 2006) (interpreting the

Rehabilitation Act and finding that "[t]he conclusion that an employee's oral request cannot

trump an employer's established procedure for requesting and approving disability

accommodations is supported by practical and persuasive policy justifications").

Defendants were willing to continue to discuss accommodations with Plaintiff. *See*

*E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 806 (7th Cir. 2005). WIU agents, up to and

including WIU's President met with Plaintiff to discuss his concerns.[6] *E.g.*, May 6, 2021 Video

Recording of Meeting with Plaintiff, Pl.'s Am. Mot. Prelim. Inj. Ex. 38, on file with the Court.

Regarding Plaintiff's request that he able to retake certain courses at no additional cost and with

his preferred accommodations, Dr. Huang requested that Plaintiff follow established

---

[6] The Court notes there are serious concerns with enjoining persons in their individual capacities under the ADA and Rehabilitation Act. *See Brewer v. Wis. Bd. of Bar Examiners*, 270 F. App'x 418, 421 (7th Cir. 2008) ("[The plaintiff's] ADA claims against individual defendants in their individual capacity must fail because the Act authorizes suits only against public entities."); *Silk v. City of Chicago*, 194 F.3d 788, 797 n.5 (7th Cir. 1999) ("Such a claim, in any event, would fail, for the ADA provides only for employer, not individual, liability. Our case law is clear that a supervisor cannot be held liable in his individual capacity under the ADA or under Title VII."). This issue will be addressed in a forthcoming order on Defendants' pending motion to dismiss. *Compare* Defs.' Mem. Supp. Partial Mot. Dismiss Pl.'s Compl. 7, ECF No. 15 (arguing claims against Defendants in their individual capacities must be dismissed), *with* Pl.'s Mem. Opp'n Defs.' Partial Mot. Dismiss Pl.'s Compl. 7–14, ECF No. 17 (arguing sufficient individual conduct by Defendants to justify an individual-capacity suit under *Ex parte Young*, 209 U.S. 123 (1908)). The Court need not resolve this issue now, as it finds injunctive relief inappropriate.

procedures—filing an appeal via CAGAS—for appealing grade decisions.  June 7, 2021 Email from Guiyou Huang to Chris Cesca 36 ("The first step in the process is the appeal to CAGAS.  If you do not take this step, we can go no further in our attempts to resolve this issue.").  Plaintiff does not show that he took this step.  Instead, he cites the inapposite remedies section of Title III of the ADA to argue that he is not "required to follow futile gestures to obtain accommodations through DRC/SDSC or by filing grade appeals with WIU's 'CAGAS' committee or by other internal appeal procedures."  Pl.'s Am. Mot. Prelim. Inj. 7 (citing 42 U.S.C. § 12188(a)(1) ("Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered *by this subchapter* does not intend to comply with its provisions." (emphasis added))); *see also Ramos v. Uber Techs., Inc.*, No. SA-14-CA-502-XR, 2015 WL 758087, at *7 (W.D. Tex. Feb. 20, 2015) (explaining the "futile gestures" exception for Title III claims, not Title II).  The Court is not aware of any similar provision in Title II.

The Court finds that Plaintiff frequently engaged in the interactive process of requesting accommodations directly from WIU agents in an often hostile and abrasive manner, constituting a lack of good faith.  *See Beck*, 75 F.3d at 1135–36; Defs.' Mem. L. Opp'n Pl.'s Am. Mot. Prelim. Inj. 6–7.  For example, Plaintiff received an apology from an WIU employee regarding an incident where Plaintiff was wrongfully excluded from a university library because he was accompanied by his service animal, but the email referred to the wrong date in describing the incident.  Oct. 10, 2019 Email from Michael Lorenzen to Chris Cesca and Martin Abraham 42, Compl. Ex. 21, ECF No. 1-2 at 42–43.  Plaintiff described the employee's mistake as the result of either apathy or "errant incompetence" and Plaintiff criticized the employee's email generally as "lazy" and "lackadaisical."  Oct. 11, 2019 Email from Chris Cesca to Michael Lorenzen 43,

Compl. Ex. 21, ECF No. 1-2 at 42–43; *see also id.* at 42–43 ("[I]t is unconscionable to me how an ostensibly highly educated individual, in the position of *DEAN*, such as yourself, could make such a clear error as misrepresenting the actual date of the incident to which I was subjected."). Plaintiff's emails to LEJA faculty were often sarcastic and demeaning. *See, e.g.*, Aug. 24, 2021 Email from Chris Cesca to Patricia Walton 51, Compl. Ex. 24, ECF No. 1-2 at 46–54 ("[D]espite what your ostensibly illustrious career or other nebulous acumen may otherwise compel you to believe, neither you, nor any of your colleagues, are beyond reproach . . . .").

Plaintiff sometimes does not extend to WIU agents the same respect he expects from them. *Compare* Sept. 28, 2019 Email from Chris Cesca to Sarah Worthington 38, Compl. Ex. 20, ECF No. 1-2 at 38–39 ("It had been my hope that Mr. Endres would have noticed this identification, but I may have been foolish to assume that he, a librarian, would know how to read."), with *Compl.* ¶¶ 468–69 (describing how Plaintiff was "outraged and hurt" when he heard that someone questioned whether he could read). Plaintiff demands that others recognize and respect "disabilities of all kinds . . . and not solely those that are readily apparent or obvious," Meeting with WIU President Dr. Martin Abraham: Opening Thoughts 3, but doubts whether others are really allergic to his service animal, Decl. Chris Cesca 18 ("Notably, Angie LaFrance had warned me to not sit in the front row of Chairperson Myers classes due to some purported allergy to dogs . . . . I carefully looked for some sign of an allergic reaction, but Myers never showed any so I remained in the front row during her class."). The Court concludes that Plaintiff has not shown a "strong" likelihood of success in his claim that Defendants—and not himself—are to blame for the failure of the interactive process.

### b.  Count II: Discriminatory Criteria and Methods

The Court finds that Plaintiff has not shown a sufficient chance of success with respect to Count II, despite the lack of evidence that Defendants gave considered reasons for denying Plaintiff's requests for certain accommodations.  This showing is insufficient to justify injunctive relief.  *See Bevis*, 85 F.4th at 1188 (requiring the movant "make a 'strong' showing that reveals how it proposes to prove its case").  Of the seventeen types of discriminatory criteria and methods of administration that Plaintiff points to in his declaration, Decl. Chris Cesca 16, Plaintiff only makes arguments with respect to two in his memorandum of law: (1) systematic nonenforcement of the Misuse of Electronic Devices Policy, and (2) denial of Plaintiff's request for verbal alerts.  The Court addresses these two allegedly discriminatory criteria and methods.

The Court finds Plaintiff's argument regarding the systematic nonenforcement of the Misuse of Electronic Devices Policy to be totally inscrutable, unsupported by the authorities which it cites, and deems it to be waived.  *See Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022) ("[P]erfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority are waived.").  At a high level, Plaintiff posits that the systemic nonenforcement of the Misuse of Electronic Devices Policy constitutes a "discriminatory administrative method," but his citations do not support this position.  Am. Mem. L. Supp. Pl.'s Am. Mot. Prelim. Inj. 17 & 17 n.37.  Plaintiff cites a state-law case about a high school board's promulgation of disciplinary procedures, a federal case about child support obligations and 42 U.S.C. § 1983 claims, and generally applicable ADA and Rehabilitation Act regulations to reach the wholly unsupported conclusion that "[f]ailure to enforce policy violates Illinois law, & as accommodation denial & discriminatory method, violates Title II & 504."  Am. Mem. L. Supp. Pl.'s Am. Mot. Prelim. Inj. 17 n.37.  Plaintiff does not connect these non-

27

sequiturs to his likely success on Count II—alleging that WIU uses discriminatory criteria and methods of administration—and the Court will not make Plaintiff's arguments on his behalf.

Plaintiff next argues that the systematic denial of his requests for verbal alerts was a discriminatory method of administration, resulting in a failure to provide accommodations in the form of "auxiliary aids & services." *Id.* at 18–19;[7] *see also id.* at 15–16 (arguing that WIU's inaccessible websites adds to the reasonableness of Plaintiff's request for verbal alerts). It is unclear how Plaintiff distinguishes this discriminatory method of administration claim from a typical failure to accommodate claim, and the Court considers whether Plaintiff has shown that Defendants inadequately considered his request for accommodation.[8] Plaintiff argues that other professors and instructors granted him certain accommodations, suggesting that those accommodations are therefore reasonable. *See* Compl. ¶¶ 72, 143, 430, 436, 483–84.

If a student can show "the existence of some accommodation that would allow the plaintiff to meet the essential requirements of the service, program, or activity at issue," it falls upon "the defendant educational-institution to persuade the fact-finder that the proposed accommodation is unreasonable." *Dean*, 804 F.3d at 190. "An institution's past decision to

---

[7] 45 C.F.R. § 605.44(d)(2) defines auxiliary aids:

> Auxiliary aids may include taped texts, interpreters or other effective methods of making orally delivered materials available to students with hearing impairments, readers in libraries for students with visual impairments, classroom equipment adapted for use by students with manual impairments, and other similar services and actions. Recipients need not provide attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature.

[8] The Court notes that Plaintiff makes passing references to cases like *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 (1999), to argue that the denial of verbal alerts is equivalent to unjust institutionalization and segregation of those with disabilities. Am. Mem. L. Supp. Pl.'s Am. Mot. Prelim. Inj. 18 n.40. Setting aside the difference between institutional care and university classes, even *Olmstead* recognized that state officials "could resist modifications that would fundamentally alter the nature of the service, program, or activity." *Olmstead*, 527 U.S. at 597. At bottom, the inquiry is still whether verbal alerts were a reasonable accommodation and whether Defendants adequately considered that request for accommodation. *See* Am. Mem. L. Supp. Pl.'s Am. Mot. Prelim. Inj. 19 n.43 ("These repeated failures [to provide verbal alerts] constituted denials of the interactive process & reasonable accommodation requirements under Title II & 504.").

make a concession to a disabled individual does not obligate it to continue to grant that accommodation in the future, nor does it render the accommodation reasonable as a matter of law." *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 820 (9th Cir. 1999), *as amended* (Nov. 19, 1999).  But those past decisions are "persuasive evidence from which a [fact-finder] could conclude that the accommodation was reasonable." *Id.*

Defendants may show an accommodation is unreasonable by "establishing that the requested accommodation would (a) impose undue hardship on the operation of the defendant's service, program, or activity, or (b) require a fundamental or substantial modification to the nature of its academic program or standards." *Dean*, 804 F.3d at 190.  A university may not reject an appropriate accommodation "without offering other suggestions or at least expressing a willingness to continue discussing possible accommodations." *Sears*, 417 F.3d at 806.  A university should "explain[] why the requests have been rejected or offer[] alternatives." *Id.*

The Court takes judicial notice of WIU's stated policy regarding accommodations.  WIU lists categories of accommodations which it generally considers to be unreasonable, such as accommodations which "[are] of a personal service in nature (personal aid, study coach, individually paid tutor, etc.)" or which "cause undue financial or administrative hardship (college-wide).  *Reasonable and Typical Accommodations*, Western Illinois University, https://www.wiu.edu/student_success/disability_resources/reasonableAndTypicalAccommodatio ns.php (last visited Jan. 11, 2024).  WIU also states that "[a]ccommodation requests that appear reasonable and logically based on the diagnosis but fall under one of the categories listed above will often be denied." *Id.*  Plaintiff's preferred accommodation of verbal alerts appears to fall squarely within those categories.   Requiring every WIU agent or extracurricular officer to tell Plaintiff of "important" information via face-to-face communication, video chats, phone calls,

and emails could either impose a tremendous administrative hardship on WIU or substantially alter the nature of WIU's academic programs.  The willingness of some professors to remind him of some deadlines does not establish as a matter of law that verbal alerts are a reasonable accommodation.  *See Wong*, 192 F.3d at 820.

On this limited record, Defendants have not yet shown that WIU adequately considered and rejected Plaintiff's request for verbal alerts.  Defendants have yet to show that WIU's decisionmakers contemporaneously considered and relied upon WIU's stated reasonable accommodation policy—or the reasonableness of the request generally—in denying Plaintiff's request for accommodations as unreasonable.  Given WIU's stated policy regarding accommodations, such a showing seems likely.  *See* 34 C.F.R. § 104.44(d)(2) (stating covered entities need not provide "services of a personal nature" as auxiliary aids).  A showing by Plaintiff that his request for accommodation via verbal alerts had previously been adopted by some of his professors and instructors would suggest that verbal alerts was a reasonable accommodation.  *See Wong*, 192 F.3d at 820.  The burden would then shift to Defendants to demonstrate that the accommodation was unreasonable.  *See Dean*, 804 F.3d at 190.

But Plaintiff has not made a sufficient showing that some of his professors and instructors accepted his request for accommodation via verbal alerts to justify finding that Plaintiff has shown a chance for success on the merits under Count II.  Plaintiff has alleged that other professors and instructors were willing to comply with his requested accommodation of verbal alerts but has only shown evidence that those professors and instructors were sometimes willing to use communication methods aside from email with Plaintiff.  *E.g.*, Compl. ¶¶ 165–66 (alleging that Professor Kevin Bacon gave Plaintiff a verbal reminder of a requirement); Mar. 30, 2020 Email from Phillip Entzminger to Chris Cesca 22 (showing that Plaintiff had previously

requested verbal alerts from Professor Entzminger and that Professor Entzminger was willing to video conference with Plaintiff regarding a quiz deadline after LEJA proscribed phone calls with students).  But Plaintiff points to no evidence that any professor or instructor consistently gave him a phone call before an impending deadline or any other sort of verbal alert.  Compliance with Plaintiff's request for verbal alerts would also require a subsequent email for record keeping purposes.  *See, e.g.*, Compl. ¶ 129 ("[Plaintiff] has specifically and repeatedly requested verbal notice to [Plaintiff] of the faculty notifications of [reasonable accommodations], with emailed copies of the notifications provided, but only used as backup documentation . . . .").  This absence of evidence significantly undermines Plaintiff's claim that other professors have complied with his accommodation request of verbal alerts.  Accordingly, the Court concludes that Plaintiff has not shown a likelihood of success on Count II.

### 3.   Balance of the Equities and the Public Interest

Because the Court concludes that Plaintiff has not shown a likelihood of success on the merits and has not shown that he will be subject to irreparable harm, the Court need not balance the equities and consider the public interest—Plaintiff is not entitled to an injunction.  *See Grubhub*, 80 F.4th at 844 (describing likelihood of success on the merits and irreparable harm as threshold issues).

### B.  Special Master

The Court finds that appointment of a special master is unnecessary as the Court declines to issue an injunction and no compliance monitoring is needed.  Upon a future and appropriate motion, the Court may revisit this issue, should the calculation of damages or the monitoring of compliance with a permanent injunction become relevant.

**CONCLUSION**

Plaintiffs' [sic] Amended Motion for Preliminary Injunction, ECF No. 24, is DENIED.

Entered this 15th day of January, 2024.

s/ Sara Darrow

SARA DARROW
CHIEF UNITED STATES DISTRICT
JUDGE